**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS,**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LARRY McKINNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| ANTHONY PANICO, individually and as trustee | ) | |
| of the PANICO FAMILY TRUST, VINCENT | ) | JURY TRIAL DEMANDED |
| PALMIERI, PASQUALE PANICO, MICHAEL | ) | |
| PANICO, ACV PROPERTIES, LLC, | ) | |
| POST TIME SPORTS BAR AND GRILLE, LLC, | ) | |
| AP CAPITAL MANAGEMENT, LLC, | ) | |
| FPH MANAGEMENT, INC., FPH LLC, | ) | |
| PANICO PROPERTIES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Larry McKinney ("McKinney") complains against Defendants Anthony Panico, individually and as the trustee of the Panico Family Trust, Vincent Palmieri, Pasquale Panico, Michael Panico, ACV Properties, LLC, Post Time Sports Bar and Grille, LLC, AP Capital Management, LLC, FPH Management, Inc., FPH, LLC, and Panico Properties, LLC (collectively, "Defendants") as follows:

### NATURE OF THE ACTION

1.      This is an action for racketeering, fraud, aiding and abetting fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, civil conspiracy, unjust enrichment, fraudulent transfer, and for a declaratory judgment. The principal individual Defendants, Anthony Panico and Vincent Palmieri, and entities owned or controlled by them, directed a long-term unlawful scheme against Plaintiff Larry McKinney in which they fraudulently

1

induced him to invest over twenty million dollars in various development projects as an "owner" of those projects. They diverted that money and the proceeds of those investments into the Defendant corporate entities controlled by Panico, Palmieri, and Panico's sons, Pasquale and Michael, and into Panico's personal homes across the country and into the Panico Family Trust for the benefit of his children.

2.      Over the course of many years, Defendants Anthony Panico and Panico's long-time attorney, Vincent Palmieri, repeatedly and fraudulently induced McKinney to provide funds to Panico, his nominees, and entities Panico and Palmieri owned or controlled based on promises that McKinney would be an owner of the businesses which were the objects of these projects. Panico and Palmieri also fraudulently induced McKinney to provide funds based on the false representation that Panico was investing the same amount of funds as McKinney in these projects.

3.      As it turned out, Panico and Palmieri had no intention of partnering with McKinney or providing him his agreed-upon ownership interests in the business ventures. Instead, their only intentions were to use McKinney's money to fund the acquisition of these businesses for themselves and only themselves, or to otherwise misappropriate McKinney's funds to their own personal use.

4.      In doing so, Panico and Palmieri deliberately avoided providing McKinney with legitimate documentation of McKinney's investments, while misleading and lulling him by assuring him that he was a partner and owner of the businesses.

5.      McKinney has suffered damages of over twenty million dollars as a result of this misconduct and seeks compensatory damages, consequential damages, treble damages, punitive damages, an avoidance of certain fraudulent transfers, and a declaration that he is an owner of the projects and businesses in which he invested.

## PARTIES, JURISDICTION AND VENUE

6.     Plaintiff Larry McKinney is a citizen of South Carolina.

7.     Defendant Anthony Panico ("Panico") is a citizen of Illinois. On information and belief, Panico is also the trustee of the Panico Family Trust.

8.     Defendant Vincent Palmieri ("Palmieri") is a citizen of Illinois. Palmieri is a lawyer who was suspended from the practice of law for fraud.

9.     Defendant Pasquale Panico ("Pasquale") is a citizen of Illinois.

10.     Defendant Michael Panico ("Michael") is a citizen of Illinois.

11.     Defendant ACV Properties, LLC is an Illinois LLC whose managers and members, on information and belief, are Pasquale and Michael. It is therefore a citizen of Illinois.

12.     Defendant Post Time Sports Bar and Grille, LLC is an Illinois LLC whose managers and members, on information and belief, are Pasquale and Michael. It is therefore a citizen of Illinois.

13.     Defendant AP Capital Management, LLC is an Illinois LLC whose sole manager and member is Panico. It is therefore a citizen of Illinois.

14.     Defendant FPH Management Inc. is an Illinois corporation with its principal place of business in Libertyville, Illinois. It is a citizen of Illinois.

15.     Defendant FPH LLC is an Illinois LLC whose sole member, on information and belief, is FPH Management, Inc. It is a citizen of Illinois.

16.     Defendant Panico Properties, LLC is an Illinois LLC whose managers and members, on information and belief, are Pasquale and Michael. It is therefore a citizen of Illinois.

17.     The Panico Family Trust is, on information and belief, an Illinois trust benefiting defendant Anthony Panico and his children.

18.     The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 because Counts One, Two, and Three arise under the laws of the United States. This Court further has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a) because the action is exclusively between a citizen of South Carolina and citizens of Illinois and the amount in controversy exceeds $75,000, exclusive of interests and costs. The Court also has supplemental jurisdiction over the remaining counts pursuant to 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over the individual defendants, Panico, Palmieri, Pasquale, and Michael under 735 ILCS 5/2-209(b)(1), (2), and (4) and 735 ILCS 5/2-209(a)(1), (2), (3), (7), (10), (11); and over the corporate defendants, ACV Properties, LLC, Post Time Sports Bar and Grille, LLC, AP Capital Management, FPH LLC, FPH Management Inc., and Panico Properties, LLC under 735 ILCS 5/2-209(a)(1), (2), (3), (7), and (10).

20.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because the defendants reside in this District and a substantial part of the events and omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

21.     Larry McKinney is a successful businessman who founded Eldeco Inc., a Greenville, South Carolina-based company that designs and builds electrical systems for commercial, institutional, and industrial projects throughout the Southeast.

22.     In or around 2007, McKinney was introduced to Anthony Panico. McKinney met Panico through a mutual acquaintance, who would also later be taken advantage of by Panico.

23.     In or around 2007 Panico first raised the idea with McKinney of investing in certain projects with Panico. For the next twelve years, Panico, with the assistance of Palmieri, fraudulently induced McKinney to invest in certain projects based on agreements that McKinney and Panico would be equal owners in those projects and the businesses which were the objects of

those projects, with Palmieri owning a small share of most of the projects, and that Panico himself would invest the same amounts of his own funds in those projects. In fact, Panico invested little or nothing and diverted McKinney's money into entities owned by Panico, Palmieri, and Panico's sons, Defendants Pasquale and Michael Panico, to the Panico Family Trust, and to their own personal use.

24. Panico, during the same time period, spent over $23 million on homes, funding the Panico Family Trust, and on businesses of his own. On information and belief, almost all of those funds came from McKinney.

### *The Libertyville Shopping Center*

25. The first of these projects was a proposed shopping center in downtown Libertyville, Illinois at Route 137 and Milwaukee (the "Shopping Center project").

26. On a date near to but preceding August 10, 2007, Panico and Palmieri represented to McKinney that if McKinney invested $3 million in the Shopping Center project, Panico would put in the same amount, and they would each own 49.5% of the business, with Palmieri receiving a one percent ownership interest.

27. Based on Panico's and Palmieri's representations and the parties' agreement, McKinney invested in the Shopping Center project in exchange for becoming a 49.5% owner in the business. Accordingly, on August 10, 2007, McKinney wrote a check for $100,000 as his first investment payment. Panico instructed McKinney to make the check out to a nominee who then turned the funds over to Panico.

28. On December 17, 2007, McKinney made his second payment into the Shopping Center project, this one for $500,000, again, at Panico's direction to a nominee who then turned the funds over to Panico.

5

29.     Over the next two years of the project, pursuant to Panico's directions, McKinney made another $2,583,817 in payments into the Shopping Center project, with many of those payments being made to nominees at Panico's direction.

