IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LARRY MCKINNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21-cv-04602 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| ANTHONY PANICO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Larry McKinney Sr. ("McKinney") brought the present action alleging that Defendants engaged in a multi-year conspiracy during which they fraudulently induced McKinney to invest in several business ventures and then diverted his funds for their personal use. Altogether, McKinney was allegedly defrauded out of about $20 million. McKinney's 18-count complaint sets forth federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, as well as state-law claims for fraud, breach of fiduciary duty, breach of oral contract, fraudulent transfer, unjust enrichment, and civil conspiracy. Shortly after initiating this lawsuit, McKinney passed away. (Suggestion of Death, Dkt. No. 43.) Now, Larry McKinney, Jr., in his capacities as personal representative of the Estate of Larry A. McKinney, Sr. and as trustee of the Larry A. McKinney, Sr. Living Trust ("Estate"), moves to be substituted as Plaintiff pursuant to Federal Rule of Civil Procedure 25(a). (Dkt. No. 48.) All Defendants object to the motion for substitution, as they contend that none of McKinney's claims survive his death. For the reasons that follow, the Estate's motion for substitution is granted.

## BACKGROUND

The complaint's allegations are summarized as follows.[1]

Before his passing, McKinney was a successful businessman who lived in South Carolina. (Compl. ¶¶ 6, 21, Dkt. No. 1.) In 2007, McKinney met Defendant Anthony Panico through a mutual friend. (*Id.* ¶ 22.) Shortly thereafter, Panico and Panico's attorney, Defendant Vincent Palmieri, persuaded McKinney to partner with Panico in investing in a number of real estate development projects and other business ventures. (*Id.* ¶ 23.) Panico claimed that he and McKinney would be equal partners in the investments, with Palmieri also contributing a small share for many of the investments. (*Id.*) Unbeknownst to McKinney, Panico and Palmieri were investing very little or none of their own money in the various projects. (*Id.*) Instead, Panico and Palmieri were diverting McKinney's capital contributions to corporate entities owned by Panico or Panico's sons (Defendants Pasquale Panico and Michael Panico), to Defendant Panico Family Trust, or for other personal uses. (*Id.* ¶¶ 3, 23.)

Beginning in 2007 and lasting for around twelve years, Panico and Palmieri convinced McKinney to invest in nine different projects. (*Id.* ¶¶ 25–82.) Of those nine projects, seven were located in Illinois, one in Florida, and one in the Bahamas. (*Id.* ¶¶ 25, 36, 42, 49, 60, 69, 74, 78.) For some of McKinney's investments, Panico and Palmieri simply took McKinney's funds and told him that the project did not pan out. (*Id.* ¶¶ 32–33, 39–41, 45–48.) For other investments, one of the Panico-family-affiliated corporate entities would use McKinney's misappropriated funds to invest in the project itself without providing McKinney any ownership interest or share of the investment's proceeds. (*Id.* ¶¶ 3, 55, 64, 82–88, 97.) Panico and Palmieri took various measures to conceal their fraud. For example, they drew up paperwork for a fake partnership in an effort to

---

[1] For present purposes, the Court merely summarizes the factual allegations of the complaint but, of course, does not vouch for their accuracy.

convince McKinney that he had a legitimate and recognized interest in the various investments. (*Id.* ¶ 95.) Panico and Palmieri also invited McKinney to tour the sites of certain projects and arranged for McKinney to be treated like an owner during those visits. (*Id.* ¶ 98.)

