**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LARRY A. MCKINNEY, JR., as Personal Representative of the Estate of Larry A. McKinney, Sr. and as Trustee of the Larry A. McKinney, Sr. Living Trust Dated October 5, 2017, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 21-cv-04602 |
| v. | ) ) | Judge Andrea R. Wood |
| ANTHONY PANICO, et al., | ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Larry McKinney, Sr.[1] brought the present action alleging that Defendants Anthony Panico and Vincent Palmieri engaged in a multi-year conspiracy during which they fraudulently induced McKinney to invest in several business ventures and then diverted his invested funds for their personal use. Altogether, McKinney was allegedly defrauded out of over $20 million. McKinney's 18-count complaint sets out federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, as well as state-law claims for fraud, breach of fiduciary duty, breach of oral contract, fraudulent transfer, unjust enrichment, and civil conspiracy, and he seeks a declaratory judgment. Along with Panico and Palmieri, the complaint names as Defendants several of Panico and Palmieri's purported co-conspirators in the scheme to defraud. Now before the Court are Defendants' three motions to dismiss this case

---

[1] Several months after initiating this action, Larry McKinney, Sr. passed away. Shortly thereafter, Larry McKinney, Jr., as personal representative of the Estate of Larry A. McKinney, Sr. and as trustee of the Larry A. McKinney, Sr. Living Trust, moved to be substituted as Plaintiff. (Dkt. No. 48.) This Court granted McKinney, Jr.'s motion. (Dkt. Nos. 56–57.) The Court use "McKinney" interchangeably to refer to both the deceased Plaintiff and the current, substituted Plaintiff.

pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. Nos. 23, 26, 28.) For the reasons that

follow, all three motions to dismiss are granted in part and denied in part.

## BACKGROUND

For the purposes of the motions to dismiss, the Court accepts all well-pleaded facts in the

complaint as true and views those facts in the light most favorable to McKinney as the non-

moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The

complaint alleges as follows.

Before his passing, McKinney was a successful businessman who lived in South Carolina.

(Compl. ¶¶ 6, 21, Dkt. No. 1.) In 2007, McKinney met Defendant Anthony Panico through a

mutual friend. (*Id.* ¶ 22.) Shortly thereafter, Panico persuaded McKinney to partner with him and

his long-time attorney, Defendant Vincent Palmieri, in investing in a number of real estate

development projects and other business ventures. (*Id.* ¶¶ 2, 23.) Panico claimed that he and

McKinney would be equal partners in the investments, with Palmieri also contributing a small

share for many of the investments. (*Id.*) Unbeknownst to McKinney, Panico and Palmieri were

investing very little or none of their own money in the various projects. (*Id.*) Instead, Panico and

Palmieri were diverting McKinney's capital contributions to corporate entities owned by Panico

or Panico's sons, Defendants Michael Panico and Pasquale Panico, to Defendant the Panico

Family Trust, or for other personal uses. (*Id.* ¶¶ 3, 23.)

### I. The Investments

Beginning in 2007 and lasting for around twelve years, Panico and Palmieri were

allegedly engaged in a scheme to defraud McKinney centered around their solicitation of his

investments in nine different projects. (*Id.* ¶¶ 25–82.) Those investments are as follows.

### A.    Libertyville Shopping Center

The first investment opportunity related to a proposed shopping center in Libertyville, Illinois. (*Id.* ¶ 25.) In August 2007, Panico and Palmieri told McKinney that if he invested $3 million in the project, Panico would invest the same amount and Palmieri would invest a smaller sum. (*Id.* ¶ 26.) McKinney was told that, in exchange for his investment, both he and Panico would own 49.5% of the business with Palmieri owning the remaining 1%. (*Id.* ¶¶ 26–27.) McKinney agreed to the investment as represented by Panico and Palmieri and, over the next two years, directed multiple payments to the project, altogether investing over $3 million in the shopping center. (*Id.* ¶¶ 27–29, 32.) Yet contrary to his representations to McKinney, Panico invested none of his own money in the project. (*Id.* ¶ 30.) Instead, Panico took a substantial portion of McKinney's investment and deposited it into a bank account held by Defendant AP Capital Management, LLC ("AP Capital"), a company whose sole member and manager was Panico. (*Id.* ¶ 33.) Panico then told McKinney that the shopping center project failed because its developer had run off with McKinney's investment. (*Id.* ¶ 32.) None of the over $3 million that McKinney invested in the shopping center project was returned to him. (*Id.* ¶ 34.)

### B.    Harley Davidson Building

Despite the failure of the shopping center project, Panico and Palmieri convinced McKinney to make another investment with them in July 2013. (*Id.* ¶¶ 35–37.) Panico and Palmieri told McKinney that the investment involved the development of a Harley Davidson building in Libertyville, Illinois. (*Id.* ¶ 36.) Similar to the shopping center project, Panico and Palmieri claimed that if McKinney invested $3 million in the Harley Davidson building, Panico would match the investment, with each owning 49.5% of the business and Palmieri owning the remaining 1%. (*Id.* ¶ 37.) Over the next year, McKinney paid over $2 million toward his

3

investment in the project at Panico's direction. (*Id.* ¶¶ 38–39.) Once again, Panico failed to invest his own money in the project as promised. (*Id.* ¶ 40.) Ultimately, the Harley Davidson building project did not go forward. (*Id.* ¶ 41.) Nonetheless, McKinney, Panico, and Palmieri agreed that McKinney's investment in the project would be rolled over into new investment opportunities. (*Id.* ¶ 41.)

### C. Naples Garage Project

In May 2014, Panico and Palmieri proposed that McKinney invest in the development of a garage in Naples, Florida, where car collectors could store their vehicles and spend time with other collectors. (*Id.* ¶ 42.) As represented by Panico and Palmieri, McKinney and Panico would each invest $6 million for a 35% share of the project, Palmieri would own a 10% share of the project, and a project administrator would own 20% in exchange for developing the site. (*Id.* ¶ 43.) McKinney agreed to invest in the garage project and made an initial investment on May 21, 2014, by making out a check for $2.1 million to AP Capital. (*Id.* ¶ 44.) A few months later, McKinney invested another $1 million in the project, again writing a check to AP Capital as directed by Panico. (*Id.* ¶ 45.) Panico never invested his own money in the project. (*Id.* ¶ 47.) After the Naples garage project failed to get off the ground, Panico and Palmieri falsely represented to McKinney that his investment in the project would be rolled over into new projects. (*Id.* ¶ 48.)

### D. Viking-Polo and Polo Build to Suit Projects

Around the same time Panico and Palmieri solicited McKinney's investment in the Naples garage project, they also persuaded McKinney to invest in two other Illinois-based projects. (*Id.* ¶ 49.) Specifically, the Polo Build to Suit project involved the manufacture of a building on the site of the terminated Harley Davidson building project in Libertyville, and the Viking-Polo

project involved the development of both an office building and a mixed-use office and condominium building in Green Oaks, Illinois. (*Id.*) Panico and Palmieri represented to McKinney that he would be a 50% owner as to each project, and, as to the Polo Build to Suit project, Panico agreed to match McKinney's investment and own the remaining 50%. (*Id.* ¶¶ 50–51.) McKinney made a $2 million payment for the projects on September 16, 2014. (*Id.* ¶ 52.) Yet Panico never invested his own funds in the projects as promised, nor was McKinney's investment in the Naples garage project rolled over. (*Id.* ¶ 53.)

Unlike the previous developments, both the Polo Build to Suit and Viking-Polo projects were built and, today, are generating significant profits. (*Id.* ¶ 54.) But contrary to Panico and Palmieri's representations, McKinney is not documented as an owner of either project, has not received any portion of the projects' profits, and has not had his principal investment returned to him. (*Id.* ¶¶ 56, 84.) Instead, unbeknownst to McKinney, Panico and Palmieri transferred McKinney's invested funds to Defendant ACV Properties LLC ("ACV Properties"), an entity whose two members are Panico's sons, Michael Panico and Pasquale Panico. (*Id.* ¶¶ 11, 55, 84.) ACV Properties is the sole owner of both projects. (*Id.* ¶¶ 55, 85–86.)