30.     On information and belief, contrary to his agreement with McKinney, Panico made no investments of his own into the Shopping Center project. Thus, a material fact that induced McKinney to make his $3 million investment in the project was false.

31.     Panico and Palmieri represented to McKinney that the money McKinney invested was being used to purchase the property on which the shopping center was to be built, to demolish the motel currently on the site, and to pay for architectural plans.

32.     After McKinney made over $3 million in investments in the Shopping Center project, Panico and Palmieri told McKinney that the supposed developer, Joseph Tremont, ran off with the money which McKinney had invested.

33.     On information and belief, this was not true, and Panico himself took at least a substantial portion of the money McKinney had provided him. Indeed, from 2007-2009, Panico deposited over $3.4 million into a bank account in the name of Defendant AP Capital Management, LLC. AP Capital Management is an LLC of which Panico is the sole manager.

34.     McKinney has never had any money from the Shopping Center project returned to him.

*Harley Davidson Building*

35.     When the Shopping Center project failed, Panico and Palmieri induced McKinney to invest in a number of other projects based on Panico and Palmieri's representations that McKinney was an owner in the businesses.

6

36.     One of those businesses was the development of a Harley Davidson building in Libertyville, Illinois (the "Harley project").

37.     On a date near to but preceding July 10, 2013, Panico and Palmieri represented to McKinney that if McKinney invested $3 million in the project, Panico would put in the same amount and they would each own 49.5% of the business, with Palmieri receiving one percent ownership interest.

38.     Based on Panico's representations and the parties' agreement, McKinney agreed to invest in the Harley project. Accordingly, on July 10, 2013, McKinney wrote his first check in the amount of $288,692 to a nominee per Panico's directions. The nominee then turned the funds over to Panico.

39.     Over the next year of the project, pursuant to Panico's directions, McKinney made another more than $2 million in payments into the Harley project.

40.     Contrary to his agreement with McKinney, Panico made no investments of his own into the Harley project. Thus, a material fact that induced McKinney into making his investments was false.

41.     Eventually, the Harley project did not go forward. McKinney, Panico, and Palmieri agreed that McKinney's investment in the Harley project would be "rolled over" into subsequent projects, including the Naples Garage project, the Polo Build to Suit project, and the Viking-Polo project as described below. However, McKinney never obtained any funds or interests in property from the supposed "roll over," and the promise of a roll over was merely part of the fraud and fraudulent concealment.

*The Naples Garage Project*

42.     The Premier Auto Suites of Naples project (the "Naples Garage project") was a planned development in Naples, Florida, the idea of which was to create a place where men could store their collectible cars and spend time with other car lovers. The project was to have approximately 140 "garage-condominiums." The project site was at the intersection of Radio and Livingston Roads in Naples and, when Panico first proposed the project, the site was owned by Lowe's Corporation ("Lowe's").

43.     On a date near to but preceding May 21, 2014, Panico and Palmieri represented to McKinney that if McKinney invested $6 million in the project, Panico would put in the same amount and they would each own 35% of the business. As to the remaining 30% ownership, Palmieri was to own 10% of it for being the project "administrator" and Mike Werchek ("Werchek") was to own the remaining 20% in exchange for developing the site.

44.     Accordingly, on May 21, 2014, per Panico and Palmieri's direction, McKinney made his initial investment in the Naples Garage project via a check for $2.1 million made out to AP Capital Management, LLC.

45.     On September 15, 2014, McKinney invested another $1,000,000 in the Naples Garage project through a check written to AP Capital per Panico's directions.

46.     Panico and Palmieri induced McKinney to make his investments by telling him that they made a deal with Lowe's to buy the property and that the partnership put in $500,000 of earnest money. Panico represented to McKinney that another $170,000 of money was spent on the project.

47.    Even though McKinney and Panico had agreed to contribute equal amounts to the project, all of the funds that were contributed for the project were contributed by McKinney. Thus, a material fact inducing McKinney to make his investments was false.

48.    The Naples Garage project did not go forward and Panico and Palmieri represented to McKinney that McKinney's investment in the Naples Garage project would be "rolled over" into subsequent projects, including the Polo Build to Suit project, the Viking Polo project, and the Post Time Sports Bar and Grille project. However, McKinney never received any funds or interests in property from the supposed "roll over," and the promise of a roll over was merely part of the fraud and fraudulent concealment.

### The Viking-Polo and Polo Build to Suit Projects

49.    At around the same time Panico and Palmieri induced McKinney to invest in the Naples Garage project, they also induced McKinney to invest in another two projects, the first a planned manufacturing building on the site of the terminated Harley project (the "Polo Build to Suit project"), and the second, a 20,000 square foot office-warehouse building and 75,000 square feet of mixed office and warehouse condominiums in Viking Park in Green Oaks, Illinois (the "Viking-Polo project").

50.    As to each project, Panico and Palmieri represented that McKinney would be a 50% owner with his investment, and that McKinney was in fact an owner in them.

51.    As to the Polo Build to Suit project, on a date near to but preceding September 16, 2014, Panico and Palmieri represented to McKinney that if McKinney invested in the project, Panico would put in the same amount of money and they would each own 50% of the business.

52.    Accordingly, on September 16, 2014, pursuant to Panico's instructions, McKinney wired $2,000,000

53.     Panico never invested his own funds as promised, nor was McKinney's investment in the Naples Garage project rolled over, and thus material facts that induced McKinney to make his investments in these projects were false.

54.     The Polo Build to Suit and the Viking Polo projects were both built and are successfully operating and generating significant profits.

55.     Unbeknownst to McKinney, however, the funds McKinney invested in these projects were transferred by Panico and Palmieri to ACV Properties LLC. Each of the individual parcels and condominiums is owned by ACV Properties LLC.

56.     McKinney is not documented as an owner, has not received profits from the business, and has never received the return of his principal investment.

57.     By November 21, 2014, McKinney had already invested the following sums with Panico and Palmieri: $3,783,817 for the Shopping Center, $2,265,267 for the Harley building, $2,100,000 for the Naples Garage project, $1,000,000 for the Viking Polo Project, and $2,000,000 for the Polo Build to Suit project for a total of $11,149,084. On that date, Panico and Palmieri provided a fraudulent document to McKinney that understated his capital contributions by $4 million.

58.     Panico and Palmieri directed McKinney to put still more money into the various projects in order to "perfect" his various ownership interests. Accordingly, at the direction of Panico and Palmieri, on April 6, 2015, McKinney wrote a check for $800,000 payable to AP Capital; a second check to AP Capital on April 6, 2015 for $1,250,000; a check for $177,000 payable to FPH LLC; and a payment of $276,125 on June 8, 2015 and a check for $134,108 in August 2015.

59.     Thus, by June 2015, McKinney had made $13,552,209 in total investments to the projects at Panico and Palmieri's direction.

*Post Time Sports Bar and Grille*

60.     Around the same time as the Viking Polo project began, Panico and Palmieri also planned to invest McKinney's money in Post Time Sports Bar and Grille, a sports bar with off-track betting and video gaming in Libertyville, Illinois ("Post Time").

61.     As with prior projects, Panico and Palmieri represented that with his investment, McKinney would be a 49.5% owner of the project.

62.     During the period August 2016 to May 2018, McKinney invested $3.9 million into the Post Time project.

63.     Panico directed McKinney to make his investment largely in checks payable to AP Capital.

64.     The Post Time project was built, but, as described below, McKinney's investment was transferred, unbeknownst to McKinney, into entities owned by Pasquale and Michael Panico. McKinney is not documented as an owner and has not received profits from the business, or a return of his principal.