In April 2017, McKinney requested that Panico create a Limited Liability Company ("LLC") that would reflect McKinney's ownership in the various developments and projects in which he had invested with Panico and Palmieri. (*Id.* ¶ 102.) McKinney then asked Palmieri to draw up the paperwork for such an LLC. (*Id.*) Yet when McKinney showed Panico the paperwork prepared by Palmieri, Panico tore it up and told McKinney that he would create a better version. (*Id.*) About two years later, in April 2019, Panico had Palmieri show McKinney the "better version" of the LLC paperwork. (*Id.* ¶ 103.) Contrary to Panico's oral representations that McKinney's investments made him a part-owner of the various projects, the new LLC paperwork stated that McKinney had simply loaned funds to Panico for Panico to use at his discretion. (*Id.*) Palmieri asked McKinney to sign the paperwork, but McKinney declined given that the paperwork did not accurately reflect his agreements with Panico and Palmieri. (*Id.* ¶ 104.) It was not until September 2018 that McKinney learned from federal law enforcement authorities investigating Panico that Panico may have misappropriated McKinney's invested funds. (*Id.* ¶ 107.)

McKinney subsequently brought the present lawsuit in August 2021 against Panico, Palmieri, Panico's sons, certain Panico-family-affiliated corporate entities, and the Panico Family Trust, asserting claims under RICO and Illinois state law. McKinney passed away on January 26, 2022 and his counsel of record filed a suggestion of death on February 4, 2022. (Dkt. No. 43.) The Estate timely moved to be substituted as Plaintiff in place of McKinney on May 2, 2022. (Dkt. No. 48.)

**DISCUSSION**

Rule 25(a) provides that where "a party dies and the claim is not extinguished, the court may order substitution of the proper party" and that a "motion for substitution may be made by any party or by the decedent's successor or representative" within 90 days after service of a statement noting death. Fed. R. Civ. P. 25(a)(1). There is no dispute that a motion for substitution was filed by the Estate—*i.e.*, McKinney's successor and representative—within 90 days of service of the suggestion of death. Nonetheless, Defendants contend that none of McKinney's claims survive his death and therefore the Estate's motion for substitution must be denied. In deciding whether the Estate can be substituted for McKinney, federal law governs the survival of McKinney's civil RICO claims while the Court must look to the appropriate state's law to determine whether McKinney's state-law claims survive his death. *Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 413 (7th Cir. 1980), *overruled on other grounds by Pridegon v. Gates Credit Union*, 683 F.2d 182 (7th Cir. 1982); *Neumann v. John Hancock Mut. Life Ins. Co.*, 736 F. Supp. 182, 185 (N.D. Ill. 1990).

**I.    RICO Claims**

Because the federal RICO statute does not contain a specific federal statutory directive as to whether a civil RICO claim survives the death of a party, the issue is governed by federal common law. *Hoffman v. Sumner*, 478 F. Supp. 2d 1024, 1030 (N.D. Ill. 2007) (citing *Smith*, 615 F.2d at 413). "The long-standing federal common law rule is that actions for penalties do not survive the death of the defendant, but remedial actions do." *Id.* In evaluating whether a federal statutory action is penal, the Seventh Circuit directs courts to determine "whether (1) the purpose of the action is to redress individual wrongs or wrongs to the public; (2) recovery runs to the

4

individual or to the public; and (3) the authorized recovery is wholly disproportionate to the harm suffered." *Id.* (citing *Smith*, 615 F.2d at 414).

As Defendants are quick to highlight, several courts in this District have applied the Seventh Circuit's three-factor analysis and determined that civil RICO claims are penal and therefore do not survive a party's death. *E.g.*, *Hoffman*, 478 F. Supp. 2d at 1030–31; *Ball v. Marshall Field V*, No. 90-C-4383, 1993 WL 101485, at *9 (N.D. Ill. Apr. 2, 1993); *Washburn v. Brown*, No. 81 C 1475, 1988 WL 130021, at *1–3 (N.D. Ill. Nov. 23, 1988); *First Interstate Bank of Nev., N.A. v. Nat'l Republic Bank of Chi.*, No. 80 C 6401, 1985 WL 1118, at *2–4 (N.D. Ill. Mar. 10, 1985). A key factor for those district courts was the statute's treble damages provision, which they concluded "is primarily punitive." *First Interstate Bank of Nev.*, 1985 WL 1118, at *3. While acknowledging that recovery under civil RICO runs to the individual, thereby suggesting a remedial purpose under the second of the Seventh Circuit's three factors, those courts nonetheless observed that the purpose of treble damages was "to motivate individuals to vindicate the public good by bringing private suit" and that such damages were "wholly disproportionate to the individual harm suffered." *Hoffman*, 478 F. Supp. 2d at 1031. Thus, the remaining two factors led the courts to conclude that civil RICO was punitive rather than remedial and therefore such claims did not survive a party's death. *Hoffman*, 478 F. Supp. 2d at 1031; *Washburn*, 1988 WL 130021, at *3; *First Interstate Bank of Nev.*, 1985 WL 1118, at *3.