### E.    Post Time Sports Bar and Grille

Another investment opportunity that Panico and Palmieri presented to McKinney was the Post Time Sports Bar and Grille, a Libertyville sports bar with off-track betting and videogaming. (*Id.* ¶ 60.) McKinney agreed to invest in the project and take a 49.5% stake with Panico owning another 49.5% and Palmieri owning the remaining 1%. (*Id.* ¶ 61.) Between August 2016 and May 2018, McKinney invested $3.9 million into the project, usually by way of checks that Panico directed him to make payable to AP Capital. (*Id.* ¶¶ 62–63.) Although the Post Time Sports Bar and Grille project was completed, McKinney is not documented as an owner of the business. (*Id.*

¶ 64.) Rather, the bar is owned by Defendant Post Time Sports Bar and Grille, LLC ("Post Time"), an entity whose two members are Michael Panico and Pasquale Panico, and the land is owned by a land trust that shares a mailing address with Defendant Panico Properties, LLC ("Panico Properties"), which is also owned by Panico's sons. (*Id.* ¶¶ 12, 16, 87.) Further, McKinney has not received profits from the business or a return of his principal. (*Id.* ¶¶ 64, 67, 84.) And contrary to his agreement with Panico and Palmieri, McKinney provided the entirety of the funds for the project. (*Id.* ¶ 67.)

### F.    Bimini Casino

In early 2015, Panico and Palmieri told McKinney that Panico held a 20% interest in a casino in Bimini, Bahamas, and offered to sell McKinney 20% of Panico's 20% interest for $2.8 million. (*Id.* ¶¶ 69–70.) McKinney accepted the offer. (*Id.* ¶ 71.) Shortly thereafter, in May 2015, Palmieri and McKinney traveled to the Bahamas to visit the casino. (*Id.* ¶ 72.) However, Panico never held any interest in the casino, and Panico and Palmieri simply diverted McKinney's $2.8 million investment to certain Defendant corporate entities affiliated with Panico or his family. (*Id.* ¶ 73.)

### G.    OTB North

Panico and Palmieri presented McKinney with the opportunity to invest in OTB North, a Libertyville off-track betting facility in 2018. (*Id.* ¶ 74.) Specifically, Panico informed McKinney that OTB North had gone into foreclosure and could be obtained for $600,000. (*Id.*) Like many of the previous investments, McKinney agreed to invest $300,000 for a 49.5% interest, which would be matched by Panico, with the remaining 1% to be held by Palmieri. (*Id.* ¶ 75.) Pursuant to that agreement, McKinney wrote a $300,000 check to AP Capital. (*Id.* ¶ 76.) But it turned out that

Panico made up the OTB North facility, and Panico and Palmieri just took McKinney's $300,000 for their personal use. (*Id.* ¶ 77.)

### H. Thorntons Gas Station

The last investment McKinney made with Panico and Palmieri was in a parcel of land in Libertyville that Panico and Palmieri said would be developed into a site for a Thorntons gas station. (*Id.* ¶ 78.) Panico and Palmieri told McKinney that if he invested $650,000 in the project, Panico would match the investment, and each would hold a 49.5% share of the business with Palmieri holding the remaining 1%. (*Id.* ¶ 79.) On June 20, 2018, McKinney wrote a $400,000 check to AP Capital, as instructed by Panico, and wrote a check for the remaining $250,000 on August 17, 2018. (*Id.* ¶ 80.) Sometime thereafter, Panico and Palmieri told McKinney that the project was not viable because the lot did not have enough square footage and bordered wetlands. (*Id.* ¶ 81.) Currently, the land remains owned by one of the Defendant corporate entities. (*Id.* ¶ 82.)

### II. Panico and Palmieri's Concealment of Their Fraud

Between 2008 and 2018, McKinney invested over $20 million in the nine projects. (*Id.* ¶ 89.) During that period, Panico spent over $20 million, mainly using McKinney's investment funds, on personal expenses such as condominiums, funding companies owned by him or his sons, or funding the Panico Family Trust, a trust benefiting Panico and his children. (*Id.* ¶¶ 17, 90–92.) To conceal their misuse of McKinney's funds, Panico and Palmieri deliberately avoided providing McKinney with legitimate documentation of his investments. (*Id.* ¶ 94.)

At one point, in November 2014, Panico and Palmieri provided McKinney with a fraudulent document that understated by $4 million McKinney's combined capital contributions to the Libertyville shopping center, Harley Davidson building, Naples garage, Viking-Polo, and

Polo Build to Suit projects. (*Id.* ¶ 57.) Around the same time, Panico and Palmieri drew up

paperwork for a fake partnership in an effort to convince McKinney that he had a legitimate and

recognized interest in the various investments. (*Id.* ¶ 95.) To reinforce McKinney's trust, they

named the partnership FDS, which stands for "Fratelli di Sangue," an Italian phrase that translates

to "Blood Brothers." (*Id.*) But the FDS partnership was never registered in any state. (*Id.* ¶ 96.)

Panico and Palmieri also invited McKinney to tour the sites of certain projects and arranged for

McKinney to be treated like an owner during those visits. (*Id.* ¶ 98.) By 2017, McKinney began to

insist that Panico and Palmieri provide him with financial statements for the various projects, but

Panico and Palmieri made various excuses for why they could not comply with his requests. (*Id.*

¶ 101.)

### III.    McKinney Discovers Panico and Palmieri's Fraud

In April 2017, McKinney requested that Panico create a Limited Liability Company

("LLC") that would reflect McKinney's ownership in the various projects in which he had

invested with Panico and Palmieri. (*Id.* ¶ 102.) McKinney then asked Palmieri to draw up the

paperwork for such an LLC. (*Id.*) Yet when McKinney showed Panico the paperwork prepared by

Palmieri, Panico tore it up and told McKinney that he would create a better version. (*Id.*) It was

not until April 2019 that Panico had Palmieri show McKinney the "better version" of the LLC

paperwork. (*Id.* ¶ 103.) In the meantime, in September 2018, McKinney learned from federal law

enforcement authorities investigating Panico for tax evasion and investment fraud that Panico

may have misappropriated McKinney's invested funds. (*Id.* ¶¶ 106–07.) McKinney's suspicions

were confirmed when he saw the new LLC paperwork. Contrary to Panico's oral representations

that McKinney's investments made him a part-owner of the various projects, the new LLC

paperwork stated that McKinney had simply loaned funds to Panico for Panico to use at his

discretion. (*Id.* ¶ 103.) Palmieri asked McKinney to sign the paperwork, but McKinney declined given that the paperwork did not accurately reflect his agreements with Panico and Palmieri. (*Id.* ¶¶ 104–05.) That April 2019 meeting was the last time McKinney saw Panico and Palmieri, although McKinney spoke with Palmieri by phone in August 2021 when Palmieri attempted to convince McKinney not to file the present lawsuit. (*Id.* ¶ 105.)

## DISCUSSION

To survive a motion under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). Further, Rule 9(b) requires that a party alleging fraud must "state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To state the circumstances of fraud with sufficient particularity, the plaintiff must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

McKinney's 18-Count complaint sets forth against various configurations of Defendants federal RICO claims (Counts I–III); state-law claims for fraud (Count IV), aiding and abetting fraud (Count V), breach of fiduciary duty (Count VI), aiding and abetting breach of fiduciary duty (Count VII), breach of oral contract (Counts VIII–XIV), civil conspiracy (Count XV), and unjust

enrichment (Count XVII); a claim for fraudulent transfer under 740 ILCS 160/5 (Count XVI); and a claim for declaratory judgment (Count XVIII). Together, Defendants' three motions to dismiss seek dismissal of McKinney's complaint in its entirety.[2] In addition to attacking the sufficiency of most claims on the merits, Defendants also contend that all of McKinney's claims are time-barred. Thus, the Court will begin by addressing Defendants' statute-of-limitations arguments.

## I.  Statute of Limitations

According to Defendants, McKinney waited too long to bring this lawsuit and, as a result, the applicable statutes of limitations governing his claims have all lapsed. For that reason alone, Defendants contend that the complaint must be dismissed. Normally, a plaintiff's complaint need not anticipate an affirmative defense such as the statute of limitations to survive a motion to dismiss. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). It is therefore "irregular to dismiss a claim as untimely under Rule 12(b)(6)." *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006) (internal quotation marks omitted). Dismissal on statute of limitations grounds at the pleading stage may be warranted, however, when a plaintiff pleads facts that effectively establish the defense. *Id.*

### A.  RICO Claims

Although RICO's civil enforcement provision does not provide an express statute of limitations, the Supreme Court has held that civil RICO claims are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 146, 156 (1987). The four-year limitations period "begins to run when the plaintiffs discover, or should, if diligent,

---

[2] The two separate motions to dismiss filed by Michael Panico, Pasquale Panico, and Post Time (Dkt. No. 26), and Anthony Panico, ACV Properties, AP Capital, FPH Management, Inc., FPH LLC, and Panico Properties (Dkt. No. 23) adopt and incorporate most of the arguments set forth in Palmieri's motion to dismiss (Dkt. No. 28), but also advance additional, separate arguments for dismissal. For the sake of simplicity, the Court generally treats arguments as if they are advanced by Defendants collectively, even if the argument was raised in only one or two of the three motions.

have discovered, that they had been injured by the defendants." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). Further, it is "the injury arising from the first predicate act to injure the plaintiff ('predicate acts' are the illegal acts committed by the racketeering enterprise) [that] starts the limitations period running, rather than the injury from the last predicate act, which might occur decades after the first." *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 386–87 (7th Cir. 2010). "And the victim doesn't have to know he's been injured by a RICO violation, which is to say by a ***pattern*** of racketeering activity (that is, a series of predicate acts)." *Id.* at 387; *see also Cancer Found.*, 559 F.3d at 674 ("A plaintiff does not need to know that his injury is actionable to trigger the statute of limitations— the focus is on the discovery of the harm itself, not the discovery of the elements that make up a claim."). At the same time, there must "be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers [his] injury." *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992).