65.     As that project went on, it became bigger and more expensive, and Panico and Palmieri repeatedly directed that McKinney put more money into it. Panico told McKinney that one of the problems with Post Time was that it was next to a synagogue and that a gaming facility like Post Time may not be within a certain distance of churches, synagogues, and other religious centers. Panico told McKinney that they needed to purchase the synagogue so that it would be relocated. At Panico's direction, McKinney put in the money to purchase the synagogue. On information and belief, McKinney put in all of the money spent to purchase the synagogue.

11

66. Post Time used the structure that formerly housed the synagogue as offices before it sold the structure in 2020. Though McKinney's investment was used to purchase the synagogue, he received none of the proceeds of its sale.

67. On information and belief, contrary to his agreement with Panico, McKinney has funded one-hundred percent of the Post Time project, and neither Panico nor Palmieri has invested any of their own money in it. Also contrary to his agreement with Panico and representations made by Panico and Palmieri, McKinney is not documented as an owner and has not received profits from the business or a return of his principal.

*Panico and Palmieri Induce McKinney to Invest in a Casino in Bimini*

68. While Panico and Palmieri were inducing McKinney to invest in these projects as an owner, they also sought money from McKinney on additional projects.

69. In or around early 2015, Panico and Palmieri induced McKinney to invest in a casino in the Bahamas attached to Resorts World Bimini (the "Bimini project").

70. At that time, Panico and Palmieri represented to McKinney that Panico had a twenty percent interest in the casino and that McKinney could "purchase" twenty percent of Panico's twenty percent for $2.8 million.

71. McKinney agreed to the offer and, in early 2015, pursuant to Panico's instructions, invested $2.8 million into the Bimini project.

72. After McKinney made the investment, Palmieri and McKinney traveled to the resort on May 16 to May 21, 2015. On that trip, Palmieri reiterated that with his investment, McKinney had purchased a portion of Panico's twenty percent interest in the casino.

73. On information and belief, Panico never had any interest in the casino and Panico and Palmieri simply deposited McKinney's money into the corporate Defendants controlled by them or Panico's sons.

*"OTB North"*

74. In or around 2018, Panico and Palmieri brought another supposed investment opportunity to McKinney, for another off-track betting facility (the "OTB North"). Panico told McKinney that the OTB North's facility was "north of Libertyville," had gone into foreclosure, was operating under some kind of receivership, and that they could obtain it for $600,000 and lease it out to the current operator.

75. On a date near to but preceding May 30, 2018, Panico and Palmieri represented to McKinney that if McKinney invested $300,000 in the OTB North, Panico would put in the same amount into the project and they would each own 49.5% of the business, with the remaining 1% going to Palmieri.

76. Accordingly, on May 30, 2018, pursuant to Panico's instructions, McKinney wrote a check for $300,000 to the bank account of AP Capital.

77. On information and belief, there was no OTB North facility at all, and Panico and Palmieri simply pocketed the money.

*Thorntons Gas Station*

78. At about the same time, Panico and Palmieri also induced McKinney to invest in a parcel of land in Libertyville, Illinois which they said they would develop into a site for a gas station that Thorntons would purchase from them (the "Thorntons project").

79. On a date near to but preceding June 20, 2018, Panico and Palmieri represented to McKinney that if McKinney invested $650,000 in the Thorntons project, Panico would put in the

same amount into the project and they would each own 49.5% of the business, with the remaining 1% going to Palmieri.

80.     Accordingly, on June 20, 2018, pursuant to Panico's instructions, McKinney wrote a check for $400,000 to the bank account of AP Capital, and on August 17, 2018, McKinney wrote a second check for $250,000 to AP Capital for his ownership share in the Thorntons project.

81.     After McKinney made his investment, Panico and Palmieri told McKinney that because the lot did not have enough square footage for Thorntons and because it bordered wetlands, the project was not viable and it was terminated.

82.     On information and belief, the parcel is still owned by a company controlled by Panico, Palmieri, or Panico's sons.

*Defendants Put Ownership of the Projects in Their Own Names and Panico Used McKinney's Investment to Buy Homes for Himself and Fund Family Trust Funds*

83.     Contrary to their representations to McKinney about his ownership in the projects, Panico and Palmieri instead transferred his funds to LLCs held in the name of Panico and Panico's sons, Pasquale and Michael, and used his investment funds for personal use.

84.     The Polo Build to Suit project, the Viking-Polo project, and the Post Time project were all built, are operational, and are generating significant profits, but ownership is held by certain of the corporate Defendants controlled by Panico and owned by Panico's sons. McKinney has received almost none of his principal back and is not receiving profits from the businesses.

85.     The Viking-Polo project is, according to property tax records, owned by ACV Properties, LLC, which is an LLC managed by Pasquale and Michael.

86.     The Build to Suit project is, according to property tax records, also owned by ACV Properties, LLC.

87.     The Post Time Sports Bar and Grille is an LLC managed by Pasquale and Michael and the land on which Post Time Sports Bar and Grille sits is owned by a land trust that has a mailing address of Panico Properties, LLC, which is also managed by Pasquale and Michael.

88.     The former synagogue next to Post Time, purchased as part of the Post Time project, was owned by ACV Properties until it was sold in 2020. Defendants did not provide any proceeds of the sale to McKinney, whose money funded the purchase of the synagogue.

89.     In total, from 2008-2018, McKinney invested over $20 million in the projects.

90.     During that same time period, Panico spent over $20 million on personal expenses, including on a condo in Irvine, California, a condo in Elmwood Park, Illinois, two condos in Naples, Florida, a lake house in Genoa City, Wisconsin, a condo in New York City, a condo and another residence in Chicago, and funding for his LLCs held in his and his family members' names, including AP Capital Management, FPH, ACV Properties, Panico Properties, and Post Time.

91.     Panico also used that money to fund five trust accounts for his children.

92.     On information and belief, almost all of this money came from McKinney's investments.

### *Defendants Fraudulently Concealed their Malfeasance*

93.     While Panico and Palmieri were moving funds and the ownership of projects and land into the names of entities controlled by Panico and his sons and while Panico was spending McKinney's money on himself, Panico and Palmieri were also taking action to keep McKinney in the dark about what they were doing.

94.     Panico and Palmieri deliberately avoided providing McKinney with legitimate documentation of McKinney's investments and did not tell him that the projects were actually held in the names of certain corporate Defendants.

95.     Part of the scheme to conceal the fraud involved creation of a phony partnership they called FDS. (*See* Ex. 1.) FDS stands for *"Fratelli di Sangue,"* which, according to the document, translates from Italian to "Blood Brothers." Panico and Palmieri came up with the name to convince McKinney that he was their "blood brother" and to ensure that he would not be concerned about his investments. The purpose of the document, besides to document the agreements of the parties, was to convince McKinney that his interests in the various investments were recognized and legitimate.

96.     While they provided McKinney with the FDS Partners document, they did not register FDS Partners with the secretary of state of any state.

97.     Panico and Palmieri also repeatedly told McKinney that he was a partner and owner in the various projects and that his investment was being put to the use to which Panico and Palmieri said it was, while concealing that ownership was held in the names of certain corporate Defendants in which McKinney held no interest.

98.     Panico and Palmieri also repeatedly invited McKinney to visit the sites of the projects where they arranged to have him treated as an owner by, among other things, permitting him full access to the facilities. McKinney, for example, visited Post Time many times, and had full access to the facilities and even, until recently, had an app on his phone on which he could view the security cameras there.

99.     Likewise, while Post Time was still under construction, Palmieri emailed McKinney photos of the project in process on at least September 9, 2016 and April 14, 2017, treating him as an owner and partner in the business while concealing that ownership was held in the names of certain corporate Defendants in which McKinney held no interest.