Notably, however, the conclusion by certain courts in this District that civil RICO is punitive is a minority position. *See Saleh v. Merchant*, No. 14-cv-09186, 2017 WL 1478000, at *6 (N.D. Ill. Apr. 25, 2017) (noting that, "without specific guidance from the Seventh Circuit on the question of survivability, the Northern District of Illinois has become a pocket of dissent" in concluding that civil RICO claims are punitive rather than remedial such that they abate upon the

5

plaintiff's death). Indeed, the two Circuit Courts of Appeals that have addressed the question have concluded that civil RICO claims do not abate upon a plaintiff's death. *See Malvino v. Delluniversita*, 840 F.3d 223, 230–31 (5th Cir. 2016); *Faircloth v. Finesod*, 938 F.2d 513, 518 (4th Cir. 1991). The Fourth Circuit has observed that "civil RICO is a square peg, and squeeze it as we may, it will never comfortably fit in the round holes of the remedy/penalty dichotomy." *Faircloth*, 938 F.2d at 518. Nonetheless, accounting for the fact that "Congress explicitly declared the purpose of RICO to be 'remedial' and directed that it be 'liberally construed' to effect this purpose," the Fourth Circuit concluded that civil RICO claims survive a plaintiff's death. *Id.* (quoting Pub. L. 91-452, tit. IX § 904(a), 84 Stat. 947). In reaching the same conclusion, the Fifth Circuit cited the Fourth Circuit's analysis favorably and further noted that "[t]he Supreme Court has 'repeatedly acknowledged that the treble-damages provision contained in RICO itself is remedial in nature.'" *Malvino*, 840 F.3d at 230 (quoting *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406 (2003)).

More recent decisions from courts in this District have declined to follow the earlier decisions finding civil RICO to be punitive. *Saleh*, 2017 WL 1478000, at *5–6; *LaFlamboy v. Landek*, No. 05 C 4994, 2009 WL 10695379, at *2–4 (N.D. Ill. Apr. 23, 2009). Like the Fourth Circuit, those courts noted both remedial and punitive aspects to civil RICO but found that, overall, the statute served to address individual wrongs. *Saleh*, 2017 WL 1478000, at *6; *LaFlamboy*, 2009 WL 10695379, at *4. In *LaFlamboy*, the district court found it particularly instructive that RICO provided a civil remedy to "[a]ny person injured in his business or property." *LaFlamboy*, 2009 WL 10695379, at *4 (quoting 18 U.S.C. § 1964(c)). And in both *Saleh* and *LaFlamboy*, the district courts declined to find that treble damages under civil RICO were wholly disproportionate to the harm suffered, particularly in light of the Supreme Court's

characterization of the treble damages provision as remedial. *Saleh*, 2017 WL 1478000, at *6; *LaFlamboy*, 2009 WL 10695379, at *4.

This Court agrees that civil RICO claims are remedial and therefore survive the death of the plaintiff. Although the Supreme Court has not weighed in on the matter, it is difficult to ignore the Supreme Court's references to the remedial nature of civil RICO's treble damages provision. *E.g.*, *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 240–41 (1987) ("The legislative history of § 1964(c) reveals the same emphasis on the remedial role of the treble-damages provision [whereas] [t]he policing function of § 1964(c), although important, was a secondary concern."). Nor is it necessarily the case that treble damages will be wholly disproportionate to the harm suffered. As the Seventh Circuit has explained, while "there is some sense in which RICO treble damages are punitive, they are largely compensatory in the special sense that they ensure that wrongs will be redressed in light of the recognized difficulties of itemizing damages." *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 n.8 (7th Cir. 1987); *see also Saleh*, 2017 WL 1478000, at *6 ("An argument can be made . . . that treble damages provisions may represent an accurate measure of actual damages in some contexts, given difficulties with detection and other factors rather than a simple penalty.").