McKinney contends that he did not discover his injury until September 2018, when federal law enforcement authorities notified him that Panico was misappropriating his investments. Under that view, since McKinney initiated this lawsuit on August 27, 2021, he discovered his injury within the four-year limitations period. On the other hand, Defendants contend McKinney's allegations demonstrate that he should have known that he was injured as early as November 2014. By that time, McKinney had already invested over $11 million with Panico and Palmieri. (Compl. ¶ 57.) Yet on November 21, 2014, Panico and Palmieri "provided a fraudulent document to McKinney that understated his capital contributions by $4 million." (*Id.*) Defendants assert that document should have alerted McKinney both that he had been injured and that it was Panico and Palmieri who had injured him.

At the motion to dismiss stage, the question before the Court is whether "there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense." *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). Defendants' sole support for a November 21, 2014 accrual date is a one-sentence allegation regarding McKinney's receipt of a document understating his capital contributions by $4 million. But that allegation provides no details about the nature and contents of the document such that the Court could definitively conclude that it supplied McKinney with sufficient information to detect that Panico and Palmieri had harmed him. Of course, "[w]hether a person should have known of his injury may turn on whether a reasonable person in the same circumstances would have engaged in further inquiry." *Scarabello v. Reichle*, No. 93 C 4606, 1995 WL 153338, at *7 (N.D. Ill. Apr. 6, 1995). Thus, Defendants assert that Panico and Palmieri's substantial understatement of his investments triggered a duty on the part of McKinney to investigate whether he was being defrauded. The problem with Defendants' contention is that the complaint says nothing about how McKinney reacted after receiving the document containing the understatement. Nor was it required to contain such allegations—again, McKinney need not anticipate and overcome a limitations defense at the pleading stage. That leaves open many possible factual scenarios under which the RICO claims could be found not to have accrued on November 21, 2014. Indeed, it is entirely possible that McKinney did make an inquiry into the discrepancy and determined it was simply a clerical error.

Alternatively, Defendants contend that McKinney should have known of Panico and Palmieri's fraud in May 2015, when he traveled to the Bahamas to tour the Bimini casino in which he had invested. Although Defendants acknowledge that nothing in the complaint establishes that McKinney could have learned of the fraud on the tour, they ask the Court to take

judicial notice of a March 5, 2015 internet news article revealing that the Bimini casino was opened under the "Hilton flag." (Def. Palmieri's Mot. to Dismiss at 2, Dkt. No. 28; Def. Palmieri's Mot. to Dismiss, Ex. 1, Dkt. No. 28-1.) Thus, Defendants claim that when McKinney toured the Bimini casino two months later, it should have been obvious that Hilton was the true owner of the casino. Even accepting Defendants' dubious assertion that the Court can take judicial notice from an internet news article of the fact that the Bimini casino was opened under the Hilton flag, the Court cannot conclude that it was unreasonable for McKinney to believe that his ownership interest in the casino was legitimate notwithstanding its association with Hilton. As McKinney notes, Hilton is a franchisor that often licenses the use of its name to private owners and owns only a small number of properties flying the Hilton flag. Thus, Defendants fail to demonstrate that Hilton owned 100% of the Bimini casino, and McKinney should have been aware of that fact, simply because of the casino's association with Hilton.

Finally, Defendants argue that the RICO claims accrued in April 2017, when McKinney told Panico that he wanted to have an LLC created that reflected his ownership interest in the various projects. (Compl. ¶ 102.) Defendants argue that the allegation shows that McKinney knew that Panico and Palmieri were not titling the properties underlying his investments to reflect his ownership interests. The Court does not agree. Instead, the Court understands the allegation as evidencing simply that McKinney requested that his ownership interests be memorialized in writing. Such an allegation does not preclude all plausible factual scenarios that could defeat a limitations defense predicated on an April 2017 accrual date.

Of course, it is entirely possible that a more complete factual record will reveal that McKinney knew or should have known that he had been injured by Panico and Palmieri at some point prior to McKinney's asserted September 2018 accrual date such that his RICO claims are

13

time-barred. But, at this stage, the Court cannot conclude that the complaint's allegations are sufficient to establish a statute-of-limitations defense as to the RICO claims.

### B. State-Law Claims

Like the RICO claims, McKinney's September 2018 discovery that he had been injured by Defendants is critical to the timeliness of McKinney's state-law claims. That is because Illinois recognizes the "discovery rule," which acts to "postpone the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Golla v. Gen. Motors Corp.*, 657 N.E.2d 894, 898 (Ill. 1995); *see also Fujitsu Ltd. v. Tellabs Operations, Inc.*, No. 12 C 3229, 2014 WL 1527777, at *3 (N.D. Ill. Apr. 18, 2014) ("Because the parties are diverse, this court's analysis begins from the premise that Illinois statute of limitations law must apply."). According to McKinney, his state-law claims are governed by the five-year period set forth at 735 ILCS 5/13-205, which is broadly applicable to claims based on "unwritten contracts . . . or to recover damages for an injury done to property, real or personal." Under that statute of limitations, McKinney's state-law claims are timely.[3]

However, Defendants argue that the claims against Palmieri are governed by the two-year statute of limitations applicable to claims "against an attorney arising out of an act or omission in the performance of professional services." 735 ILCS 5/13-214.3(b). "The 'arising out of' language indicates an intent by the legislature that the statute apply to all claims against attorneys concerning their provision of professional services." *Evanston Ins. Co. v. Riseborough*, 5 N.E.3d

---

[3] All Defendants argue that the state-law claims are governed not by the five-year limitations period under 735 ILCS 5/13-205 but rather the three-year period applicable to actions involving securities set forth at 815 ILCS 5/13(D). However, their timeliness arguments hinge on this Court finding that McKinney knew or should have known of his injury some time earlier than September 2018. Since this Court has now found, for purposes of the motions to dismiss, that McKinney's claims accrued in September 2018, the state-law claims would be timely even under a three-year limitations period.

158, 166 (Ill. 2014). Further, the limitations period is not restricted to legal malpractice claims but "encompasses a number of potential causes of action in addition to legal malpractice." *Id.* Finally, "it is the nature of the act or omission, rather than the identity of the plaintiff, that determines" the applicability of the statute of limitations. *Id.* at 165. Put differently, it is not necessary that there be an attorney-client relationship between the plaintiff and the defendant, so long as the plaintiff's claims arise out of the defendant's provision of professional services. *Id.* at 165–66.

To demonstrate that McKinney's claims against Palmieri arise out of Palmieri's provision of legal services, Defendants point to McKinney's allegation that Palmieri "owed a fiduciary duty to McKinney because Palmieri represented that he was an attorney at law and was representing Panico, McKinney and the various entities." (Compl. ¶ 146.) But while Palmieri may have, at times, performed some legal services in connection with the alleged fraud, it is clear that McKinney's claims against Palmieri predominantly arise out of Palmieri's role as a partner in and promoter of the various investments. First, Palmieri represented that he would hold a small share of most of the investments, and the complaint contains few allegations concerning his provision of legal services. To the contrary, most of the allegations of Palmieri's interactions with McKinney involve discussions about the various investments. Moreover, there is substantial overlap between Palmieri and Panico's alleged wrongful conduct, with the two often operating in tandem to defraud McKinney. Given that Panico is not an attorney, that overlap by itself indicates that the claims against Palmieri do not concern his provision of legal services. Finally, it would be incongruous to apply a different, more defendant-friendly statute of limitations to the claims against Palmieri when there is little meaningful difference between his conduct and Panico's conduct other than the possibility that Palmieri performed some legal services ancillary to the alleged fraud.

15

In sum, the Court finds that the claims against Palmieri are governed by the same five-year statute of limitations applicable to the claims against all other Defendants. And because the allegations do not establish that any state-law claim is untimely, none of them can be dismissed as time-barred at the pleading stage.

## II.     RICO's Securities Fraud Exception

Turning to the merits of McKinney's claims, the Court first addresses Defendants' contention that the RICO claims (Counts I–III) are barred because they are based on allegations that would be actionable as securities fraud. In particular, 18 U.S.C. § 1964(c) provides, in relevant part, that no civil RICO claim "may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities."[4]

RICO's securities fraud exception is an amendment to the statute added by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737. The Act's legislative history reveals that, in adding § 1964(c),

> Congress intended not only "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent plaintiffs from attempting "to plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."