100.    In 2016 and 2017, Palmieri sent McKinney several P&Ls for the Viking-Polo and Post Time project that included "upcoming capital expenses," which McKinney would be directed to pay. Later, Panico, Palmieri, and their associates avoided sending McKinney P&Ls and other financials for the projects to keep him in the dark about ownership and profits.

101.    In 2017 and 2018, McKinney repeatedly requested financial statements for the projects from Panico and Palmieri, who would give McKinney excuses as to why they could not be provided. McKinney told them that all they had to do was have Kim Rothman, an assistant of Panico's, hit a button in QuickBooks and the financials would be created, but still Panico and Palmieri, and even Rothman herself, would give excuses as to why that could not be done.

102.    In or around April of 2017, McKinney told Panico that because they did not have an LLC reflecting ownership in the entities and projects, he wanted an LLC created. To that end, McKinney had Palmieri create the LLC paperwork. When McKinney presented the paperwork to Panico in McKinney's office in South Carolina, Panico ripped it up and said that he would create a "better" version of it.

103.    In April 2019, Panico had Palmieri present his "better version" to McKinney. However, this "better version" was a continuation of both the underlying fraud and an effort to conceal it. In it, instead of documenting that McKinney was the principal investor and an owner in each of the businesses, Panico falsely represented that McKinney owned nothing and had merely loaned funds to Panico to use as Panico "saw fit," including "benefiting" his own family's trusts. This was an intentional falsehood. Specifically, Panico said:

> The purpose of this letter is to memorialize our oral understanding concerning the amounts borrowed by AP Capital Management, Inc. from you over the past fifteen years. The amount owed to you by AP Capital, at this point in time, is approximately $_____. This amount was loaned to AP Capital by you with the understanding that AP Capital would invest this money as I saw fit and without any restriction on how the investments

> would be made. Repayments have been made in the past and I fully expect that the full amount borrowed will be repaid with interest when investments made with those funds mature. The Panico Family Trust, which has benefited from the investments made by AP Capital, is not in any way responsible or liable for the repayment of funds borrowed by AP Capital.

(*See* Ex. 2.)

104.    Palmieri told McKinney that Panico wanted McKinney to sign it. McKinney did not sign it as it did not reflect their agreements or Panico and Palmieri's many representations over the course of years about McKinney's investments. McKinney never provided Panico with authority to invest money as Panico "saw fit and without any restriction," nor to did he authorize Panico to use his money to fund his family's trust funds.

105.    McKinney left without signing the document and never saw Panico or Palmieri again.

106.    Sometime in approximately May 2018, federal law enforcement authorities began to investigate Panico both for tax evasion and for the various investments in which he was involved.

107.    In September 2018, during the criminal investigation of Panico, McKinney was made aware that Panico was misusing and misappropriating his investments.

108.    Panico has now been indicted and pled guilty to tax evasion.

109.    On August 10, 2021, Palmieri made a telephone call to McKinney, whom Palmieri knew was represented by counsel, to try to persuade him not to file a lawsuit, stating that Panico had "never failed him yet," that Panico was McKinney's "friend," and that McKinney simply needed to "stay the course." The purpose of this call was to continue to lull McKinney under false pretenses and avoid having to answer for their wrongdoing.

110.     On information and belief, Panico has obstructed counsel for McKinney's attempts to contact witnesses with information relevant to this complaint.

## COUNT ONE
### Racketeering in violation of 18 U.S.C.§ 1962(c)
### (Defendants Panico, individually and as trustee of the Panico Family Trust, and Palmieri)

111.     All prior paragraphs are realleged and incorporated herein.

112.     There existed at all relevant times an enterprise, as that term is defined in 18 U.S.C. § 1961(4), namely, an association-in-fact, which enterprise was comprised of defendants Panico, Palmieri, ACV Properties, LLC, AP Capital Management, LLC, FPH Management, Inc., FPH, LLC, and the Panico Family Trust, the activities of which affected interstate commerce. The enterprise had a regular hierarchy, leadership, organization, and decision-making. Its purpose was to engage in illegal conduct, fraud and money laundering. The enterprise is hereafter identified in this Complaint as the Panico Racketeering Enterprise.

113.     Defendants Panico and Palmieri, being associated with the enterprise, conducted and participated in the conduct of the affairs of the Panico Racketeering Enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5). The pattern of racketeering activity included the fraudulent schemes to obtain money and property from Larry McKinney in connection with the Libertyville Shopping Center project, the Harley Davidson building project, the Naples Garage Project, the Viking-Polo and Polo Build-to-Suit projects, the Post-Time project, the Bimini casino, the OTB North project, and the Thorntons project.

114.     The acts of racketeering occurred over a period of fourteen years. They included multiple acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956 and 1957), and interstate transportation in connection with a fraud scheme (18 U.S.C. § 2314).

115. <u>Mail fraud</u>. Between 2007 and the present, Defendants Panico and Palmieri devised and intended to devise and participated in a scheme to defraud McKinney of money and property and in furtherance of that scheme regularly caused to be sent or delivered by the Postal Service and private commercial carriers matters, including:

a. causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around November 14, 2013;

b. causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around August 25, 2014;

c. causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around October 15, 2014;

d. causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around May 26, 2015;

e. causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around December 7, 2015;

f. causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around March 16, 2016

g. causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around November 10, 2016;

h. causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around January 30, 2017;

i. causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around May 13, 2018;

j.   causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around August 28, 2018; and

k.   causing McKinney to mail a document memorializing certain investments in the projects by the Postal Service on or around September 26, 2018.

116.   <u>Wire fraud</u>. Between 2007 and the present Panico and Palmieri devised and intended to devise and participated in a scheme to defraud McKinney of money and property and in furtherance of that scheme regularly caused to be transmitted in interstate commerce certain writings, signs, signals, pictures and sounds that were intended to and did in fact contribute to the fraud, including:

a.   a $2,000,000 wire transfer from McKinney to AP Capital on September 16, 2014;

b.   email from Palmieri to McKinney regarding Bimini project on May 5, 2015;

c.   email from Palmieri to McKinney regarding earnest money paid to Lowes on June 16, 2016;

d.   email from Palmieri to McKinney regarding Viking-Polo project on August 8, 2016;

e.   email from Palmieri to McKinney regarding Viking-Polo project on August 15, 2016;

f.   email from Palmieri to McKinney regarding Post Time project on August 27, 2016;

g.   email from Palmieri to McKinney regarding Viking-Polo project on August 31, 2016;

h.   email from Palmieri to McKinney re: "Post Time Sports Bar & Grille" on September 9, 2016;

i.   email from Palmieri to McKinney regarding interstate travel on October 3, 2016;

j. email from Palmieri to McKinney regarding Post Time project on December 26, 2016;

k. email from Palmieri to McKinney regarding Post Time project on April 14, 2017;

l. email from Palmieri to McKinney regarding Post Time project on April 14, 2017;

m. email from Palmieri to McKinney regarding Bimini project on April 14, 2017; and

n. telephone call from Palmieri to McKinney on August 10, 2021.