It is true that civil RICO claims cannot be neatly categorized as either penal or remedial. Nonetheless, civil RICO's substantial remedial goals lead this Court to conclude that such claims survive a plaintiff's death. For that reason, the Estate will be substituted as Plaintiff with respect McKinney's civil RICO claims.

**II.  State-Law Claims**

The Court next turns to the state-law claims. The parties disagree as to which state's laws govern the survival of McKinney's state-law claims. Defendants cite McKinney's residence in

South Carolina to argue that South Carolina law governs the survival of his claims. The Estate, on the other hand, contends that survival of the state-law claims is a matter of Illinois law since Defendants are Illinois residents, they committed the alleged wrongful conduct there, and their relationship with McKinney was centered there.

McKinney's state-law claims are before the Court pursuant to both its diversity jurisdiction and supplemental jurisdiction. "Federal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). However, no choice-of-law analysis is necessary if there is no actual conflict between Illinois law and South Carolina law; in such case, the law of the forum state, Illinois, will apply. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020). In Illinois, the "choice-of-law analysis begins by isolating the issue and defining the conflict." *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014) (internal quotation marks omitted). "Once a conflict between laws is established, the analysis turns to which law should be applied." *Id.*

### A. The Conflict

Here, the issue is whether McKinney's state-law claims survive his death. Defendants contend that all McKinney's state-law claims are predicated on allegations of fraud or deceit and that there is a conflict between South Carolina law and Illinois law as to whether actions for fraud or deceit survive. The Estate does not dispute either point.

Both Illinois and South Carolina have statutes addressing when claims survive a party's death. In South Carolina, "[c]auses of action for and in respect to any and all injuries and trespasses to and upon real estate and any and all injuries to the person or to personal property

shall survive both to and against the personal or real representative . . . of a deceased person." S.C. Code Ann. § 15-5-90. Despite the broad language that seemingly "include[s] almost every conceivable cause of action," the South Carolina Supreme Court has "continued to recognize a common law exception regarding causes of action for fraud or deceit." *Ferguson v. Charleston Lincoln Mercury, Inc.*, 564 S.E.2d 94, 97 (S.C. 2002). This fraud exception to survivability is not limited solely to those causes of action titled "fraud;" instead, it encompasses all claims that "fit within the ambit of fraudulent or deceptive conduct." *Brailsford v. Brailsford*, 669 S.E.2d 342, 345 (S.C. Ct. App. 2008). By contrast, Illinois explicitly identifies "actions for fraud or deceit" as among those actions that survive death. 755 ILCS 5/27-6.

The Court agrees with Defendants that McKinney's state-law claims are predicated on fraud or deceit. Two of his state-law claims are explicitly identified as claims for fraud and the remaining claims arise out of Defendants' purported scheme to defraud McKinney by making allegedly false statements and misrepresentations to induce McKinney to invest in various business ventures and then fraudulently concealing their misappropriation of his funds. Such claims based on fraud or deceit would survive McKinney's death under Illinois law but would not survive under South Carolina law. Because Defendants have established a conflict between South Carolina law and Illinois law as to the survival of McKinney's state-law claims, the Court now considers which state's law governs survival.

### B. Applicable Law

Illinois has adopted the choice-of-law method set forth in the Restatement (Second) of Conflict of Laws. *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 919 (Ill. 2007). In a tort case, the Second Restatement "chooses the law of the state which, 'with respect to that issue, has the most significant relationship to the occurrence and the parties.'" *Gunn*, 968 F.3d at 809

(quoting Restatement (Second) of Conflict of L. § 145(1) (Am. L. Inst. 1971)). Further, by prescribing an "issue-oriented approach" to the choice-of-law analysis, "the Second Restatement authorizes the process of *depecage*, which refers to the process of cutting up a case into individual issues, each subject to a separate choice-of-law analysis." *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 901 (Ill. 2007).