---

[4] There is an exception to the securities fraud exception for "an action against any person that is criminally convicted in connection with the fraud." 18 U.S.C. § 1964(c). The Court notes that Panico has pleaded guilty to tax evasion in *United States v. Panico*, No. 21-cr-00305 (N.D. Ill. May 20, 2021), and the charges were predicated, at least in part, on Panico's avoidance of taxes on funds derived from his alleged scheme to defraud McKinney. (*See generally* Gov.'s Sentencing Mem., *Panico*, No. 21-cr-00305 (N.D. Ill. Oct. 19, 2021).) Nonetheless, Panico's tax evasion conviction does not trigger the exception to RICO's securities fraud exception because "it applies to defendants that have been criminally convicted of **securities violations**." *Jones v. U.S. Bank Nat'l Ass'n*, No. 10 C 0008, 2012 WL 899247, at *5 (N.D. Ill. Mar. 15, 2012) (emphasis added); *see also Kaplan v. S.A.C. Cap. Advisors, LP*, 104 F. Supp. 3d 384, 389 (S.D.N.Y. 2015) ("RICO's criminal conviction exception must be interpreted as narrowly as possible [and therefore] the exception is only available to those plaintiffs against whom a defendant has specifically been convicted of criminal fraud." (internal quotation marks omitted)).

*Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2004 WL 2278545, at *5 (N.D. Ill. Oct. 8, 2004) (quoting H.R. Rep. No. 104-369, at 47 (1995) (Conf. Rep.)). In adding the securities fraud exception, "Congress reasoned securities laws generally provide an adequate remedy for securities fraud and that imposition of the treble damages provided by RICO was unfair in those cases." *MJK Partners, LLC v. Husman*, 877 F. Supp. 2d 596, 603 (N.D. Ill. 2012); *see also Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 327 (3d Cir. 1999) ("The 'focus' of the Amendment was on completely eliminating the so-called treble damage blunderbuss of RICO in securities fraud cases." (internal quotation marks omitted)).

Consistent with Congressional intent, "courts broadly construe section 1964(c) to preclude wire and mail fraud from forming predicate acts under RICO if such conduct would also be actionable as securities fraud." *Hollinger*, 2004 WL 2278545, at *5 (internal quotation marks omitted). In determining whether "the conduct pled as predicate offenses is actionable as securities fraud," a court must "carefully examine the predicate acts in relation to the overall fraudulent conduct to determine if they are part of a scheme that operated as a fraud on sellers or purchasers of securities." *Id.* at *6 (internal quotation marks omitted). "For a claim to be actionable as securities fraud, 'it is enough that the scheme to defraud and the sale of securities coincide.'" *Cohen v. Feiner*, No. 18 C 7328, 2019 WL 1787527, at *3 (N.D. Ill. Apr. 24, 2019) (quoting *SEC v. Zandford*, 535 U.S. 813, 822 (2002)). Moreover, a court must be mindful that a plaintiff "cannot artfully plead around the securities fraud exception to RICO in an attempt to advance their case past the pleadings stage." *Id.* Thus, courts regularly dismiss RICO claims as barred by the securities fraud exception pursuant to Rule 12(b)(6). *See, e.g.*, *Cohen*, 2019 WL 1787527, at *4; *Baron v. Chehab*, No. 05-3240, 2006 WL 156828, at *9 (C.D. Ill. Jan. 20, 2006); *Hollinger*, 2004 WL 2278545, at *10.

Defendants contend that McKinney's RICO claims are barred by the securities fraud exception because the allegations underlying those claims also constitute a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, which prohibit making any material misstatement or omission in connection with the purchase or sale of any security. "By its terms, the bar in § 1964(c) . . . requires asking whether the fraud . . . alleged . . . would be actionable under . . . section 10(b) and Rule 10b-5." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 334 (7th Cir. 2019). The elements of a § 10(b) and Rule 10b-5 claim are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).

McKinney cannot credibly deny that his allegations satisfy many of the elements of a securities fraud claim under § 10(b) and Rule 10b-5. Indeed, in pleading his Illinois-law fraud claims, McKinney has alleged that: (a) "Defendants knowingly and intentionally made countless false statements of fact to and omitted to provide or disclose information to McKinney regarding his business dealings [*i.e.*, investments] with Defendants" (Compl. ¶ 130); (b) those false statements and omissions were "material" (*id.* ¶ 132); (c) Defendants made the false statements and omissions "with the intent to defraud and to falsely and fraudulently obtain and retain funds that rightfully belonged to McKinney" (*id.* ¶ 133); (d) "McKinney justifiably relied on the false statements and the absence of the information omitted and concealed" (*id.* ¶ 134); and (e) the false statements and omissions caused McKinney damages of over $20 million (*id.* ¶¶ 5, 136). But for the securities fraud exception to apply, the alleged fraud must have been in connection with the

purchase or sale of a security. And McKinney argues that his investments do not constitute securities for purposes of the federal securities laws.

Federal securities laws define "security" as including, among other things, "any note, stock, treasury stock, security future, security-based swap, bond, debenture, . . . investment contract, . . . [or] any instrument commonly known as a 'security.'" 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). Congress defined "security" broadly, so as "to encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). Notably, the term is broad enough to include unwritten instruments. *Canadian Imperial Bank of Com. Tr. Co. v. Fingland*, 615 F.2d 465, 467 n.5 (7th Cir. 1980) ("Oral agreements have been held to be securities . . . ."). Here, Defendants contend that McKinney's investments fall within the definition of "security" because each is an "investment contract."

The term "investment contract" was left undefined by Congress. *SEC v. Edwards*, 540 U.S. 389, 393 (2004). Nonetheless, in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court determined that the term "means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298–99. The Supreme Court explained that its definition was consistent with Congress's "purpose of compelling full and fair disclosure relative to the issuance of the many types of instruments that in our commercial world fall within the ordinary concept of a security." *Id.* at 299 (internal quotation marks omitted). Further, it emphasized that its definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* Accordingly, "in evaluating a financial interest to determine whether an 'investment contract,' or security, exists, the substance of the transaction must be elevated over

form; that is, the existence or non-existence of an 'investment contract' must be determined from the actual facts and circumstances of the investment arrangement." *Goodman v. Epstein*, 582 F.2d 388, 406 (7th Cir. 1978).

As defined by the Supreme Court, "[a]greements are investment contracts, and therefore 'securities,' if they reflect (1) an investment of money (2) in a common enterprise (3) with profits to come solely from the entrepreneurial or managerial efforts of others." *Shirley v. Jed Cap., LLC*, 724 F. Supp. 2d 904, 910 (N.D. Ill. 2010) (citing *Howey*, 328 U.S. at 301). The parties spend little time discussing the first two prongs of the test. Undoubtedly, McKinney invested money in exchange for a share of each development or business. As to the common enterprise prong, the Seventh Circuit has required a showing of "horizontal commonality," meaning that "each investor's interest is pooled with that of the other investors, so that each has an undivided share in a pool of assets rather than an individual asset." *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995). Horizontal commonality is present as to each investment because, at least as represented, McKinney's investment would be pooled with Panico's investment (and, where applicable, investments by Palmieri and others), with each investor to receive a pro rata share of the relevant enterprise's profits. (Compl. ¶¶ 160, 167, 174, 181, 188, 195, 202); *see Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984) (explaining that horizontal commonality requires "multiple investors [to] pool their investments and receive pro rata profits."); *see also Lauer*, 52 F.3d at 670 ("[I]t is the representations made by the promoters, not their actual conduct, that determine whether an interest is an investment contract (or other security).").

The parties' dispute focuses on whether McKinney expected that the profits he earned on his investments would accrue solely from the efforts of Panico, Palmieri, or other third parties. Despite the Supreme Court's use of the word "solely" in the third prong of the *Howey* test,

"[c]ourts have eschewed a rigid interpretation, concluding that complete passivity is not required for an individual to be an investor." *Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir. 1986). Instead, courts interpret "solely" realistically rather than strictly, such that the analysis "should turn on whether the actions of those other than the investor are the 'undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Shirley*, 724 F. Supp. 2d at 910 (quoting *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)); *see also SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1296 (M.D. Fla. 2007) ("If the scheme is designed so that the investor can remain passive while reaping the benefits of the investment, it is likely that *Howey*'s third prong has been satisfied."). Thus, even if the investor had "in some small way, personally taken some part in earning the profit which he expected from his investment," that would not, without more, "affect[] the basic nature of his . . . interest as an 'investment contract.'" *Goodman*, 582 F.2d at 408 n.59; *see also SEC v. Merchant Cap., LLC*, 483 F.3d 747, 755 (11th Cir. 2007) ("An interest . . . does not fall outside the definition of investment contract merely because the purchaser has some nominal involvement with the operation of the business."). Ultimately, "[t]he question is whether an investor, as a result of the investment agreement itself or the factual circumstances that surround it, is left unable to exercise meaningful control over his investment." *Robinson v. Glynn*, 349 F.3d 166, 170 (4th Cir. 2003).