117. <u>Money laundering (Section 1956)</u>. Between 2007 and the present Panico and Palmieri, knowing that the property involved in financial transactions for the projects represented the proceeds of some form of unlawful activity, namely, fraud in violation of Illinois law, conducted financial transactions which in fact involved the proceeds of specified unlawful activity, namely wire fraud, mail fraud and interstate transportation in connection with a fraud scheme, with intent to promote the carrying on of that specified unlawful activity, and with the intent to engage in conduct constituting violations of sections 7201 and 7206 of the Internal Revenue Code of 1986, and knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity, including:

a. check from McKinney cashed by Defendants' nominee payee shortly after March 12, 2013;

b. check from McKinney cashed by Defendants' nominee payee shortly after July 10, 2013;

c. McKinney investment in the Polo Build to Suit project transferred by Defendants to ACV Properties shortly after September 16, 2014;

d.   McKinney investment in the Viking Polo project transferred by Defendants to ACV Properties shortly after September 16, 2014;

e.   McKinney investment in the Bimini project cashed by AP Capital in or around early 2015;

f.   McKinney investment in the Post Time project transferred by Defendants to Post Time Sports Bar and Grille LLC and to Panico Properties, LLC in or around August 2016;

g.   McKinney further investment in the Post Time project transferred by Defendants to Post Time Sports Bar and Grille LLC in or around September 2017;

h.   McKinney further investment in the Post Time project transferred by Defendants to Post Time Sports Bar and Grille LLC in or around October 2017;

i.   McKinney further investment in the Post Time project transferred by Defendants to Post Time Sports Bar and Grille LLC in or around December 2017;

j.   McKinney further investment in the Post Time project transferred by Defendants to Post Time Sports Bar and Grille LLC in or around April 2018; and

k.   McKinney further investment in the Post Time project transferred by Defendants to Post Time Sports Bar and Grille LLC in or around May 2018.

118.   Money laundering (Section 1957).   Between 2007 and the present, Defendants Panico and Palmieri knowingly engaged in monetary transactions in criminally derived property of a value in excess of $10,000 and was derived from specified unlawful activity.

119.   Interstate transportation. Between 2007 and 2019, the Panico Racketeering Enterprise, having devised and intended to devise a scheme or artifice to defraud, and for obtaining money and property from Larry McKinney by means of false or fraudulent pretenses,

representations or promises, caused on multiple occasions Panico, Palmieri, and McKinney to travel in interstate commerce in the execution or concealment of the scheme, which scheme involved money or property having a value of more than $5,000. In addition, on information and belief, defendants Panico and Palmieri transported, transmitted and transferred in interstate commerce money and checks of a value of more than $5,000 knowing the same to have been converted and taken by fraud, including:

 a. Panico traveled from Illinois to South Carolina on May 5, 2013;

 b. caused McKinney to travel from South Carolina to Naples, Florida on June 21, 2013;

 c. caused McKinney to travel from South Carolina to Illinois on June 15, 2013;

 d. caused McKinney to travel from South Carolina to Naples, Florida on May 17, 2014;

 e. caused McKinney to travel from South Carolina to Naples, Florida on November 30, 2014;

 f. caused McKinney to travel from South Carolina to Naples, Florida and then to the Bahamas between May 15, 2015 and May 20, 2015;

 g. caused McKinney to travel from South Carolina to Illinois on November 12, 2015;

 h. caused McKinney to travel from South Carolina to Naples, Florida on April 7, 2016;

 i. caused McKinney to travel from South Carolina to Illinois on December 9, 2017;

 j. caused McKinney to travel from South Carolina to Illinois on February 12, 2018;

 k. caused McKinney to travel from South Carolina to Florida on June 10, 2019; and

 l. caused McKinney to travel from South Carolina to Illinois on September 9, 2019.

120.     Panico and Palmieri fraudulently concealed the racketeering acts as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

a.     For treble damages;

b.     For punitive damages;

c.     For attorneys' fees and costs;

d.     For such other relief as this Court deems just and proper.

## COUNT TWO
### Racketeering in violation of 18 U.S.C.§ 1962(a)
**(Defendants Panico, individually and as trustee of the Panico Family Trust, Palmieri, AP Capital Management, LLC, FPH LLC, FPH Management, Inc., ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC)**

121.     All prior paragraphs are realleged and incorporated herein.

122.     Defendants Panico, individually and as trustee of the Panico Family Trust, Palmieri, AP Capital Management, FPH LLC, FPH Management, Inc., ACV Properties, LLC, Post Time Sports Bar and Grille, LLC, and Panico Properties, LLC, having received income derived, directly and indirectly from the pattern of racketeering activity identified in Count One, used and invested, directly or indirectly, the proceeds of such income in acquisition of an interest in and the establishment and operation of an enterprise engaged in and the activities of which affect interstate commerce, including in the Polo Build to Suit project, the Viking-Polo project, the Post Time project and the Panico Family Trust.

123.    Panico and Palmieri fraudulently concealed the racketeering acts as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico, Palmieri, AP Capital Management, FPH, FPH Management, ACV Properties, Post Time Sports Bar and Grille, and Panico Properties as follows:

a.   For treble damages;

b.   For punitive damages;

c.   For attorneys' fees and costs;

d.   For such other relief as this Court deems just and proper.

### COUNT THREE
**Racketeering conspiracy in violation of 18 U.S.C. § 1962(d)**
**(Defendants Panico, individually and as trustee of the Panico Family Trust, Palmieri, AP Capital Management, LLC, FPH LLC, and FPH Management, Inc.)**

124.    All prior paragraphs are realleged and incorporated herein.

125.    Defendants Panico, individually and as trustee of the Panico Family Trust, Palmieri, AP Capital Management, LLC, FPH LLC, and FPH Management, Inc. being associated with the Panico Racketeering Enterprise, conspired to violate Section 1962(c), as described above.

126.    Each of the defendants agreed that some person would commit at least two acts of racketeering in furtherance of the conspiracy.

127.    Panico and Palmieri fraudulently concealed the racketeering acts as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico, Palmieri, AP Capital Management, LLC, FPH LLC and FPH Management, Inc. as follows:

    a.   For treble damages;

    b.   For punitive damages;

    c.   For attorneys' fees and costs;

    d.   For such other relief as this Court deems just and proper.

### COUNT FOUR
### Fraud
### (Panico and Palmieri)

128.    McKinney incorporates and re-alleges the foregoing allegations.

129.    Defendants Panico and Palmieri devised and executed a scheme to defraud McKinney. The purpose of that scheme was to obtain money and property that rightfully belonged to McKinney.

130.    As part of their scheme, Defendants knowingly and intentionally made countless false statements of fact to and omitted to provide or disclose information to McKinney regarding his business dealings with Defendants, including in statements made to McKinney regarding his ownership interest in the projects.

    a.   On a date near to but preceding August 10, 2007, Panico intentionally misrepresented to McKinney that if McKinney invested $3 million in the Shopping Center project, Panico would put in the same amount, and they would each own 49.5% of the business, with Palmieri receiving a 1% ownership interest in order to induce McKinney to make the investment.

b.  On a date near to but preceding May 21, 2014, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested $6 million in the Naples Garage project, Panico would put in the same amount and they would each own 35% of the business, with Palmieri receiving a 10% interest in order to induce McKinney to make the investment.

c.  On a date near to but preceding September 16, 2014, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested in the Polo Build to Suit and Viking-Polo project, Panico would put an equal amount into the project and they would each own 50% of the business in order to induce McKinney to make the investment.

d.  On November 21, 2014, Panico and Palmieri created the FDS Partners document, which intentionally misrepresented that ownership in the projects was held by the FDS Partners, while ownership was transferred to and held by certain corporate Defendants.

e.  On a date near November 21, 2014, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested $750,000 into the Post Time project, Panico would put in the same amount into the project and they would each own 49.5% of the business, with Palmieri receiving a 1% ownership interest of the business in order to induce McKinney to make the investment.

f.  On a date in early 2015, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested $2.8 into the Bimini project, he would own twenty percent of Panico's twenty percent share in the casino in order to induce McKinney to make the investment.

g.  On a date near to but preceding May 30, 2017, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested $300,000 into the Second OTB, Panico would put in the same amount into the project and they would each own 49.5% of the business, with Palmieri receiving a 1% ownership interest in the business in order to induce McKinney to make the investment.

h.  On a date near to but preceding June 20, 2018, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested $650,000 in the Thorntons project, Panico would put in the same amount into the project and they would each own 49.5% of the business, with Palmieri receiving a 1% ownership in the business in order to induce McKinney to make the investment.

i.  In April 2019, Panico intentionally misrepresented that McKinney owned nothing and had merely loaned funds to Panico to use as Panico "saw fit," including "benefiting" his own family's trusts.