To determine the presumptively applicable law governing the survival of a tort claim, the Second Restatement directs the Court to section 145. Restatement (Second) of Conflict of L. § 167. Section 145 of the Second Restatement provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>    (a) the place where the injury occurred,
>    (b) the place where the conduct causing the injury occurred,
>    (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>    (d) the place where the relationship, if any, between the parties is centered.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of L. § 145. Section 6 of the Second Restatement sets forth the factors relevant to the choice of law inquiry:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of L. § 6. Ultimately, the goal of the Second Restatement's approach is "to ensure that a court is not merely 'counting contacts,' and that each contact is meaningful in light of the policies sought to be vindicated by the conflicting laws." *Townsend*, 879 N.E.2d at 905.

The Court begins by considering the section 145(2) contacts. *See id.* (explaining that it makes no difference whether a court begins its analysis with section 145(2) or section 6). Again, section 145(2) instructs that the contacts are to be evaluated with respect to the particular issue. Here, although the issue is survival, presumably a state's contacts with respect to the survival of a claim are substantially similar to its contacts with the claim itself. Further, the Illinois Supreme Court has noted that "[s]ection 145 sets forth principles to be applied to tort cases, but also is cast in 'great generality' and directs that the 'best way to bring precision into the field is by attempting to state special rules for particular torts and for particular issues in tort.'" *Barbara's Sales*, 879 N.E.2d at 922 (quoting Restatement (Second) of Conflict of L. § 145 cmt. a). Thus, for claims sounding in fraud, like McKinney's state-law claims, the Illinois Supreme Court has followed the Second Restatement's direction to look to section 148 "because it is applied more precisely to claims based on false representations and thus provides the proper analytical framework for [the] 'most significant relationship' approach." *Id.* Section 148 of the Second Restatement "applies to actions brought to recover pecuniary damages suffered on account of" fraud and misrepresentation. Restatement (Second) of Conflict of L. § 148 cmt. a. Relevant here, subsection (2) of section 148 states:

> When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of L. § 148.

Applying section 148(2) here, the place where McKinney acted in reliance upon Defendants' representations is best understood as his place of residence, South Carolina, because that is where he presumably authorized the transfer of funds for the various investments. Restatement (Second) of Conflict of L. § 148 cmt. f ("The plaintiff's reliance may take a variety of forms. He may rely by relinquishing assets . . . ."). Similarly, the place where McKinney received the representations also points to his place of residence, South Carolina. By contrast, since all Defendants are Illinois residents, the place where they made the representations is Illinois. And while there are multiple Defendants from Illinois, McKinney's residence in South Carolina is more significant as to the contact set out at subsection (2)(d) "because a financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship." Restatement (Second) of Conflict of L. § 148 cmt. i. Finally, because seven of the nine development projects were based in Illinois, the place where the land and developments that were the subject of McKinney's investments were located weighs heavily in favor of Illinois.[2] Considering all the relevant contacts, the section 148(2) analysis produces no clear winner between South Carolina and Illinois.

---

[2] The subsection 148(2)(f) contact plays no role in the analysis given the lack of allegations suggesting that McKinney had any performance obligations with respect to the investments.