Normally, an investor's expectations regarding the degree of his control over his investment's profitability are "analyzed at the time the interest is sold." *Santore v. Swaminathan*, No. 17 CV 5742, 2018 WL 1124414, at *3 (N.D. Ill. Mar. 1, 2018). But where, as here, "there is no written statement which delineates the intent of the parties at the time the plaintiff made his investment, that intent becomes clear from the relationship which the parties accepted thereafter." *Slevin v. Pedersen Assocs., Inc.*, 540 F. Supp. 437, 441 (S.D.N.Y. 1982); *see also SEC v. Sethi*,

910 F.3d 198, 204 (5th Cir. 2018) ("[C]ourts examine how the arrangement functioned in practice. How the arrangement functioned is typically the most important indication of whether investors had power."); *Merchant Cap.*, 483 F.3d at 756 ("[W]e may look at how the [registered limited liability partnerships] actually operated to answer the question of how control was allocated at the outset.").

In each of the nine investments discussed in the complaint, McKinney's role is consistent with that of a passive investor. For each investment, McKinney is depicted as simply following directions from Panico and Palmieri by writing out checks that were ostensibly meant to fund the purchase of property, construction or demolition work, or other steps that Panico and Palmieri claimed were necessary to develop the underlying project. (*See* Compl. ¶¶ 27–29, 31, 38–39, 44–46, 52, 58, 63, 65, 71, 76, 80, 97.) There is no suggestion that McKinney meaningfully participated in the success of the various investments beyond writing checks.[5] To the contrary, McKinney himself acknowledges that "Panico and Palmieri had a significant degree of dominance and superiority over McKinney in that Panico and Palmieri controlled the finances of entities which controlled the various projects and determined the amount of money McKinney was required to pay into the projects," and therefore, "McKinney reposed trust and confidence in Panico and Palmieri to conduct themselves with the utmost honesty and fidelity *for the benefit of McKinney's investment in the projects*." (*Id.* ¶ 147 (emphasis added)); *see Woods v. Michael*, No. 20-80651-CV, 2021 WL 1055816, at *5 (S.D. Fla. Feb. 10, 2021) ("Nowhere in the Complaint does Plaintiff allege that he was responsible for taking or took any action to render his

---

[5] McKinney cites as indicative of his control over the investments allegations of Panico and Palmieri arranging for McKinney to tour project sites and sending him photos showing the progress of construction. (Compl. ¶¶ 72, 97–98.) However, the Court finds those allegations just as consistent with the type of nominal involvement in an investment that does not place the investor's interest outside the definition of investment contract.

investments profitable; rather, the allegations paint a picture of Plaintiff transferring funds to [the defendants] in exchange for their promises that they would generate a return on those investments for Plaintiff.").

In addition, allegations that "Panico and Palmieri did not allow McKinney access to the books and records of the entities controlling the projects" and avoided providing him with other financial information regarding the projects are highly indicative of McKinney's lack of control. (*Id.* ¶¶ 100–01, 147.) Indeed, some courts regard an investor's access to information about the investment as the critical factor in the investment-contract analysis. *E.g.*, *SEC v. Shields*, 744 F.3d 633, 645 (10th Cir. 2014) ("[B]ecause the principal purpose of the securities acts is to protect investors by promoting full disclosure of information necessary to informed investment decisions, we have recognized that access to information about the investment, and not managerial control, is the most significant factor in determining whether investors are in need of the protections of the securities acts." (internal quotation marks omitted)); *Cogniplex, Inc. v. Ross*, Nos. 00 C 7463, 00 C 7933, 2001 WL 436210, at *9 (N.D. Ill. Apr. 27, 2001) ("In applying [the *Howey*] test, we remember that one of the principal purposes underlying the federal securities laws is to protect investors by promoting full disclosure of information necessary to informed investment decisions." (internal quotation marks omitted)). Without sufficient access to information, investors are precluded from making meaningful decisions about their investments. *Sethi*, 910 F.3d at 205. And here, it is clear that Defendants' control over information about the investments played a critical role in furthering their alleged fraud by depriving McKinney of a critical means of detecting it. (*E.g.*, Compl. ¶ 135 ("Panico and Palmieri fraudulently concealed the fraud by deliberately avoiding providing McKinney with legitimate documentation of McKinney's investments . . . and by failing to provide financial statements on the projects when McKinney

asked for them . . . preventing McKinney's discovery of the breaches until September 2018 at the earliest.").)

Viewing the complaint's allegations as a whole, McKinney is depicted as a passive investor who wrote checks to Panico and relied on Panico and Palmieri to do what was necessary for the success of each of the nine investments. And because the allegations also satisfy the investment-of-money and common-enterprise prongs of the *Howey* test, the Court finds that McKinney's investments are properly considered investment contracts and therefore securities as defined by the federal securities laws. In arguing against an investment-contract finding, McKinney points to the phony FDS partnership paperwork that Panico and Palmieri used to convince McKinney that his investment interests were recognized and legitimate. Specifically, McKinney argues that because the partnership was never registered, it is presumptively a general partnership under Illinois law. *See Pershing v. Sirmer*, No. 89 C 2239, 1989 WL 165155, at *3 (N.D. Ill. Dec. 27, 1989) ("Under Illinois law, a partnership is treated as a general partnership unless it files a Certificate of Limited Partnership."). And he claims that general partnerships do not satisfy the *Howey* test.

As an initial matter, in arguing that general partnerships are categorically precluded from being deemed investment contracts, McKinney relies on a Third Circuit case holding that "a participant who holds a general partnership interest in an enterprise . . . does not possess a security within the meaning of federal securities law." *Goodwin v. Elkins & Co.*, 730 F.2d 99, 108 (3d Cir. 1984). The Third Circuit, however, is an outlier in adopting a per se rule that a general partnership interest is not a security. Although the Seventh Circuit has not squarely addressed the issue, the majority of Circuits have held that while a general partnership interest is presumptively not a security, such an interest can nonetheless be deemed a security in certain circumstances. *E.g.,*

*Shields*, 744 F.3d at 643–44; *Merchant Cap.*, 483 F.3d at 755; *Hocking v. Dubois*, 885 F.2d 1449, 1460–61 (9th Cir. 1989); *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. 1981). One such circumstance is where "an agreement among the parties leaves so little power in the hands of the partner . . . that the arrangement in fact distributes power as would a limited partnership." *Williamson*, 645 F.2d at 424. Here, the FDS paperwork does not actually say anything about the distribution of power among the "partners" (*see* Compl., Ex. 1, Dkt. No. 1-1), leaving the Court to discern the distribution of power from the parties' course of dealing with respect to the investments. And, as discussed above, in practice, McKinney's status was akin to that of a passive investor such as a limited partner.

In any case, the Court rejects McKinney's contention that his arrangement with Panico and Palmieri should be treated as a general partnership. That McKinney, Panico, and Palmieri, at one point, referred to their arrangement in concededly fraudulent paperwork as a "partnership" does not mean that it should be treated as a general partnership and not an investment contract. Indeed, "[d]ressing an investment contract in the trappings of a general partnership interest does not immunize that interest from the federal securities laws." *SEC v. Schooler*, 905 F.3d 1107, 1110 (9th Cir. 2018). And the Court finds it particularly inappropriate to treat the investments as a general partnership based on the fact that Panico and Palmieri drafted fraudulent partnership paperwork and then never registered the non-existent entity with any state. "In defining the term investment contract, *Howey* itself uses the terms 'contract, transaction or scheme,' leaving open the possibility that the security not be formed of one neat, tidy certificate, but a general 'scheme' of profit seeking activities." *Hocking*, 885 F.2d at 1457 (citation omitted) (quoting *Howey*, 328 U.S. at 298–99). To take McKinney's approach and treat his investment relationship with Panico and Palmieri as a general partnership by default would "flout the Supreme Court's command to

conduct thoughtful inquiries into the economic realities of situations on a case-by-case basis." *Cogniplex*, 2001 WL 436210, at \*10; *see also SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982) ("[I]t would be incongruous to attach decisive legal significance to mere legal formality when the [Supreme] Court explicitly refused to be bound by 'the legal terminology in which such contracts are clothed,' and preceded its conclusion with a discussion of the purposes of the securities laws, which require disregarding form for substance and placing emphasis upon economic reality." (citation omitted) (quoting *Howey*, 328 U.S. at 300)). Thus, where there is no agreement delineating the parties' respective control over a venture, the Court "must look to the particulars of the instant situation, rather than invoke generalized default provisions." *Cogniplex*, 2001 WL 436210, at \*10 (declining to apply the Illinois Limited Liability Company Act's provision giving LLC members equal rights in the company's management and control in the absence of an operating agreement because the allegations depicted a business relationship in which one member assumed nearly complete control over the company). As discussed above, the economic reality of McKinney's investment relationship with Panico and Palmieri compels the conclusion that McKinney's investments constituted investment contracts.