131.   These statements were false and were part of a scheme to defraud McKinney.

132.   The facts misrepresented and those not disclosed were material.

133.   Those false statements and omissions were made with the intent to defraud and to falsely and fraudulently obtain and retain funds that rightfully belonged to McKinney.

134.   McKinney justifiably relied on the false statements and the absence of the information omitted and concealed.

135.   Panico and Palmieri fraudulently concealed the fraud by deliberately avoiding providing McKinney with legitimate documentation of McKinney's investments, repeatedly telling McKinney that he was a partner and owner in the various projects and that his investment was being put to the use to which Panico and Palmieri said it was and that he would see the

proceeds of his investments, creating the FDS Partners document to convince McKinney that his investments were recognized and legitimate, arranging visits to the sites of the projects where Panico and Palmieri told the employees there to treat McKinney like an owner, and by failing to provide financial statements on the projects when McKinney asked for them as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

136.    As a result of his justified reliance on the defendants' false statements and omissions, McKinney invested time and money in the projects and suffered damages.

137.    Defendants' acts or omissions were willful and wanton and were committed or omitted with conscious indifference to existing circumstances and conditions.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

a.  For compensatory damages in an amount to be proven at trial;

b.  For prejudgment interest;

c.  For a constructive trust over the assets owned by the corporate Defendants connected to the projects and the Panico Family Trust.

d.  For punitive damages; and

e.  For such other relief as this Court deems just and proper.

### COUNT FIVE
### Aiding and Abetting Fraud
### (Pasquale Panico, Michael Panico, ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC)

138.    McKinney incorporates and re-alleges the foregoing allegations.

139.    Panico and Palmieri devised and executed a scheme to defraud McKinney. The purpose of that scheme was to obtain money and property that rightfully belonged to McKinney

by diverting into entities owned and controlled by Panico, Palmieri, or Pasquale and Michael Panico.

140.    Pasquale and Michael Panico were aware of their role as part of the overall activity to divert McKinney's investments into LLCs controlled by Pasquale and Michael, including ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC at the time they provided substantial assistance.

141.    Pasquale and Michael Panico knowingly and substantially assisted Panico and Palmieri in diverting McKinney's investments into the entities controlled by Pasquale and Michael by facilitating the transfer of McKinney's investments and ownership of the Polo Build to Suit project, the Viking-Polo project, and the Post Time project into ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC. ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC knowingly and substantially assisted Panico and Palmieri in diverting McKinney's investments by accepting the funds, with knowledge that they were fraudulently induced and wrongfully diverted.

142.    Panico and Palmieri fraudulently concealed the fraud as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Pasquale Panico, Michael Panico, ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC as follows:

    a.    For compensatory damages in an amount to be proven at trial;

    b.    For prejudgment interest;

    c.    For a constructive trust over the assets owned by the corporate Defendants connected to the projects and the Panico Family Trust.

    d.    For such other relief as the Court deems just and appropriate.

## COUNT SIX
### Breach of Fiduciary Duty
### (Panico and Palmieri)

143.     McKinney incorporates and re-alleges the foregoing allegations.

144.     Panico and Palmieri owed a fiduciary duty to McKinney as a matter of law because McKinney was a partner of FDS Partners.

145.     Panico and Palmieri also owed a fiduciary duty to McKinney because McKinney was a partner in the broader partnership in fact that invested in the various projects.

146.     Palmieri also owed a fiduciary duty to McKinney because Palmieri represented that he was an attorney at law and was representing Panico, McKinney and the various entities.

147.     Panico and Palmieri also owed a fiduciary duty to McKinney due to the special circumstances of Panico, Palmieri, and McKinney's relationship. Panico and Palmieri had a significant degree of dominance and superiority over McKinney in that Panico and Palmieri controlled the finances of entities which controlled the various projects and determined the amount of money McKinney was required to pay into the projects. As a result, McKinney reposed trust and confidence in Panico and Palmieri to conduct themselves with the utmost honesty and fidelity for the benefit of McKinney's investment in the projects. This disparity in power was even greater because Panico and Palmieri did not allow McKinney access to the books and records of the entities controlling the projects.

148.     These fiduciary duties include the duty of care, the duty to act in good faith, the duty of loyalty, the duty of honesty, the duty of fairness in all dealings and transactions related to the partnership, and the duty to disclose all information relating to the fiduciary relationship.

149.     Panico and Palmieri knowingly and intentionally breached these duties to McKinney by conduct described in detail in Paragraphs 21-110, including but not limited to the following:

    a.  lying to McKinney and concealing relevant facts from him;

    b.  misappropriating the investments McKinney made in the projects;

    c.  concealing financial records from McKinney bearing on McKinney's interest in the projects;

    d.  withholding amounts due and owing to McKinney for his investment in the projects; and

    e.  failing to recognize, or keep corporate records of the entities controlling the projects showing, that McKinney was an investor, partner, and/or member of the entities.

150.    Panico and Palmieri's acts or omissions were willful and wanton and were committed or omitted with conscious indifference to existing circumstances and conditions.

151.    McKinney suffered damages proximately caused by these breaches in misappropriated investments and in his interest in the projects, including the real estate, facilities, and income.

152.    Panico and Palmieri fraudulently concealed the breaches of fiduciary duty as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

    a.  For compensatory damages in an amount to be proven at trial;

    b.  For prejudgment interest;

    c.  For a constructive trust over the assets owned by the corporate Defendants connected to the projects and the Panico Family Trust.

    d.  For punitive damages;

    e.  For an award to McKinney of his attorneys' fees;

f.   For such other relief as the Court deems just and appropriate.

**COUNT SEVEN**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Pasquale Panico, Michael Panico, ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC)**

153.   McKinney incorporates and re-alleges the foregoing allegations.

154.   Panico and Palmieri breached their fiduciary duties to McKinney which caused an injury for the reasons stated in Paragraphs 21-110 and 149, incorporated herein.

155.   Pasquale and Michael Panico were aware of their role as part of the overall activity to divert McKinney's investments into LLCs controlled by Pasquale and Michael, including ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC at the time they provided substantial assistance.

156.   Pasquale and Michael Panico knowingly and substantially assisted Panico and Palmieri in diverting McKinney's investments into the entities controlled by Pasquale and Michael by facilitating the transfer of McKinney's investments and ownership of the Polo Build to Suit project, the Viking-Polo project, and the Post Time project into ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC. ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC knowingly and substantially assisted Panico and Palmieri in diverting McKinney's investments by accepting the funds, with knowledge that they were fraudulently induced and wrongfully diverted.

157.   Panico and Palmieri fraudulently concealed the breaches of fiduciary duty as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Pasquale Panico, Michael Panico, ACV Properties, LLC, Post Time Sports Bar and Grille LLC, and Panico Properties LLC as follows:

a.  For compensatory damages in an amount to be proven at trial;

b.  For prejudgment interest;

c.  For a constructive trust over the assets owned by the corporate Defendants connected to the projects and the Panico Family Trust.

d.  For such other relief as the Court deems just and appropriate.