Next, the Court considers the section 6 principles. The Illinois Supreme Court has recognized that not all section 6 principles will be relevant to a particular issue. *See Townsend*, 879 N.E.2d at 906. Here, the Court concludes that the survival of McKinney's fraud claims requires it to consider only the relevant policies of Illinois and the relevant policies of South Carolina and their interests in the determination of the survival of McKinney's state-law claims. First, Illinois has a substantial interest in seeing the claims survive McKinney's death. McKinney has alleged that he was fraudulently induced by Illinois residents to invest in seven business development projects located in Illinois. Undoubtedly, Illinois wants to encourage investment in the state and wants to deter its residents from defrauding out-of-state investors. *Cf. Walls v. VRE Chi. Eleven, LLC*, 344 F. Supp. 3d 932, 949 (N.D. Ill. 2018) ("Illinois has a significant public policy interest in having its law applied to fraudulent schemes made regarding Illinois property . . . ."). Those interests would be undermined if these Illinois-based Defendants were able to escape liability as to the state-law claims solely because their victim passed away in the midst of litigation.

By contrast, it is difficult to see what interest South Carolina has in having its survival law applied to the detriment of its deceased resident and to the benefit of the Illinois residents who allegedly defrauded him. The policy underlying the fraud-or-deception exception to the generally broad language of South Carolina's survival statute is opaque. And as far as this Court can tell, neither the South Carolina Supreme Court nor any lower South Carolina court has explained the reason for the exception. *See Schneider v. Allstate Ins. Co.*, 487 F. Supp. 239, 244 (D.S.C. 1980) ("[I]t is extremely difficult to glean controlling principles from the cases construing [South Carolina's] Survival Statute."). In upholding the exception against an equal protection challenge, the Fourth Circuit suggested that because

> fraud is a tort that requires a special quality of proof, and the states of mind of the victim (*e.g.*, whether he knew the statement was false, relied upon it, and was justified in so relying), and the perpetrator are especially vital. . . . a legislature could rationally conclude that the difficulty and potential unfairness of proving the state of mind of a dead party to a fraudulent transaction justified excepting fraud from the survival statute.

*Faircloth*, 938 F.2d at 517. Under this rationale, the exception is defendant protective. So perhaps South Carolina would be interested in having its law applied if this action involved an Illinois plaintiff and South Carolina defendants. But the opposite circumstance is presented here.

The Court doubts that South Carolina has a strong interest in having its survival law applied to protect Illinois defendants who would otherwise be liable for their alleged fraud had their victim resided in-state (or in any other state that allows survival of claims involving fraud or deceit). *Cf. In re Air Crash Disaster Near Chi., Ill. on May 25, 1979*, 644 F.2d 594, 612 (7th Cir. 1981) ("The domiciliary states do not have an interest in disallowing punitive damages because the decision to disallow such damages is obviously designed to protect the interest of resident defendants, not to effectuate the interest of the domiciliary states in the welfare of plaintiffs."). To the contrary, it is highly likely that South Carolina would want its deceased resident fraud victim treated the same as a deceased Illinois-resident fraud victim. Further, courts have recognized "when there is no domiciliary defendant, limiting recovery 'advances no policy behind the limitation,' and a limit on recovery should not be applied." *Haskins v. Midwest Air Traffic Control Serv., Inc.*, No. 12 CV 4584, 2016 WL 3653531, at *4 (N.D. Ill. July 8, 2016) (quoting *Foster v. United States*, 768 F.2d 1278, 1283 (11th Cir. 1985)).

In sum, both Illinois and South Carolina have significant contacts with McKinney's state-law claims. But consideration of Illinois's and South Carolina's interests in applying their respective laws concerning the survival of claims predicated on fraud or deceit tilts the scale significantly in favor of Illinois. And in Illinois, such claims survive the plaintiff's death. For that

14

reason, the Court concludes that McKinney's state-law claims did not abate with his death and the Estate will be substituted as Plaintiff as to those claims as well.

## CONCLUSION

For the foregoing reasons, the Estate's motion for substitution (Dkt. No. 48) is granted. Larry A. McKinney, Jr., as personal representative of the Estate of Larry A. McKinney, Sr. and as trustee of the Larry A. McKinney, Sr. Living Trust dated October 5, 2017, shall be substituted as Plaintiff in this matter in place of Larry A. McKinney.

ENTERED:

Dated: June 30, 2022

_____
Andrea R. Wood
United States District Judge