Having determined that McKinney's investments were securities governed by federal securities laws, the Court finds that McKinney's allegations support all elements of a securities fraud claim under § 10(b) and Rule 10b-5. Consequently, McKinney's RICO claims plead predicate offenses that are actionable as securities fraud and therefore barred by § 1964(c)'s securities fraud exception. Accordingly, Counts I through III of McKinney's complaint are dismissed. The Court will, out of an abundance of caution, dismiss the RICO claims initially without prejudice to give McKinney an opportunity to attempt to plead RICO claims falling

26

outside the scope of § 1964(c).[6] But that is not an invitation for McKinney to engage in a "surgical presentation" of the facts in order to avoid the application of the securities fraud exception. *Hollinger*, 2004 WL 2278545, at *5.

### III.    State-Law Fraud Claims

Count IV of McKinney's complaint sets forth an Illinois-law fraud claim against Panico and Palmieri, and Count V alleges that Michael Panico, Pasquale Panico, ACV Properties, Post Time, and Panico Properties aided and abetted the fraud alleged in Count IV. Relatedly, Count XV alleges that all Defendants conspired to defraud McKinney. Defendants contend that, because McKinney's underlying fraud claims fail, all three Counts must be dismissed. Insofar as McKinney can state a claim for fraud, Defendants argue that the aiding and abetting and conspiracy claims nonetheless fail because they are not alleged with the particularity required by Rule 9(b).

### A.    Fraud

In Illinois, to state a claim for fraud, a plaintiff must allege: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 496 (Ill. 1996). Defendants contend that McKinney's allegations fail to plead adequately the false statement of material fact and reliance elements.

---

[6] Certainly, where RICO claims are precluded by the securities fraud exception, a plaintiff has the option to replead the barred RICO claims as claims for violations of the federal securities laws. However, that option is likely foreclosed to McKinney. Given that he has alleged discovering his injury in September 2018, the statute of limitations has apparently run on any federal securities fraud. 28 U.S.C. § 1658(b) ("[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.").

> ### i. *False Statement*

Defendants first argue that the supposedly false statements of material fact identified by McKinney are not actionable as fraud because they largely relate to Panico and Palmieri's failure to fulfill their promises to invest their own funds in the various projects. In Illinois, a fraud claim normally cannot be predicated on statements of future intention. *Am. Kitchen Delights, Inc. v. Nat'l R.R. Passenger Corp.*, No. 13 CV 4010, 2013 WL 6713776, at *2 (N.D. Ill. Dec. 19, 2013). Such "[p]romissory fraud is generally not actionable in Illinois unless the plaintiff also proves that the act was part of a scheme to defraud." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012) (internal quotation marks omitted).

The Court finds that McKinney has easily alleged the existence of a scheme to defraud. "To invoke the scheme exception, the plaintiff must allege and then prove that, at the time the promise was made, the defendant did not intend to fulfill it." *Id.* A scheme to defraud can be pleaded through a "pattern of fraudulent statements." *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 136 (7th Cir. 2011). Here, Panico made repeated promises to match McKinney's investments but never did. Similarly, Palmieri frequently promised to invest a smaller share in the investments but also failed to do so. Panico and Palmieri's fraudulent statements were made to induce McKinney's investments and McKinney relied on those promises to his detriment, as Panico and Palmieri did not invest their own funds as promised and instead misappropriated McKinney's investments while declining to give him a true ownership interest in any of the underlying projects. Those allegations are more than adequate to plead a scheme to defraud. *See Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) ("[T]he scheme exception applies where 'a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment.'"

(quoting *Concord Indus., Inc. v. Harvel Indus. Corp.*, 462 N.E.2d 1252, 1255 (Ill. App. Ct.

1984))).

In addition, Defendants contend that McKinney fails to plead the alleged false statements

with requisite particularity because, with one exception, he attributes the false statements to both

Panico and Palmieri. A complaint pleading fraud "that attributes misrepresentations to all

defendants, lumped together for pleading purposes, generally is insufficient." *Cornielsen v.*

*Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 599 (7th Cir. 2019). But the Court disagrees that

McKinney has impermissibly lumped together Panico and Palmieri with respect to the alleged

false statements. Ultimately, in pleading fraud against multiple defendants, "the complaint should

inform each defendant of the nature of his alleged participation in the fraud." *Rocha v. Rudd*, 826

F.3d 905, 911 (7th Cir. 2016) (internal quotation marks omitted). The Seventh Circuit has

observed that "courts and litigants often erroneously take an overly rigid view" of Rule 9(b),

explaining that the requisite "'who, what, when, where, and how' of the fraud . . . . may vary on

the facts of a given case." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,

631 F.3d 436, 442 (7th Cir. 2011). Here, McKinney alleges that Panico and Palmieri worked in

tandem to defraud McKinney such that the complaint adequately informs each Defendant of the

nature of their participation in the fraud when it attributes the false statements to both. For

example, McKinney alleges that on "May 21, 2014, Panico and Palmieri intentionally

misrepresented to McKinney that if McKinney invested $6 million in the Naples Garage project,

Panico would put in the same amount and they would each own 35% of the business, with

Palmieri receiving a 10% interest." (Compl. ¶ 130.b.) There is no lumping in this allegation;

Panico and Palmieri jointly presented McKinney with the investment opportunity, and both are

properly alleged to be responsible for the false representations made regarding that investment.

The remaining false statements follow a similar format, and Defendants' claim of insufficient particularity is equally unavailing as to them.

Finally, Defendants assert that the fraud claims are deficient because certain allegations related to the falsity of Panico and Palmieri's representations are made "on information and belief." Normally, a plaintiff "cannot satisfy the particularity requirement of Rule 9(b) with a complaint that is filed on information and belief." *Pirelli*, 631 F.3d at 442. However, that rule "is not ironclad," and "the practice is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Id.* at 443 (internal quotation marks omitted). The Court finds no issue with McKinney's allegations made "on information and belief." First, only 8 paragraphs of McKinney's 225-paragraph complaint are alleged "on information and belief," (Compl. ¶¶ 30, 33, 65, 67, 73, 77, 82, 92), and McKinney could plead the falsity of Panico and Palmieri's statements even with those paragraphs excised. Moreover, the allegations made "on information and belief" relate to facts that are not accessible to McKinney—namely, specific details about the misappropriation of McKinney's funds and how much of their own funds Panico or Palmieri contributed to a project. Given the control Panico and Palmieri had over financial information regarding the projects, it is unsurprising that such facts are unavailable to McKinney. And the complaint provides multiple bases for McKinney's suspicions that Panico and Palmieri contributed little to nothing to the projects and did not use McKinney's funds as represented. Allegations supporting McKinney's suspicions include that McKinney was not recognized as an owner in any project and that, during the period McKinney was investing with Panico, Panico spent amounts roughly approximate to the total amount of McKinney's investments on personal expenses and funding for entities affiliated with himself or his family. (*Id.* ¶¶ 83–91.)

Put simply, the Court finds that McKinney has alleged that Panico and Palmieri's statements of future intention were part of a pattern of fraudulent statements such that McKinney has adequately pleaded a scheme to defraud actionable as fraud in Illinois. And because those allegations were made with the requisite particularity, McKinney has sufficiently pleaded false statements of material fact.

        *ii.    Reliance*

Defendants next argue that McKinney has failed to plead that his reliance on Panico and Palmieri's false representations was justifiable. Because "[t]he law will not allow a person to enter into a transaction with eyes closed to material facts and then claim fraud by deceit," Illinois requires a plaintiff alleging fraud to "demonstrate that they justifiably relied on defendant's words or silence." *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 9 (Ill. App. Ct. 2001) (internal quotation marks omitted). For reliance to be justifiable, it need only be "'not reckless,' in other words not willfully embracing a substantial risk." *BPI Energy Holdings*, 664 F.3d at 138–39. "The right to rely depends on consideration of all the surrounding circumstances." *Miller*, 762 N.E.2d at 9.

Defendants assert that by November 2014, McKinney could not justifiably rely on any of Panico and Palmieri's statements because, by then, he had lost $3 million from investing in the Libertyville shopping center and had been provided with a document that revealed another $4 million of his investments was unaccounted for. As discussed above, the Court cannot conclude at this stage that the document understating his investments by $4 million represented an actual loss or otherwise should have alerted McKinney to the fraud. And McKinney was told that the $3 million he had invested in the Libertyville shopping center was taken by the developer, so McKinney could have reasonably continued to trust Panico and Palmieri even in spite of that loss.