## COUNT EIGHT
### Breach of Oral Contract – The Shopping Center Project
### (Panico and Palmieri)

158.    McKinney incorporates and re-alleges the foregoing allegations.

159.    On a date near to but preceding August 10, 2007, McKinney entered into an oral contract with Panico and Palmieri to invest in the Shopping Center project.

160.    The key terms of the contract were that McKinney would invest $3 million into the Shopping Center project and, in exchange for that investment, become a 49.5% owner in it entitled to the profits of ownership; that Panico would invest the same amount; and that if the project failed to get off the ground, McKinney's investment would be returned to him or rolled over into subsequent projects to be owned by McKinney.

161.    McKinney performed on this contract by paying $3,083,817 into the Shopping Center project.

162.    Panico and Palmieri breached by not investing Panico's own money in the project, by not making McKinney an owner of the business, but instead by keeping ownership in the hands of the corporate Defendants controlled by Panico, Palmieri or Michael and Pasquale Panico, and by not returning his principal or by purporting to "roll it over" into subsequent projects where it was diverted into certain corporate Defendants controlled by Panico when the Shopping Center failed to get off the ground.

163.    As a direct and proximate result of Panico and Palmieri's breaches, McKinney has suffered damages in an amount to be proved at trial.

164.    Panico and Palmieri fraudulently concealed the breaches of contract as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

a.  For damages in an amount to be proven at trial;

b.  For prejudgment interest;

c.  For other relief this Court deems just and appropriate.

**COUNT NINE**
**Breach of Oral Contract – The Naples Garage Project**
**(Panico and Palmieri)**

165.    McKinney incorporates and re-alleges the foregoing allegations.

166.    On a date near to but preceding May 21, 2014, McKinney entered into an oral contract with Panico and Palmieri to invest in the Naples Garage project.

167.    The key terms of the contract were that McKinney would invest $6 million into the Shopping Center project and, in exchange for that investment, become a 35% owner of the business entitled to profits of ownership, with 35% going to Panico, 10% going to Palmieri, and 20% going to Mike Werchek; that Panico would invest the same amount; and that if the project failed to get off the ground, McKinney's investment would be returned to him or rolled over into subsequent projects to be owned by McKinney.

168.    McKinney performed on this contract by paying $6 million into the Naples Garage project.

169.     Panico and Palmieri breached by not investing Panico's own money in the project, by not making McKinney an owner of the business, but instead by keeping ownership in the hands of the corporate Defendants controlled by Panico, Palmieri or Michael and Pasquale Panico, and by not returning his principal or by purporting to "roll it over" into subsequent projects where it was diverted into certain corporate Defendants controlled by Panico when the Naples Garage project failed to get off the ground.

170.     As a direct and proximate result of Panico and Palmieri's breaches, McKinney has suffered damages in an amount to be proven at trial.

171.     Panico and Palmieri fraudulently concealed the breaches of contract as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

   a.   For damages in an amount to be proven at trial;

   b.   For prejudgment interest;

   c.   For other relief this Court deems just and appropriate.

## COUNT TEN
### Breach of Oral Contract – The Polo Build to Suit and Viking-Polo Projects
### (Panico and Palmieri)

172.     McKinney incorporates and re-alleges the foregoing allegations.

173.     McKinney entered into an oral contract with Panico and Palmieri to invest in the Polo Build to Suit and Viking-Polo projects on or around September 2014.

174.     The key terms of the contract were that McKinney would invest $6 million into the Polo Build to Suit and Viking-Polo projects and, in exchange for that investment, become a fifty-fifty owner in it with Panico, entitled to the profits of ownership; that Panico would invest the

same amount; and that if the project failed to get off the ground, McKinney's investment would be returned to him or rolled over into subsequent projects to be owned by McKinney.

175.     McKinney performed on this contract by paying $6,327,000 into the Polo Build to Suit and Viking Polo projects.

176.     Panico and Palmieri breached by not investing Panico's own money in the project, by not making McKinney an owner of the business, but instead by keeping ownership in the hands of the corporate Defendants controlled by Panico, Palmieri or Michael and Pasquale Panico, and by not providing McKinney with profits from the business.

177.     As a direct and proximate result of Panico and Palmieri's breaches, McKinney has suffered damages in an amount to be proved at trial.

178.     Panico and Palmieri fraudulently concealed the breach of contract as described in Paragraphs 93-110, preventing McKinney's discovery of the breach until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

        a.   For damages in an amount to be proven at trial;

        b.   For prejudgment interest;

        c.   For other relief this Court deems just and appropriate.

### COUNT ELEVEN
### Breach of Oral Contract – The Post Time Project
### (Panico and Palmieri)

179.     McKinney incorporates and re-alleges the foregoing allegations.

180.     McKinney entered into an oral contract with Panico to invest in the Post Time project in or around August 2016.

181.    The key terms of the contract were that McKinney would invest $750,000 into the Post Time project and, in exchange for that investment, become a 49.5% owner in it, entitled to the profits of ownership; that Panico would invest the same amount; and that if the project failed to get off the ground, McKinney's investment would be returned to him or rolled over into subsequent projects to be owned by McKinney.

182.    McKinney performed on this contract by paying over $3 million into the Post Time project.

183.    Panico and Palmieri breached by not investing Panico's money in the project, by not making McKinney an owner of the business, but instead by keeping ownership in the hands of the corporate Defendants, controlled by Panico, Palmieri or Michael and Pasquale Panico, and by not providing McKinney with profits from the business.

184.    As a direct and proximate result of Panico and Palmieri's breaches, McKinney has suffered damages in an amount to be proved at trial.

185.    Panico and Palmieri fraudulently concealed the breach of contract as described in Paragraphs 93-110, preventing McKinney's discovery of the breach until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

        a.   For damages in an amount to be proven at trial;

        b.   For prejudgment interest;

        c.   For other relief this Court deems just and appropriate.

### COUNT TWELVE
### Breach of Oral Contract – The Bimini Project
### (Panico)

186.    McKinney incorporates and re-alleges the foregoing allegations.

187.   McKinney entered into an oral contract with Panico to invest in the Bimini project in early 2015.

188.   The key terms of the contract were that McKinney would "purchase" twenty percent of Panico's purported twenty percent interest in the casino attached to the Resorts World Bimini for $2.8 million, entitled to the profits of ownership; and that if the project failed to get off the ground, McKinney's investment would be returned to him or rolled over into subsequent projects to be owned by McKinney.

189.   McKinney performed on this contract by paying $2.8 million into the Bimini project.

190.   Panico breached by not making McKinney a twenty percent owner of his purported twenty percent ownership in the casino, but instead by keeping McKinney's investment in the hands of the corporate Defendants, controlled by Panico, Palmieri or Michael and Pasquale Panico, and by not returning his principal or by purporting to "roll it over" into subsequent projects where it was diverted into certain corporate Defendants controlled by Panico.

191.   As a direct and proximate result of Panico's breaches, McKinney has suffered damages in an amount to be proved at trial.

192.   Panico and Palmieri fraudulently concealed the breach of contract as described in Paragraphs 93-110, preventing McKinney's discovery of the breach until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendant Panico as follows:

    a.   For damages in an amount to be proven at trial;

    b.   For prejudgment interest;

    c.   For other relief this Court deems just and appropriate.

## COUNT THIRTEEN
### Breach of Oral Contract – The OTB North Project
### (Panico and Palmieri)

193.     McKinney incorporates and re-alleges the foregoing allegations.

194.     On a date near to but preceding May 30, 2018, McKinney entered into an oral contract with Panico and Palmieri to invest in the OTB North project.