In addition, because Panico and Palmieri had control over McKinney's access to information regarding his investments, McKinney lacked a real opportunity to investigate the truth of Panico and Palmieri's representations. *See, e.g.*, *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1058 (7th Cir. 1988) ("Only where the parties do not have equal knowledge, or access thereto . . . will a person be found to have justifiably relied upon the others' representations." (internal quotation marks omitted)); *Van Dorn v. Peters*, No. 14-cv-03920, 2015 WL 1396492, at *3 (N.D. Ill. Mar. 24, 2015) ("A party's reliance on another's misrepresentations is unjustified when the party has the opportunity and ability to ascertain the truth of the misrepresentation before relying on them.").

Alternatively, Defendants claim that McKinney's reliance stopped being justified in April 2017, when he asked that an LLC be created reflecting his ownership interests in the various projects. Defendants contend that McKinney's request revealed his concerns about his arrangement with Panico and Palmieri. Certainly, the Court agrees that the allegation suggests that McKinney had some concern that his investment interests had not been formalized. But there are many good reasons why McKinney might have been concerned over a lack of a legal document recording his investment interests other than suspicion of fraud. McKinney's allegations at least leave open a question of fact as to whether McKinney's reliance was justified. *See Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 918 (N.D. Ill. 2019) ("Reliance is typically a question of fact, but it can be determined as a matter of law when only one conclusion can be drawn.").

Having rejected Defendants' challenges to the Illinois-law fraud claims, their motions to dismiss Count IV are denied.

32

### B.      Aiding and Abetting

Because the underlying fraud claims survive dismissal, the Court now turns to whether McKinney has stated a claim for aiding and abetting fraud. "To plead aiding and abetting fraud, a plaintiff must plead the common law tort of fraud, and then plead the elements of aiding and abetting." *Burke v. Nationstar Mortg., LLC*, No. 21-cv-1549, 2022 WL 888811, at *14 (N.D. Ill. Mar. 25, 2022). An aiding and abetting claim requires a plaintiff to allege "(1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant is aware of his role when he provides the assistance, and (3) the defendant knowingly and substantially assisted the violation." *Fifth Third Mortg. Co. v. Kaufman*, 934 F.3d 585, 588 (7th Cir. 2019) (internal quotation marks omitted). Only Michael Panico, Pasquale Panico, and Post Time challenge the sufficiency of the aiding abetting allegations. They contend that even if the underlying fraud claims were adequately pleaded, McKinney fails to allege with particularity that they aided and abetted that fraud.

Rule 9(b)'s heightened pleading standard applies to claims of aiding and abetting fraud. *Burke*, 2022 WL 888811, at *14. Nonetheless, Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Thus, allegations of a defendant's knowledge and awareness may be alleged generally even under Rule 9(b). *Damian v. Courtright*, No. 21 C 1694, 2021 WL 3144447, at *6 (N.D. Ill. July 26, 2021). Here, McKinney pleads with particularity that Post Time (and thus its two managers, Michael Panico and Pasquale Panico) aided Panico and Palmieri's fraud by accepting transfers of McKinney's misappropriated funds and taking ownership of the Post Time Sports Bar and Grille project without recognizing McKinney's promised 49.5% ownership share. (Compl. ¶¶ 12, 61, 64, 83–84, 87, 139.) The complaint also alleges generally that Michael Panico, Pasquale Panico, and Post

Time were aware of their role in the fraud and that they knowingly and substantially assisted the fraud (*id.* ¶¶ 140–41), which suffices under Rule 9(b). Count V therefore survives Defendants' motions to dismiss.

### C. Civil Conspiracy

The complaint also alleges that all Defendants conspired to defraud McKinney. "Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). To plead a civil conspiracy claim, a plaintiff must allege:

> (1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act.

*Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053–54 (Ill. 2020). "The point of a civil-conspiracy claim is to extend liability 'beyond the active wrongdoer' to those who have 'planned, assisted or encouraged the wrongdoer's acts.' Once the conspiracy is formed, 'all of its members are liable for injuries' caused by unlawful acts performed to further the conspiracy." *Malek v. Malek*, No. 19 CV 8076, 2020 WL 6075871, at *11 (N.D. Ill. Oct. 15, 2020) (citations omitted) (quoting *Lewis*, 178 N.E.3d at 1053). Because McKinney's conspiracy claim is predicated on fraud, Rule 9(b) applies. *Edalatdju v. Guaranteed Rate, Inc.*, 748 F. Supp. 2d 860, 867 (N.D. Ill. 2010).

Given that the Court has already found above that McKinney has pleaded that he was injured by overt acts of fraud on the part of Panico and Palmieri, the question as to the civil conspiracy claim is whether McKinney has adequately alleged the existence of an agreement among Defendants to participate in the fraudulent scheme. Not all Defendants challenge the

existence of an agreement, but Michael Panico, Pasquale Panico, and Post Time argue that the complaint does not allege with specificity that they were part of any agreement with the other Defendants. Specifically, they contend that McKinney fails to allege the particulars of when the agreement was formed and how they participated in the conspiracy.

It is true that McKinney does not allege details as to when and where the agreement was made. However, the Seventh Circuit has "cautioned . . . that the exact level of particularity that is required will necessarily differ based on the facts of the case," noting that courts should be "sensitive to information asymmetries that may prevent a plaintiff from offering more detail." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013) (internal quotation marks omitted); *see also Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885, 897 (N.D. Ill. 2009) ("Although individualized information about the role of each defendant in the fraud is generally required, 'the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim.'" (quoting *Corley v. Rosewood Care Ctr.*, 142 F.3d 1041, 1051 (7th Cir. 1998))). Here, the Court has already discussed the information asymmetries between McKinney and Defendants. Consequently, it would be unreasonable to expect McKinney to know exactly when and where each Defendant joined the conspiracy or what, exactly, they agreed to do in furtherance of the conspiracy.

Ultimately, Rule 9(b) does not require a complaint to describe all aspects of the conspiracy in elaborate detail. *Edalatdju*, 748 F. Supp. 2d at 867. All that is necessary is that the complaint "provide[] a 'general outline of the fraud scheme' sufficient to 'reasonably notify the defendants of their purported role' in the fraud." *Whitley*, 607 F. Supp. 2d at 897 (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)); *see also Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827, 839 (N.D. Ill. 2007) ("Rule 9(b) mandates only that the ***circumstances***

constituting fraud be stated with particularity. If those circumstances are well and particularly pleaded, it would saddle plaintiffs with an inordinate burden to require that the depth and breadth of the collusion must also be set out in detail."). McKinney provides ample details regarding the fraudulent scheme and each Defendant's purported role. Broadly, McKinney alleges that Defendants agreed to defraud him by diverting his investments into Defendant corporate entities, which were owned and controlled by Panico or his sons. (Compl. ¶ 208.) That fraudulent scheme was spearheaded by Panico and Palmieri and began in 2007 when they solicited McKinney's first investment in the Libertyville shopping center project. (*Id.* ¶¶ 23, 26–27.) Panico and Palmieri took the lead in obtaining McKinney's funds. The corporate entity Defendants' role (acting through their principals, Panico or Michael Panico and Pasquale Panico) was to accept McKinney's investments and use them for their own purposes—often to take ownership of the projects themselves while disregarding McKinney's legitimate ownership interests. (*Id.* ¶¶ 83–90.)

McKinney provides more than enough details of Defendants' agreement to defraud him to satisfy Rule 9(b) and also sufficiently pleads the remaining elements of his civil conspiracy claim. For that reason, Defendants' motions to dismiss Count XV are denied.

### IV.    Fraudulent Transfer

Count XVI sets forth a claim for fraudulent transfer pursuant to 740 ILCS 160/5 against Post Time only. Illinois's Uniform Fraudulent Transfer Act ("UFTA") "was enacted to enable a creditor to defeat a debtor's transfer of assets to which the creditor was entitled." *A.G. Cullen Constr., Inc. v. Burnham Partners, LLC*, 29 N.E.3d 579, 586 (Ill. App. Ct. 2015). "The purpose of the [UFTA] is to invalidate otherwise sanctioned transactions made with fraudulent intent." *Nw.*

*Mem'l Hosp. v. Sharif*, 22 N.E.3d 1217, 1223 (Ill. App. Ct. 2014). In relevant part, the UFTA

provides:

> A transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made
> the transfer . . . :
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the
> transfer . . . and the debtor:
>
> (A) was engaged or was about to engage in business or a transaction for which the
> remaining assets of the debtor were unreasonably small in relation to the business
> or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that he would
> incur, debts beyond his ability to pay as they became due.