195.     The key terms of the contract were that McKinney would invest $300,000 into the OTB North project and, in exchange for that investment, become a 49.5% owner in it, entitled to the profits of ownership; that Panico would invest the same amount; and that if the project failed to get off the ground, McKinney's investment would be returned to him or rolled over into subsequent projects to be owned by McKinney.

196.     McKinney performed on this contract by paying $300,000 into the OTB North project.

197.     Panico and Palmieri breached by not investing Panico's money in the purported project, by not making McKinney an owner of the business, but instead by keeping McKinney's investment funds in the hands of the corporate Defendants controlled by Panico, Palmieri or Michael and Pasquale Panico, and by not returning his principal or by purporting to "roll it over" into other projects where it was diverted into certain corporate Defendants controlled by Panico.

198.     As a direct and proximate result of Panico and Palmieri's breaches, McKinney has suffered damages in an amount to be proved at trial.

199.     Panico and Palmieri fraudulently concealed the breaches of contract as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

41

a. For damages in an amount to be proven at trial;

b. For prejudgment interest;

c. For other relief this Court deems just and appropriate.

**COUNT FOURTEEN**
**Breach of Oral Contract – The Thorntons Project**
**(Panico and Palmieri)**

200.    McKinney incorporates and re-alleges the foregoing allegations.

201.    On a date near to but preceding June 20, 2018, McKinney entered into an oral contract with Panico to invest in the Thorntons project.

202.    The key terms of the contract were that McKinney would invest $600,000 into the project and, in exchange for that investment, become a 49.5% owner in it, entitled to the profits of ownership; that Panico would invest the same amount; and that if the project failed to get off the ground, McKinney's investment would be returned to him or rolled over into subsequent projects to be owned by McKinney

203.    McKinney performed on this contract by paying $600,000 into the Thorntons project.

204.    Panico and Palmieri breached by not investing any of Panico's money in the project, by not making McKinney an owner of the business, but instead by keeping ownership in the hands of the corporate Defendants controlled by Panico, Palmieri or Michael and Pasquale Panico, and by not returning his principal or by purporting to "roll it over" into subsequent projects where it was diverted into certain corporate Defendants controlled by Panico when the Thorntons project failed to get off the ground.

205.    As a direct and proximate result of Panico and Palmieri's breaches, McKinney has suffered damages in an amount to be proved at trial.

206.    Panico and Palmieri fraudulently concealed the breaches of contract as described in Paragraphs 93-110, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

        a.  For damages in an amount to be proven at trial;

        b.  For prejudgment interest;

        c.  For other relief this Court deems just and appropriate.

**COUNT FIFTEEN**
**Civil Conspiracy**
**(All Defendants)**

207.    McKinney incorporates and re-alleges the foregoing allegations.

208.    The Defendants engaged in a conspiracy to defraud McKinney out of his investments in the projects by diverting his investment and his ownership interest into the corporate Defendant entities owned and controlled by the individual Defendants.

209.    The Defendants acted in concert for the purpose of diverting McKinney's investment and ownership interest into the corporate Defendant entities owned and controlled by the individual Defendants.

210.    In furtherance of the conspiracy, Panico and Palmieri fraudulently induced McKinney into investing in the projects and transferred his investments and ownership interests into the corporate Defendants owned and controlled by the individual Defendants.

211.    Defendants' conduct was willful and wanton.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendants as follows:

        a.  For compensatory damages in an amount to be proven at trial;

43

    b.  For prejudgment interest;

    c.  For punitive damages;

    d.  For such other relief as the Court deems just and appropriate.

**COUNT SIXTEEN**
**Fraudulent Transfer Under 740 ILCS § 160/5**
**(Post Time Sports Bar and Grille LLC)**

212.    McKinney incorporates and re-alleges the foregoing allegations.

213.    The Defendants defrauded McKinney out of his investments in the projects by diverting his investment and his ownership into the corporate Defendant entities owned and controlled by the individual Defendants and the Panico Family Trust.

214.    McKinney has a claim to his investments and ownership interests in the projects.

215.    Panico and Palmieri transferred McKinney's investments and ownership in the projects to the Corporate Defendants and the Panico Family Trust with actual intent to hinder, delay, or defraud McKinney and/or without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Panico and Palmieri intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due. Specifically, Panico and Palmieri transferred:

    a.  McKinney's investment and ownership interest in the Post Time project to Post Time Sports Bar and Grille LLC in or around September 2017;

    b.  McKinney's further investment in the Post Time project to Post Time Sports Bar and Grille LLC in or around October 2017;

    c.  McKinney's further investment in the Post Time project to Post Time Sports Bar and Grille LLC in or around December 2017;

    d.  McKinney's further investment in the Post Time project to Post Time Sports Bar and Grille LLC in or around April 2018;

e.  McKinney's further investment in the Post Time project to Post Time Sports Bar and Grille LLC in or around May 2018;

216.  The transfer or obligation was to an insider; Panico and Palmieri retained possession or control of the property transferred after the transfer; the transfer was concealed and Panico and Palmieri concealed assets; and Panico and Palmieri, on information and belief, received no consideration for the transfers.

WHEREFORE, McKinney prays for the entry of judgment in his favor and against Defendant Post Time Sports Bar and Grille LLC as follows:

e.  For avoidance of the transfers to Defendant;

f.  For an attachment against the amount of McKinney's investment interests transferred to Defendant;

g.  For such other relief as the Court deems just and appropriate.

**COUNT SEVENTEEN**
**Unjust Enrichment**
**(All Defendants)**

217.  McKinney incorporates and re-alleges the foregoing allegations.

218.  Alternatively to the contract counts, McKinney asserts that Defendants were unjustly enriched by McKinney's payment of investments to Defendants without McKinney being given an ownership share in the projects or receiving income from the projects. It would be inequitable for Defendants to retain the benefits they received from McKinney through their wrongful conduct.

219.  Defendants unjustly retained a benefit to McKinney's detriment.

220.  Defendants' retention of these benefits violates fundamental principles of justice, equity, and good conscience.

221.  McKinney lacks a remedy at law.

WHEREFORE, McKinney respectfully requests that this Court enter judgment against Defendants, and in favor of McKinney, by:

        a. ordering Defendants to return the benefits to McKinney that have been wrongfully withheld by them;

        b. granting such other relief to McKinney as the Court deems just and appropriate.

**COUNT EIGHTEEN**
**Declaratory Judgment**
**(All Defendants)**

222. McKinney incorporates and re-alleges the foregoing allegations.

223. Here, as set forth in Paragraphs 21-110, McKinney was an owner in the various projects and the entities which owned or own the projects and thus had a legal, tangible interest in them.

224. Defendants, however, have taken deliberate steps to avoid recognizing McKinney as an owner, including excluding him from membership in the LLCs which control the projects, failing to provide him with accounting of the projects, and failing to provide him with profits of them.

225. There exists an actual controversy between McKinney and the Defendants because the Defendants are actively seeking to exclude McKinney as an owner of the projects.

WHEREFORE, McKinney respectfully requests that this court enter an order:

a. Declaring that McKinney is an owner of the projects and the businesses created from the projects and is entitled to profits from them; and

b. Awarding any other relief this Court deems appropriate.

August 27, 2021

Respectfully submitted,

LARRY MCKINNEY

By: /s/ Chris Gair
One of His Attorneys

Chris Gair (ARDC No. 6190781)
Jeff Eberhard (ARDC No. 6276471)
Thomas R. Heisler (ARDC No. 6296712)
Gair Eberhard Nelson Dedinas Ltd.
1 E. Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 600-4900
cgair@gairlawgroup.com
jeberhard@gairlawgroup.com
theisler@gairlawgroup.com