740 ILCS 160/5(a). For purposes of the statute, "a creditor is a person or entity who has a right to

repayment, whether or not it has been reduced to a judgment." *Nw. Mem'l*, 22 N.E.3d at 1223

(citing 740 ILCS 160/2(c), (d)).

McKinney's fraudulent transfer claim is based on Panico and Palmieri's transfer of

McKinney's investments and ownership interests to Post Time, and he cites five different

transfers related to the Post Time Sports Bar and Grille project that occurred between September

2017 and May 2018. (Compl. ¶ 215.) While Defendants claim that these transfers were not

pleaded with sufficient particularity because the complaint does not allege as to each the amounts

transferred, there is no reason to think that such detailed information was available to McKinney.

As explained above, Rule 9(b)'s particularity requirement takes into account the circumstances of

the case. Here, McKinney invested in the Post Time Sports Bar and Grille project by writing

checks to AP Capital and was unaware that his investments were being diverted to another LLC.

(Compl. ¶¶ 63–64.) Given these circumstances, the Court does not believe Rule 9(b) requires

McKinney to perform a precise accounting of how his money was misappropriated—such a task likely requires information that can only be obtained through discovery.

"Under the UFTA, there are two types of fraud; actual fraud or 'fraud in fact,' and constructive fraud or 'fraud in law.'" *Cordes & Co., LLC v. Mitchell Cos., LLC*, 605 F. Supp. 2d 1015, 1020 (N.D. Ill. 2009). Relevant here, fraud in fact refers to subsection (a)(1) of the UFTA, which requires a plaintiff to "prove that the transfers were made with the actual intent to hinder, delay, or defraud the creditors." *Apollo Real Est. Inv. Fund, IV, LP v. Gelber*, 935 N.E.2d 963, 975 (Ill. App. Ct. 2010).[7] To determine the existence of actual intent, the UFTA lists 11 factors that are sometimes referred to as "badges of fraud." 740 ILCS 160/5(b); *People ex rel. Dep't of Hum. Rights v. Oakridge Healthcare Ctr., LLC*, 181 N.E.3d 184, 196 (Ill. 2020). Many of those badges of fraud are present here. First, the transfers were to an insider, 740 ILCS 160/5(b)(1), namely from Panico (or a Panico-affiliated entity) to an entity affiliated with his sons; an "intra-family transfer[] is a powerful indicator of fraud," *Kunz v. City of Chicago*, No. 01 C 1753, 2007 WL 404022, at *4 (N.D. Ill. Jan. 31, 2007). In addition, Panico retained control over the transferred money after the transfer, 740 ILCS 160/5(b)(2), concealed the transfer, *id.* 160/5(b)(3), and received no consideration for the transfer, *id.* 160/5(b)(8). Enough badges of fraud are alleged to state a claim for fraudulent transfer. Defendants' motions to dismiss are therefore denied as to Count XVI.

## V.  Breach of Fiduciary Duty Claims

Similar to his fraud claims, McKinney asserts breach of fiduciary duty claims against Panico and Palmieri at Count VI, and alleges at Count VII that Michael Panico, Pasquale Panico, ACV Properties, Post Time, and Panico Properties aided and abetted Panico and Palmieri's breach

---

[7] Fraud in law refers to subsection (a)(2), "where a transfer is made for no or inadequate consideration" such that "fraud is presumed." *Nw. Mem'l*, 22 N.E.3d at 1223.

of fiduciary duty. Defendants argue that McKinney fails to plead a breach of fiduciary duty claim, and for that reason both Counts VI and VII must be dismissed.[8]

An Illinois breach of fiduciary duty claim requires a plaintiff to plead "that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains." *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000). Defendants assert that McKinney has failed to plead the proximate-cause element. However, none of the motions to dismiss truly develop an argument that McKinney failed to show an injury proximately caused by Defendants' breach of fiduciary duty. *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("[P]erfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." (internal quotation marks omitted)). Instead, Defendants essentially repackage the justifiable reliance arguments they made in connection with the fraud claims, with their apparent contention being that, since it was unreasonable for McKinney to rely on Panico and Palmieri's misrepresentations, proximate cause is absent. But the Court is aware of no authority suggesting that Panico and Palmieri's misrepresentations, or the reasonableness of McKinney's reliance on them, have any relevance to the breach of fiduciary duty claims. Even if reasonable reliance were a proper consideration in the fiduciary duty proximate-cause analysis, the Court has already determined that it cannot resolve that issue at the pleading stage. Because Defendants raise no other grounds for dismissing the breach of fiduciary duty claims, their motions to dismiss Counts VI and VII are denied.

---

[8] Defendants focus their attack on the sufficiency of the underlying breach of fiduciary duty claims and do not raise any argument for dismissing the aiding and abetting claims in the event McKinney is found to plead a breach of fiduciary duty adequately.

## VI. Breach of Oral Contract and Unjust Enrichment

McKinney sets forth seven claims for breach of oral contract at Counts VIII through XIV, which arise from Panico and Palmieri's failures to invest McKinney's funds as promised. Defendants seek dismissal of the breach of oral contract claims solely on statute-of-limitations grounds but otherwise do not challenge the sufficiency of the claims on the merits. Because this Court has declined to dismiss any claim as untimely, Counts VIII through XIV survive dismissal.

Pleaded in the alternative to the breach-of-contract counts, is the unjust enrichment claim at Count XVII. To state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of that benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). A claim for unjust enrichment "is an equitable remedy based upon a contract implied in law," and therefore, "[i]f an express contract exists to govern the parties' conduct, then there is no room for an implied contract." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) (internal quotation marks omitted). Because McKinney has expressly alleged the existence of oral contracts, he pleads his unjust enrichment claim in the alternative. (Compl. ¶ 218 ("Alternatively to the contract counts, McKinney asserts that Defendants were unjustly enriched . . . .").)

While it is permissible to plead a claim for breach of contract and, in the alternative, a claim for unjust enrichment, "the inconsistent-pleading option in this context is limited." *Cohen*, 735 F.3d at 615. "A plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is ***not*** an express contract, then the defendant is liable for unjustly enriching himself at my expense." *Id.* Defendants contend that McKinney does not properly plead unjust enrichment in the alternative because he begins Count XVII by stating

that he "incorporates and re-alleges the foregoing allegations." (Compl. ¶ 217.) In other words, McKinney's unjust enrichment claim improperly incorporates his preceding allegations of an express, oral contract. McKinney does not address or defend against this argument. And courts routinely dismiss unjust enrichment claims that make such an error. *E.g.*, *Hernandez v. Ill. Inst. of Tech.*, No. 20-cv-3010, 2022 WL 952524, at \*5 (N.D. Ill. Mar. 30, 2022) ("[B]reach of contract and unjust enrichment generally may be pleaded in the alternative, so long as the plaintiff has not incorporated allegations of contract into his or her unjust enrichment claim." (internal quotation marks omitted)). Consequently, Count XVII is dismissed without prejudice.

## VII. Declaratory Judgment

Finally, with Count XVIII, McKinney seeks a declaratory judgment that he is an owner in the various projects and entities in which he invested. Defendants assert that McKinney's declaratory judgment claim should be dismissed because the controversy has ripened such that a declaratory judgment serves no useful purpose that cannot be addressed by the substantive claims. In response, McKinney argues that the available remedies under his substantive claims are money damages and he needs a declaratory judgment to have his ownership rights in the projects recognized. "Because the declaratory judgment procedure does not replace but merely adds to existing remedies a form of judgment to declare the rights of the parties, the existence of other remedies does not preclude judgment for declaratory relief, even though such other remedies may be equally effective." *Beahringer v. Page*, 789 N.E.2d 1216, 1224 (Ill. 2003) (internal quotation marks omitted). Moreover, "a declaratory judgment action is proper to determine the parties' existing rights" so long as the party is not seeking to enforce his rights after the fact. *Karimi v. 401 N. Wabash Venture, LLC*, 952 N.E.2d 1278, 1283 (Ill. App. Ct. 2011).

As alleged, McKinney has ownership interests in the projects in which he invested with Panico and Palmieri. Three of those projects were completed, are currently operational, and profitable, and the land underlying one of the other projects remains in Defendants' control. (Compl. ¶¶ 82, 84.) A declaration of McKinney's rights as to those projects and property serves a purpose that may not be adequately addressed by legal remedies. Thus, the Court declines to dismiss Count XVIII.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss (Dkt. Nos. 23, 26, 28) are each granted in part and denied in part. The motions are denied as to Counts IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XV, XVI, and XVIII of McKinney's complaint, and granted as to Counts I, II, III, and XVII, which are dismissed without prejudice.

ENTERED:

Dated:  September 29, 2022

Andrea R. Wood
United States District Judge