**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | |
|---|---|
| LARRY A. McKINNEY, JR., as Personal Representative of the Estate of Larry A. McKinney, Sr. and as Trustee of the Larry A. McKinney, Sr. Living Trust Dated October 5, 2017,<br><br>        Plaintiff,<br><br>    v.<br><br>ANTHONY PANICO, individually and as trustee of the Dominic Alphonse Panico Trust Dated February 15, 2016, the Matea Ann Panico Trust Dated February 15, 2016, the Michael Anthony Panico Trust Dated February 15, 2016, the Pasquale Anthony Panico Trust Dated February 15, 2016, and the Santino Joseph Panico Trust Dated February 15, 2016; VINCENT PALMIERI; ACV PROPERTIES, LLC; ADESSO INVESTMENTS, LLC; AP CAPITAL MANAGEMENT, LLC; FPH LLC; FPH MANAGEMENT, INC.; PANICO PROPERTIES, LLC; and POST TIME SPORTS BAR AND GRILLE, LLC;<br><br>        Defendants. | Case No. 1:21-cv-4602<br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

Plaintiff Larry McKinney, Jr., as Personal Representative of the Estate of Larry A. McKinney, Sr. and as Trustee of the Larry A. McKinney Sr. Living Trust Dated October 5, 2017, complains against Defendants Anthony Panico, individually and as trustee of the Dominic Alphonse Panico Trust Dated February 15, 2016, the Matea Ann Panico Trust Dated February 15, 2016, the Michael Anthony Panico Trust Dated February 15, 2016, the Pasquale Anthony Panico Trust Dated February 15, 2016, and the Santino Joseph Panico Trust Dated February 15, 2016,

1

Vincent Palmieri, ACV Properties, LLC, Adesso Investments, LLC, AP Capital Management, LLC, FPH Management, Inc., FPH, LLC, Panico Properties, LLC, and Post Time Sports Bar and Grille, LLC, (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1.      This is an action for fraud, breach of fiduciary duty, breach of contract, promissory estoppel, civil conspiracy, unjust enrichment, and fraudulent transfer.

2.      Between 2007 and 2018, Defendant Anthony Panico and, beginning in 2010, Defendant Vincent Palmieri, and entities owned or controlled by them, engaged in an unlawful scheme to defraud Larry A. McKinney, Sr. ("McKinney") that involved a combination of fraudulent misrepresentations, material omissions, and acts of concealment.

3.      The purpose and effect of the fraudulent scheme was to obtain over $30 million from McKinney under a variety of pretenses.  Defendants obtained these funds pursuant to explicit and acknowledged obligations to pay McKinney back in full for moneys provided to them and that McKinney would have ownership interests in certain projects. However, Defendants never had any intention to pay McKinney back or to provide him with ownership interests in the projects and instead misused and diverted McKinney's funds into the Defendant corporate entities controlled by Panico, his family members, and Palmieri, and to fund the acquisition of Panico's personal homes across the country and into trusts for the benefit of his children.

4.      Most of the money McKinney provided to the Defendants was for the purpose of investing in specific real estate development projects as an owner of those projects. Defendants used a series of fraudulent misrepresentations and omissions to induce McKinney to provide those funds, including that they would also invest their own funds in the projects and that McKinney

would be recognized as an owner of, and entitled to profits generated by, those projects. Defendants knew these statements were false when they made them.

5.     Defendants have admitted in both contemporaneous documents and in this litigation that McKinney provided funds to be invested in the real estate projects and that they in fact either did not invest his funds in the projects and/or have not recognized McKinney as an investor or owner in the projects.

6.     McKinney also provided funds to the Defendants as loans, either to Defendants or third parties. Defendants have admitted in both contemporaneous documents and in this litigation that they owed McKinney an obligation to return both principal and interest to McKinney on those loans.

7.     Defendants' fraudulent scheme began in 2007 and involved the misappropriation and misuse of tens of millions of dollars. In just the period between 2011 and 2018, McKinney provided nearly $20 million to Defendants. Defendants have returned, at most, only approximately $7 million of those funds to McKinney. The rest of McKinney's funds, unbeknownst to McKinney, were diverted for the personal benefit of Defendants, their entities, and their family members.

8.     Defendants used a series of fraudulent misrepresentations, omissions, and acts of concealment to avoid their obligation to pay back McKinney what they owed. By way of example, and as more fully described below, Defendants lied to McKinney about the status of the projects and the reasons those projects failed. Defendants further lied to McKinney that his investments were being rolled into new real estate projects.

9.     Defendants further have used a series of ever-changing and inconsistent excuses to avoid paying back what they owe. For example, when McKinney demanded the return of his money in 2019, Defendants proposed that McKinney execute a document that falsely stated  that

the funds McKinney had provided were loans to Defendant AP Capital to make investments for the benefit of the trusts maintained for Panico's children. Notwithstanding that lie, Defendants acknowledged in 2019 that AP Capital owed an obligation to repay the funds obtained from McKinney.

10.     Defendants' lies and acts of concealment have continued in this litigation, which has been pending since August 27, 2021, and have involved the processes of this Court. Defendants first denied in their Answers, sworn interrogatory responses, and responses to requests for admission that McKinney provided funds to be invested in the real estate projects. Defendants later amended their interrogatory responses on August 4, 2023 and finally admitted that McKinney had provided funds to be invested in the projects. Defendants' amended responses also contained a new lie—that millions of dollars that McKinney had provided to Panico was for gambling by McKinney and had been placed on losing bets. In fact, McKinney was not a gambler, and this was not the reason McKinney provided Panico with funds.

11.     Plaintiff seeks compensatory damages, punitive damages, sanctions under the Court's inherent authority and under 28 U.S.C. § 1927, and other relief as set forth herein.

## PARTIES, JURISDICTION AND VENUE

12.     Plaintiff Larry McKinney, Jr. is a citizen of South Carolina. He is the duly appointed Personal Representative of the Estate of Larry A. McKinney, Sr. and Trustee of the Larry A. McKinney, Sr. Living Trust Dated October 5, 2017.

13.     Defendant Anthony Panico ("Panico") is a citizen of Illinois and a convicted felon who failed to file tax returns for nearly three decades. Panico was also the trustee of the Panico Family Trust. The Panico Family Trust terminated in 2016 and distributed its assets to separate trusts for each of Panico's children. Panico is now trustee of the Dominic Alphonse Panico Trust

4

Dated February 15, 2016, the Matea Ann Panico Trust Dated February 15, 2016, the Michael Anthony Panico Trust Dated February 15, 2016, the Pasquale Anthony Panico Trust Dated February 15, 2016, and the Santino Joseph Panico Trust Dated February 15, 2016.

14.     Defendant Vincent Palmieri ("Palmieri") is a citizen of Illinois. Palmieri was a lawyer until his license was suspended in 2017 for conversion and misrepresentation.

15.     Defendant Panico Properties, LLC is an Illinois LLC whose sole members are the Panico children's trusts. It is therefore a citizen of Illinois.

16.     Defendant Adesso Investments, LLC was a Nevada LLC whose sole members were Palmieri and Corsair Holdings Inc. Corsair Holdings Inc., in turn, is a Nevada corporation with its principal place of business in Nevada. Adesso Investments, LLC is therefore a citizen of Illinois and Nevada.

17.     Defendant ACV Properties, LLC is an Illinois LLC whose sole member is Panico Properties LLC. It is therefore a citizen of Illinois.

18.     Defendant Post Time Sports Bar and Grille, LLC is an Illinois LLC whose managers and members, on information and belief, are Pasquale Panico and Michael Panico, who are citizens of Illinois. It is therefore a citizen of Illinois.

19.     Defendant AP Capital Management, LLC is an Illinois LLC whose sole manager and member is Panico. It is therefore a citizen of Illinois.

20.     Defendant FPH Management Inc. was an Illinois corporation with its principal place of business in Libertyville, Illinois. It is a citizen of Illinois.

21.     Defendant FPH LLC was an Illinois LLC whose sole member, on information and belief, is FPH Management, Inc. It is a citizen of Illinois.

22.     This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a) because the action is exclusively between a citizen of South Carolina and citizens of Illinois and Nevada, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

23.     This Court has personal jurisdiction over the individual defendants, Panico and Palmieri under 735 ILCS 5/2-209(b)(1), (2), and (4) and 735 ILCS 5/2-209(a)(1), (2), (3), (7), (10), (11); and over the corporate defendants, ACV Properties, LLC, Post Time Sports Bar and Grille, LLC, Adesso Investments LLC, AP Capital Management, FPH LLC, FPH Management Inc., and Panico Properties, LLC under 735 ILCS 5/2-209(a)(1), (2), (3), (7), and (10).

24.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because the defendants reside in this District and a substantial part of the events and omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

25.     Larry McKinney, Sr. was a successful businessman who founded Eldeco Inc., a Greenville, South Carolina-based company that designs and builds electrical systems for commercial, institutional, and industrial projects throughout the Southeast.

26.     In or around 2007, McKinney was introduced to Anthony Panico through a mutual acquaintance.

_McKinney's Initial Investments and Loans with Panico_

27.     Around the same time McKinney and Panico met in 2007, Panico first raised the idea with McKinney of investing in certain real estate projects.

28. The first real estate project Panico and McKinney discussed was the development of a shopping center in Libertyville, Illinois. Panico represented that if McKinney invested in the project, Panico would also invest some of his own funds and the two would be among the owners of the project, entitled to profits.

29. McKinney ultimately paid Panico more than $3.1 million through nominees to invest in the shopping center project.

30. Contrary to his representations, Panico, as he has now admitted, made no investments of his own into the shopping center development. (Panico's Response to Plaintiff's Requests to Admit, Dkt. 90, ¶ 8.)

31. Nor did Panico invest McKinney's funds to develop the shopping center. Panico instead diverted those funds to acquire lakefront land in Genoa City, Wisconsin and build a $2.5 million home there, to acquire real estate on Sage Court in Green Oaks, Illinois, and to acquire several manufacturing companies from Palmieri's clients.

32. The Libertyville shopping center was never developed. Panico falsely told McKinney that the supposed developer, Joseph Tremont, ran off with the money which McKinney had invested. That representation was false and known by Panico to be false when made.

33. By 2014, McKinney had provided Panico, his entities, and nominees over $13 million. In addition to investing in real estate projects, McKinney also provided loans to Panico, Panico's entities, or third parties through Panico or his entities. During that same time, Panico returned a small portion of funds to McKinney and acknowledged owing McKinney the remaining principal amounts provided, plus either profits (in the case of investments) or interest (in the case of loans).

*Panico's Web of Entities*

34.     At the same time McKinney was making his initial investments and loans with Panico, Panico, with Palmieri's assistance, embarked on an elaborate scheme to conceal his misuse of McKinney's funds and make his conduct difficult to detect and unravel.

35.     According to the U.S. Attorney's Office for the Northern District of Illinois, Panico "operated in a manner specifically calculated to conceal his accumulation of wealth and income. This conduct included the creation of a web of entities including LLCs and trusts, acquiring assets, holding assets in the name of nominees, and engaging in sizable cash transactions through nominees." Gov't Sent'g Mem., *United States v. Panico*, Case No. 1:21-cr-305, Dkt. 22 at 5 (N.D. Ill. Oct. 19, 2021). As Panico has himself admitted, he "sought to evade the assessment and payment of income taxes owed to the United States through the creation and use of multiple entities as well as the use of nominees to conceal his receipt of income and the acquisition of assets." Plea Agreement, *United States v. Panico*, Case No. 1:21-cr-305, Dkt. 15, at 2 (N.D. Ill. May 20, 2021). "These entities were operated in a manner in which they neither created nor maintained complete records that showed income PANICO received through these entities." *Id.* at 3.

*AP Capital Management LLC*

36.     On July 11, 2008, Panico created Defendant AP Capital Management, LLC. Panico was AP Capital's sole member and manager.

37.     AP Capital served as the central clearinghouse for receiving McKinney's funds and diverting them to Panico's and Palmieri's personal benefit. Between 2011 and 2018, McKinney paid more than $16 million directly to AP Capital. He also paid $3.8 million to FPH, LLC and at least $2.8 million to Panico through nominees.

8

38.     Panico generally deposited McKinney's funds in one of AP Capital's bank accounts. The money typically stayed there only for a short period of time until it was transferred to FPH or Adesso, or used to fund real estate acquisitions or loans to third parties. Given the magnitude of McKinney's contributions and the minimal amount of funds provided by other sources to AP Capital, McKinney's money and income derived from assets acquired with that money effectively funded all or most of Panico's and Palmieri's real estate acquisitions and third-party loans, as well as personal expenses. AP Capital paid Palmieri nearly $1 million from a single account between 2011 and 2018.

*FPH Management and FPH, LLC*

39.     Defendants FPH Management, Inc. and FPH, LLC were nominally owned by Panico's son, Pasquale. In fact, FPH Management and FPH, LLC were Panico's personal piggybanks.

40.     As Panico has admitted, between 2010 and 2017, Panico "used funds from the accounts of FPH, LLC and FPH Management to pay certain personal expenses, including college tuition and personal credit card payments for PANICO and his family members, and to make large cash withdrawals." Plea Agreement, *United States v. Panico*, Case No. 1:21-cr-305, Dkt. 15 at 5 (N.D. Ill. May 20, 2021). For example, Panico used the FPH entities to pay $300,000 in college tuition, to pay more than $600,000 to a single Citibank credit card held in his wife's name, and to withdraw nearly $3.5 million in cash. Gov't Sent'g Mem., *United States v. Panico*, Case No. 1:21-cr-305, Dkt. 22 at 8, 12–13 (N.D. Ill. Oct. 19, 2021). Panico also used the FPH entities and Corsair to transfer $5.5 million to his children's trusts in April 2016.

41.     McKinney provided $3.8 million directly to FPH, LLC. In addition, between 2011 and 2018, AP Capital transferred approximately $4.5 million to FPH, LLC and FPH management.

42.     Given the magnitude of McKinney's contributions and the minimal amount of funds provided by other sources, McKinney's money and income derived from assets acquired with that money effectively funded all or most of FPH, LLC and FPH Management's expenditures.

*Adesso Investments LLC*

43.     Panico and Palmieri created Defendant Adesso Investments, LLC in 2010. Panico's Corsair Holdings, Inc. owned 78 percent of Adesso, and Palmieri owned the remaining 22 percent.

44.     As the U.S. Attorney found, "[i]n April 2010, Panico used a portion of the McKinney funds to acquire distressed manufacturing companies that had been clients of [Palmieri]. Together, [Palmieri] and Panico used these funds to purchase the companies through [Adesso]." Gov't Sent'g Mem., *United States v. Panico*, Case No. 1:21-cr-305, Dkt. 22 at 6 (N.D. Ill. Oct. 19, 2021).

45.     Over the years, Adesso also made small, periodic payments to McKinney intended to lull him into believing that Panico's operation was legitimate and falsely conveying that Panico intended to re-pay McKinney in full.

46.     Adesso was also instrumental in shuttling funds provided by McKinney among and between Panico's and Palmieri's various entities to conceal the origin of the funds.

*ACV Properties LLC*

47.     Panico and Palmieri created Defendant ACV Properties LLC to hold office and industrial condominiums located in Viking Park and Polo Trail in Green Oaks, Illinois ("Viking-Polo").

48.     As discussed in more detail below, Panico and Palmieri acquired the condominiums with McKinney's funds, which they obtained through misrepresentations that McKinney would be and was an owner of the properties.

10

49.     ACV Properties is now owned by Defendant Panico Properties, LLC.

*Post Time Sports Bar and Grille LLC*

50.     Panico and Palmieri created Defendant Post Time Sports Bar and Grille LLC to own and operate a restaurant in Libertyville, Illinois.

51.     As discussed in more detail below, they acquired and renovated the building with McKinney's funds, which they obtained through misrepresentations that McKinney would be and was an owner.

*Panico Properties LLC*

52.     Beginning in or around 2017, Panico and Palmieri consolidated their real estate holdings acquired with McKinney's funds into Panico Properties, LLC.

53.     Panico Properties, LLC is nominally managed by Panico's son Pasquale, but it is wholly owned by the five Panico children's trusts, of which Panico is trustee and Palmieri is or was trust protector.

*Panico Family Trust*

54.     Panico and Palmieri created the Panico Family Trust in 2010. Panico's mother Ann was nominally the settlor, Panico is the trustee, and Palmieri is or was trust protector.

55.     Upon Ann Panico's death in 2016, the trust terminated, and its assets were distributed among the separate trusts of Panico's five children.

56.     Through Panico Properties, the Panico children's trusts hold all or most of the real estate acquired with McKinney's funds.

*Kim Rothmann*

57.     Kim Rothmann was an employee of Libertyville Bank until 2014. In that capacity, she facilitated Panico's money laundering and evaded reporting requirements. *See* Gov't Sent'g Mem., *United States v. Panico*, Case No. 1:21-cr-305, Dkt. 22 at 8–9 (N.D. Ill. Oct. 19, 2021).

58.     In 2014, Rothmann came to work as a bookkeeper for Panico, Palmieri, and their entities. In that capacity, she continued to facilitate Panico's money laundering through her relationships with Libertyville Bank employees. *See id.* Rothmann effected the transfer of funds between Panico's various entities through use of email accounts with the domains adessoinvest.com and panicoproperties.com.

59.     When McKinney requested financial records for the various projects from Rothmann, she provided only excuses and half-truths, concealing from McKinney that his funds had not been used for the agreed-upon purposes and that Panico and Palmieri did not acknowledge McKinney's ownership interest in the projects.

*McKinney's Subsequent Real Estate Investments after 2011*

60.     After the initial investment in the shopping center project, Panico and Palmieri proposed additional real estate development projects to McKinney. Despite Defendants' subsequent attempts to deny that McKinney ever invested in any real estate through Defendants, Panico has admitted that "McKinney lent money to AP Capital and invested in certain, mostly real estate, projects with AP Capital." Sent'g Hr'g Tr. 18:6–8, *United States v. Panico*, Case No. 1:21-cr-305, Dkt. 32 (Oct. 26, 2021). Moreover, contrary to his prior denials in this case, Panico has recently admitted that McKinney in fact invested in the below-described real estate projects. *See* Panico's Am. Resp. to Pl.'s 2d Set of Interrog. at 6.

*Naples Garage Project*

61.     Beginning in the summer of 2013, Palmieri and Panico proposed to McKinney an investment in Premier Auto Suites of Naples, which was to be a development of approximately 140 "garage condominiums" in Naples, Florida ("Naples Garage Project"). The project site was at the intersection of Radio and Livingston Roads in Naples and, when Panico and Palmieri first proposed the project, the site was owned by Lowe's Corporation ("Lowe's").

62.     McKinney first traveled to Naples in June 2013 to discuss the project with Panico and Palmieri.

63.     At various times between June 2013 and May 21, 2014, Panico and Palmieri represented to McKinney that if McKinney invested $6 million in the project, Panico would put in the same amount and they would each own 35% of the business. As to the remaining 30% ownership, Palmieri was to own 10% of it for being the project "administrator" and Mike Werchek ("Werchek") was to own the remaining 20% in exchange for developing the site.

64.     In August 2013, Palmieri forwarded to Werchek a list of questions McKinney had about the development project. Werchek responded with answers to the questions, telling McKinney, "We want you to be comfortable with the project."

65.     In May 2014, McKinney traveled to Naples again to discuss the project with Panico and Palmieri. At those meetings, Panico and Palmieri provided McKinney documentation that identified McKinney as a 50% capital and 35% profit partner in the Naples Garage project. The documentation further identified McKinney's initial investment in the project as approximately $2.3 million and outlined various scenarios for rolling McKinney's funds into new projects if the Naples Garage project fell through.

66.     Accordingly, on May 21, 2014, per Panico and Palmieri's direction, McKinney made his initial investment in the Naples Garage project via a check for $2.1 million made out to AP Capital Management, LLC.

67.     On August 7, 2014, Palmieri forwarded McKinney a brochure for the project that he represented was being sent out to high-end automobile owners in the Naples area.

68.     On September 4, 2014, Palmieri emailed McKinney a Word document entitled "Larry McKinney Naples Project Alternatives."

69.     McKinney traveled to Naples again between September 11-15, 2014 to discuss the project with Panico and Palmieri.

70.     On September 15, 2014, McKinney invested another $1,000,000 in the Naples Garage project through a check written to AP Capital per Panico's directions.

71.     Panico and Palmieri induced McKinney to make his investments by telling him that they made a deal with Lowe's to buy the property and that the partnership put in $500,000 of earnest money. Panico represented to McKinney that another $170,000 of money was spent on the project.

72.     McKinney ultimately provided approximately $6 million to Panico to be invested in the Naples Garage Project.

73.     Contrary to his representations, Panico, as he has now admitted, made no investments of his own into the Naples Garage Project. (Panico's Response to Plaintiff's Requests to Admit, Dkt. 90, ¶ 36.)

74.     Nor did Panico and Palmieri invest McKinney's funds in the Naples Garage Project. Instead, Panico used McKinney's funds and income derived from the misuse of McKinney's funds to purchase a condo in the Chelsea neighborhood of New York for his son for $1.16 million; to

purchase the Ashford Oaks development in Green Oaks, Illinois for $1.41 million; to purchase a condo in Palm Harbor, Florida for $205,000; and to purchase a building for his family's restaurant in Libertyville, Illinois for $385,000.

75.     The Naples Garage Project was never completed. Panico and Palmieri told McKinney it failed to go forward because Werchek lacked the political connections to get the necessary approvals, including in an October 21, 2018 email from Palmieri to McKinney. Those representations were false and Panico and Palmieri knew they were false when made.

76.     In fact, the Naples Garage Project failed because, having spent McKinney's money to enrich themselves personally, and never having contributed any of their own funds, Palmieri and Panico lacked the money to complete the purchase of the Radio and Livingston property from Lowes.

77.     Panico and Palmieri represented to McKinney that McKinney's investment in the Naples Garage project would be "rolled over" into subsequent projects, including the Polo Build to Suit project, the Viking Polo project, and the Post Time Sports Bar and Grille project (each discussed below). However, McKinney never received any funds or interests in property from the supposed "roll over," and the promise of a roll over was merely part of the fraud and fraudulent concealment.

78.     Panico and Palmieri further represented to McKinney that Werchek had agreed to repay to McKinney a portion of McKinney's investment in the Naples Garage Project, including in an August 8, 2016 email from Palmieri to McKinney. Upon information and belief, those representations were false, and Panico and Palmieri knew they were false when made.

*Viking Polo and Polo Build-to-Suit*

79.     At around the same time Panico and Palmieri induced McKinney to invest in the Naples Garage project, they also induced McKinney to invest in another two projects, the first a planned manufacturing building on Polo Trail (the "Polo Build to Suit project"), and the second, a 20,000 square foot office-warehouse building and 75,000 square feet of mixed office and warehouse condominiums in Viking Park in Green Oaks, Illinois (the "Viking-Polo project").

80.     As to each project, Panico and Palmieri represented that McKinney would be a 50% owner with his investment, and that McKinney was in fact an owner in them.

81.     Panico and Palmieri represented to McKinney that if McKinney invested in the projects, Panico would put in the same amount of money and they would each own 50% of the businesses.

82.     By May 18, 2014, McKinney had provided $3 million to be invested in the Viking-Polo project. Panico and Palmieri provided McKinney with a document on or around May 18, 2014 that referenced and acknowledged this investment.

83.     In or around November 2014, Panico and Palmieri provided McKinney with documentation for a partnership they called FDS Partners. (*See* Ex. 1.) FDS stands for *"Fratelli di Sangue,"* which, according to the document, translates from Italian to "Blood Brothers." Panico and Palmieri came up with the name to convince McKinney that he was their "blood brother" and to ensure that he would not be concerned about his investments. The purpose of the document, besides documenting the agreements of the parties, was to convince McKinney that his interests in the various investments were recognized and legitimate.

84.     In the FDS Partners document, Panico and Palmieri represented to McKinney that $3,000,000 he had provided to Panico had been used, with his consent, "to purchase the Viking-Polo project."

85.     The FDS Partners document also states that "The capital account reflects CDES's [a McKinney entity] contribution towards this project."

86.     Contrary to his representations, Panico, as he has now admitted, made no investments of his own into the Viking Polo or Polo Build to Suit projects. (Panico's Response to Plaintiff's Requests to Admit, Dkt. 90, ¶¶ 47, 57.)

87.     The Polo Build to Suit and the Viking Polo projects were both built and are successfully operating and generating significant profits.

88.     Unbeknownst to McKinney, however, the funds McKinney provided to be invested in these projects were used by Panico and Palmieri to purchase the property on behalf of ACV Properties LLC. Each of the individual parcels and condominiums is owned by ACV Properties LLC, which is in turn owned by Panico Properties LLC, which is itself owned by the separate trusts of Panico's children.

89.     McKinney is not documented as an owner, has not received profits from the businesses, and has never received the return of his principal investment.

*Post Time Sports Bar and Grille*

90.     Around the same time as the Viking-Polo project began, Panico and Palmieri also planned to invest McKinney's money in Post Time Sports Bar and Grille, a sports bar with off-track betting and video gaming in Libertyville, Illinois ("Post Time").

91.     As with prior projects, Panico and Palmieri represented that with his investment, McKinney would be a 49.5% owner of the project.

92.    During the period August 2016 to May 2018, McKinney provided $3.9 million to be invested into the Post Time project.

93.    Panico directed McKinney to make his investment largely in checks payable to AP Capital. Many of McKinney's checks to AP Capital for the Post Time project reflect their purpose in the memo line.

94.    The Post Time project was built, but, as described below, McKinney's investment was transferred, unbeknownst to McKinney, into entities owned by Panico and his family. McKinney is not documented as an owner and has not received profits from the business, or a return of his principal.

95.    As that project went on, it became bigger and more expensive, and Panico and Palmieri repeatedly directed that McKinney put more money into it. Panico told McKinney that one of the problems with Post Time was that it was next to a synagogue and that a gaming facility like Post Time may not be within a certain distance of churches, synagogues, and other religious centers. Panico told McKinney that they needed to purchase the synagogue so that it would be relocated. At Panico's direction, McKinney provided the money to purchase the synagogue. On information and belief, McKinney provided all of the money spent to purchase the synagogue.

96.    Post Time used the structure that formerly housed the synagogue as offices before it sold the structure in 2020. Though McKinney's money was used to purchase the synagogue, he received none of the proceeds of its sale.

97.    Contrary to his representations, Panico, as he has now admitted, made no investments of his own into the Post Time Project. (Panico's Response to Plaintiff's Requests to Admit, Dkt. 90, ¶ 63.)

18

*OTB North*

98.     In or around 2018, Panico and Palmieri brought another supposed investment opportunity to McKinney, for another off-track betting facility (the "OTB North"). Panico told McKinney that the OTB North's facility was "north of Libertyville," had gone into foreclosure, was operating under some kind of receivership, and that they could obtain it for $600,000 and lease it out to the current operator.

99.     On a date near to but preceding May 30, 2018, Panico and Palmieri represented to McKinney that if McKinney invested $300,000 in the OTB North, Panico would put in the same amount into the project and they would each own 49.5% of the business, with the remaining 1% going to Palmieri.

100.     Accordingly, on May 30, 2018, pursuant to Panico's instructions, McKinney wrote a check for $300,000, with "OTB" in the memo line, to the bank account of AP Capital.

101.     Contrary to his representations, Panico, as he has now admitted, made no investments of his own into the OTB North Project. (Panico's Response to Plaintiff's Requests to Admit, Dkt. 90, ¶ 78.)

*Thorntons Gas Station*

102.     At about the same time, Panico and Palmieri also induced McKinney to invest in a parcel of land in Libertyville, Illinois which they said they would develop into a site for a gas station that Thorntons would purchase from them (the "Thorntons project").

103.     On a date near to but preceding June 20, 2018, Panico and Palmieri represented to McKinney that if McKinney invested $650,000 in the Thorntons project, Panico would put in the same amount into the project and they would each own 49.5% of the business, with the remaining 1% going to Palmieri.

19

104. Accordingly, on June 20, 2018, pursuant to Panico's instructions, McKinney wrote a check for $400,000 to the bank account of AP Capital, and on August 17, 2018, McKinney wrote a second check for $250,000 to AP Capital for his ownership share in the Thorntons project.

105. Contrary to his representations, Panico, as he has now admitted, made no investments of his own into the Thorntons Project. (Panico's Response to Plaintiff's Requests to Admit, Dkt. 90, ¶ 84.)

106. After McKinney made his investment, Panico and Palmieri told McKinney that because the lot did not have enough square footage for Thorntons and because it bordered wetlands, the project was not viable and it was terminated.

_McKinney's Payments to Panico for Loans to Panico and Third Parties_

107. In addition to investments in real estate projects, McKinney provided money to Panico for purposes of loans to Panico and loans to be made jointly with Panico to third parties.

108. Those loans included a $2.25 million personal loan to Panico, paid in three checks in mid-March 2016. In total, upon information and belief, McKinney provided millions of dollars as loans to Panico and his entities or to be loaned to third parties.

109. For each of those loans, Panico agreed to and has acknowledged an obligation to repay McKinney the principal amount borrowed plus interest. In fact, at various times, Adesso and other Panico entities have partially repaid some of those loans. However, Panico still owes McKinney an obligation to repay millions of dollars in loans McKinney made to Panico and his entities.

110. McKinney also provided funds to AP Capital with the understanding that AP Capital would lend it to third parties. For those arrangements, Panico agreed to repay all of the amounts provided by McKinney plus half of the interest received from third parties.

20

111.     At the time Panico secured the loans from McKinney he did not intend to fully repay McKinney the amounts borrowed.

112.     Panico still owes McKinney an obligation to repay millions of dollars in principal and interest on those loans.

*Defendants Fraudulently Concealed their Malfeasance*

113.     Throughout the period that Panico and Palmieri were diverting and misusing McKinney's funds for their own benefit, they also took steps to keep McKinney in the dark about what they were doing.

114.     Panico and Palmieri repeatedly provided McKinney with documentation referencing and acknowledging his investments in the projects and their arrangement to be partners in the projects and share in the profits. Those documents include the FDS Partners document described above, as well as other documentation provided to McKinney in Naples, Florida and by email.

115.     Those documents were false and were known to be false by Panico and Palmieri. Contrary to Panico and Palmieri's representations to McKinney and the representations in the documents, and unbeknownst to McKinney, (a) certain of McKinney's funds were not used for the projects at all and (b) certain funds were used for the projects, but Panico and Palmieri held ownership of the projects in entities they controlled and in which McKinney had no ownership or membership interest.

116.     Panico and Palmieri deliberately avoided telling McKinney that the projects were actually held in the names of certain corporate Defendants and other entities they controlled.

117.     Panico and Palmieri also repeatedly invited McKinney to visit the sites of the projects where they arranged to have him treated as an owner by, among other things, permitting

him full access to the facilities. McKinney, for example, visited Naples and met with Panico and Palmieri in Naples several times.

118.    McKinney further visited Post Time many times, and had full access to the facilities and even, until recently, had an app on his phone on which he could view the security cameras there.

119.    Likewise, while Post Time was still under construction, Palmieri emailed McKinney photos of the project in process on at least September 9, 2016 and April 14, 2017, treating him as an owner and partner in the business while concealing that ownership was held in the names of certain corporate Defendants in which McKinney held no interest.

120.    In 2016 and 2017, Palmieri sent McKinney several P&Ls for the Viking-Polo and Post Time project that included "upcoming capital expenses," which McKinney would be directed to pay.  Later, Panico, Palmieri, and their associates avoided sending McKinney P&Ls and other financials for the projects to keep him in the dark about ownership and profits.

121.    In 2017 and 2018, McKinney repeatedly requested financial statements for the projects from Panico and Palmieri, who would give McKinney excuses as to why they could not be provided. McKinney told them that all they had to do was have Kim Rothmann press a button in QuickBooks and the financials would be created, but still Panico and Palmieri, and even Rothmann herself, would give excuses as to why that could not be done.

122.    In or around April of 2017, McKinney told Panico that because they did not have an LLC reflecting ownership in the entities and projects, he wanted an LLC created. To that end, McKinney had Palmieri create the LLC paperwork. When McKinney presented the paperwork to Panico in McKinney's office in South Carolina, Panico ripped it up and said that he would create a "better" version of it.

22

123.    Sometime in approximately May 2018, federal law enforcement authorities began to investigate Panico both for tax evasion and for the various investments in which he was involved.

124.    In September 2018, during the criminal investigation of Panico, McKinney sat for a proffer, where he was made aware that Panico was misusing and misappropriating his investments.

125.    In April 2019, Panico had Palmieri present his "better version" to McKinney. However, this "better version" was a continuation of both the underlying fraud and an effort to conceal it. In it, instead of documenting that McKinney was the principal investor and an owner in each of the businesses, Panico falsely represented that McKinney owned nothing and had merely loaned funds to Panico to use as Panico "saw fit," including "benefiting" his own family's trusts. This was an intentional falsehood. Specifically, Panico said:

> The purpose of this letter is to memorialize our oral understanding concerning the amounts borrowed by AP Capital Management, Inc. from you over the past fifteen years. The amount owed to you by AP Capital, at this point in time, is approximately $_____. This amount was loaned to AP Capital by you with the understanding that AP Capital would invest this money as I saw fit and without any restriction on how the investments would be made. Repayments have been made in the past and I fully expect that the full amount borrowed will be repaid with interest when investments made with those funds mature. The Panico Family Trust, which has benefited from the investments made by AP Capital, is not in any way responsible or liable for the repayment of funds borrowed by AP Capital.

(*See* Ex. 2.)

126.    Palmieri told McKinney that Panico wanted McKinney to sign it. McKinney did not sign it as it did not reflect their agreements or Panico and Palmieri's many representations over the course of years about McKinney's investments. McKinney never provided Panico with

authority to invest money as Panico "saw fit and without any restriction," nor did he authorize Panico to use his money to fund his family's trust funds.

127. McKinney left without signing the document and never saw Panico or Palmieri again.

128. On August 10, 2021, Palmieri made a telephone call to McKinney, whom Palmieri knew was represented by counsel, to try to persuade him not to file a lawsuit, stating that Panico had "never failed him yet," that Panico was McKinney's "friend," and that McKinney simply needed to "stay the course." The purpose of this call was to continue to lull McKinney under false pretenses and avoid having to answer for their wrongdoing. Moreover, the call indicates that Defendants understood they still owed money to McKinney and had not repaid what they owed.

129. Defendants' efforts to fraudulently conceal their misconduct has continued in this litigation.

130. Defendants initially took the position in their Answers, sworn interrogatory responses, and responses to requests for admission that none of the money McKinney provided to defendants was for the purpose of investing in the real estate projects.

131. Defendants further delayed amending their interrogatory responses for over seven months. When Defendants finally provided amended their interrogatory responses on August 4, 2023, they finally admitted for the first time that McKinney had, in fact, provided money to be invested in the real estate projects.

132. Defendants further have taken various and inconsistent positions on the money McKinney provided as loans, both to Panico and his entities and to third parties.

133. Defendants further made information, including pertinent emails from accounts associated with defendants Panico Properties and Adesso, unavailable while this case was pending.

Defendants also have refused to pay their prior attorneys, in part to avoid having to produce to Plaintiff information provided to and from the government in the criminal investigation of Panico.

134.    All of those acts and omissions were taken for the purpose of continuing their fraud against McKinney, concealing the truth about their misuse of McKinney's funds and the fact that they still owed an obligation to repay millions of dollars, and avoiding being held accountable for their wrongdoing.

*Defendants' Fraudulent Scheme*

135.    Defendants' conduct over the course of their years-long association with McKinney constituted a fraudulent scheme and pattern of fraudulent conduct against McKinney.

136.    The fraudulent scheme and pattern of fraudulent conduct involved material misrepresentations, omissions, and acts of concealment. All of that conduct was taken to (a) extract more than $30 million from McKinney; (b) misuse his funds for their own purposes; (c) avoid having to pay back what they owed; and (d) conceal their misconduct.

137.    It was part of Defendants' fraudulent scheme to make material misrepresentations, knowing they were false, with intent to induce McKinney to provide funds and continue providing funds that:

    a.      For every real estate project, on dates near to but preceding each of August 10, 2007, May 21, 2014, September 16, 2014, November 21, 2014, May 30, 2017, and June 20, 2018, Panico and Palmieri represented that Panico would invest the same amount as McKinney. Panico has now admitted that he did not, in fact, invest in any of the projects. (Panico's Response to Plaintiff's Requests to Admit, Dkt. 90, ¶¶ 8, 36, 47, 57, 63, 78, 84.) Upon information and belief, Panico never intended to do so.

25

b.     For every real estate project, on dates near to but preceding each of August 10, 2007, May 21, 2014, September 16, 2014, November 21, 2014, May 30, 2017, and June 20, 2018, Panico and Palmieri represented that McKinney would be part owner of the resulting development. In fact, with respect to the real estate developments that actually came to fruition—Viking Polo, Polo Build to Suit, and Post Time—the real estate is wholly owned by Panico's children's separate trusts through Panico Properties, and McKinney is not recognized as having any ownership in those entities or projects. Panico and Palmieri never intended to recognize McKinney as an owner in any of the projects.

c.     In the case of the Libertyville shopping center and the Naples Garage Project, on various dates including November 21, 2014, August 8, 2016, and December 5, 2018, Panico and Palmieri concealed that they did not use McKinney's for the projects and the true cause of the projects' failures—diversion of McKinney's investments to Panico's and Palmieri's personal benefit and Panico's failure to invest his own funds—by, among other things, pinning the blame on co-developers, Tremont and Werchek.

d.     In the case of loans made to Panico, Panico and Palmieri represented to McKinney that Panico would repay the loaned funds plus interest, knowing that Panico had no intention to do so and would instead permanently deprive McKinney of millions of dollars provided through loans. Such misrepresentations were made to McKinney on various dates, including dates near to but preceding each of January 1, 2010, April 1, 2010, May 26, 2010, January 9, 2014, and March 16, 2016.

e.     In the case of funds advanced to Panico for Panico to make loans to third parties, Panico and Palmieri represented to McKinney that Panico would repay the funds advanced, along with one-half the interest obtained from the ultimate borrowers, knowing

26

that Panico had no intention to do so and would instead permanently deprive McKinney of millions of dollars in the funds advanced and interest. On information and belief, such misrepresentations were made to McKinney on dates near to but preceding each of December 7, 2009, October 15, 2012, January 9, 2015, February 23, 2015, March 12, 2015, March 27, 2015, April 3, 2015, April 15, 2015, May 8, 2015, May 22, 2015, October 1, 2015, February 1, 2016, July 15, 2016, February 1, 2017, April 1, 2017, May 15, 2017, and November 6, 2017.

138.    It was further part of the fraudulent scheme to divert McKinney's investments to personally benefit Panico and Palmieri and entities they controlled that:

a.    Rather than use McKinney's investments in the Libertyville shopping center to develop the parcel, Panico diverted those funds to acquire lakefront land in Genoa City, Wisconsin and build a $2.5 million home there, to acquire real estate on Sage Court in Green Oaks, Illinois, and to acquire several manufacturing companies from Palmieri's clients.

b.    Rather than use McKinney's investments in the Naples Garage Project to acquire the parcel at Radio and Livingston, Panico diverted those funds to purchase a condo in the Chelsea neighborhood of New York for his son for $1.16 million; to purchase the Ashford Oaks development in Green Oaks, Illinois for $1.41 million; to purchase a condo in Palm Harbor, Florida for $205,000; and to purchase a building for his family's restaurant in Libertyville, Illinois for $385,000.

c.    Throughout their association, Panico directed McKinney to make payments to the FPH entities or otherwise diverted funds to the FPH entities, which entities Panico has admitted were used to pay personal expenses.

27

      d.     Throughout their association, Panico diverted McKinney's payments to fund trusts for the benefit of his children.

      e.     As the U.S. Attorney ultimately concluded, "The transfers of funds by McKinney to Panico closely correspond to Panico's accumulation of assets that came to be held in various sheltered trusts and entities." Gov't Sent'g Mem., *United States v. Panico*, Case No. 1:21-cr-305, Dkt. 22 at 5 (N.D. Ill. Oct. 19, 2021).

139.    It was further part of Defendants' scheme to omit material information from McKinney in order to induce McKinney to make payments and continue making payments that:

      a.     Defendants did not disclose that Panico did not invest any of his own funds in the real estate projects until over a year into this litigation and after McKinney's death despite knowing that fact since at least 2010.

      b.     Defendants did not disclose that McKinney was not acknowledged as an owner of any of the properties until April 2019, when Panico and Palmieri attempted to persuade McKinney to sign a document attesting that he had loaned money to Panico to invest as he saw fit for the benefit of the Panico Family Trust, despite having known that fact since at least 2014.

      c.     Defendants did not disclose that they diverted McKinney's funds for purposes other than the projects, or that the projects ultimately failed due to that diversion and Panico's failure to invest his own money in the projects, despite having known those facts since at least 2016.

      d.     Defendants did not disclose that they did not intend to fully repay McKinney all the amounts he provided to Defendants, including to make real estate

investments and to loan money to Panico and third parties, despite having known those facts since the loans were made.

140.     It was further part of Defendants' scheme to conceal their fraudulent activities.

a.     Defendants provided McKinney with documents such as the FDS Partners document, Viking Polo financial statements, and Post Time construction plans and progress photos to convince him that they recognized his ownership in the projects.

b.     Defendants repaid portions of McKinney's investments and loans over time, amounting to approximately $7 million, to convince him that they were paying and would fully pay the return on his investments and the money he lent.

c.     Defendants, with the aid of Kim Rothmann, transferred funds among and between more than a dozen entities to conceal the funds' origins.

d.     Defendants, with the aid of Kim Rothmann, provided varying excuses for why they could not provide McKinney with full financial statements for the projects reflecting the status of McKinney's investments and the amounts owed to McKinney.

e.     McKinney only discovered the fraud when government agents disclosed to him in September 2018 that Panico had diverted his funds to buy real estate for the benefit of himself and his family, confirmed when Panico and Palmieri later presented McKinney with the exculpatory draft agreement in April 2019.

f.     Defendants' concealment continues with this litigation. Panico failed to pay his criminal defense attorneys in order to use the attorney's lien to deprive McKinney, and now Plaintiff, of the evidence turned over to and provided by the government in Panico's criminal case—the very evidence from which the government deduced that McKinney was a victim of Defendants' fraud as reflected in the government's sentencing memorandum.

g.     During the pendency of this litigation, Defendants destroyed the data in several Adesso Investments and Panico Properties email accounts, depriving Plaintiff of evidence that would prove McKinney's claims.

h.     Kim Rothmann signed a declaration averring that the financial information for ACV Properties LLC, Panico Properties, and Post Time were stored on her computer and destroyed in March or April 2020. Upon information and belief, this statement is false and made at the urging of Defendants to obstruct Plaintiff's discovery of evidence to support his claims.

i.     Defendants' concealment has also included providing false answers and discovery responses in this litigation. Defendants initially denied that McKinney provided any funds as investments for the real estate projects—answers they now, through their amended responses, admit were false.

j.     Defendants further have falsely assigned Panico's gambling losses to McKinney, including for bets on sporting events that Panico placed after the termination of their relationship and in instances in which Panico placed bets while in Las Vegas with others but not McKinney and despite the fact that McKinney was neither a gambler nor a sports fan.

**COUNT ONE**
**Fraud**
**(All Defendants)**

141.   Plaintiff incorporates and re-alleges the foregoing allegations.

142.   Defendants Panico and Palmieri devised and executed a scheme to defraud McKinney. The purpose of that scheme was to: (a) extract more than $30 million from McKinney;

(b) misuse his funds for their own purposes; (c) avoid having to pay back what they owed; and (d) conceal their misconduct.

143.     The entity defendants' members and managers were Panico or Palmieri, and where their members and managers were Panico's nominally children, they were controlled by Panico and Palmieri. The entity defendants were used by Panico and Palmieri as instrumentalities to effect the fraud and retained the benefits of the fraud.

144.     As part of their scheme, Defendants knowingly and intentionally made countless false statements of fact to and omitted to provide or disclose information to McKinney regarding his business dealings with Defendants, including without limitation in statements made to McKinney regarding his ownership interest in the projects.

    a.     On a date near to but preceding August 10, 2007, Panico intentionally misrepresented to McKinney that if McKinney invested $3 million in the Shopping Center project, Panico would put in the same amount, and they would each own 49.5% of the business in order to induce McKinney to make the investment.

    b.     On a date near to but preceding May 21, 2014, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested $6 million in the Naples Garage project, Panico would put in the same amount and they would each own 35% of the business, with Palmieri receiving a 10% interest in order to induce McKinney to make the investment.

    c.     On a date near to but preceding September 16, 2014, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested in the Polo Build to Suit and Viking-Polo project, Panico would put an equal amount into the project and they would each own 50% of the business in order to induce McKinney to make the investment.

31

      d.     On November 21, 2014, Panico and Palmieri created the FDS Partners document, which intentionally misrepresented that ownership in the projects was held by the FDS Partners, while ownership was transferred to and held by Defendants.

      e.     On a date near November 21, 2014, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested $750,000 into the Post Time project, Panico would put in the same amount into the project and they would each own 49.5% of the business, with Palmieri receiving a 1% ownership interest of the business in order to induce McKinney to make the investment.

      f.     On a date near to but preceding May 30, 2017, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested $300,000 into the Second OTB, Panico would put in the same amount into the project and they would each own 49.5% of the business, with Palmieri receiving a 1% ownership interest in the business in order to induce McKinney to make the investment.

      g.     On a date near to but preceding June 20, 2018, Panico and Palmieri intentionally misrepresented to McKinney that if McKinney invested $650,000 in the Thorntons project, Panico would put in the same amount into the project and they would each own 49.5% of the business, with Palmieri receiving a 1% ownership in the business in order to induce McKinney to make the investment.

145.    These statements were false and were part of a scheme to defraud McKinney.

146.    The facts misrepresented and those not disclosed were material.

147.    Those false statements and omissions were made with the intent to defraud and to falsely and fraudulently obtain and retain funds that rightfully belonged to McKinney.

32

148.    McKinney justifiably relied on the false statements and the absence of the information omitted and concealed.

149.    Defendants further, as part of their scheme to defraud McKinney and pattern of fraudulent conduct, diverted money provided by McKinney as investments in the projects and for loans and misused it for their own purposes. Defendants did so with the purpose and intent of depriving McKinney of the funds and benefiting themselves, their entities, and family members at the expense of McKinney.

150.    Panico and Palmieri fraudulently concealed the fraud by deliberately avoiding providing McKinney with legitimate documentation of McKinney's investments, repeatedly telling McKinney that he was a partner and owner in the various projects and that his investment was being put to the use to which Panico and Palmieri said it was and that he would see the proceeds of his investments, creating the FDS Partners document to convince McKinney that his investments were recognized and legitimate, arranging visits to the sites of the projects where Panico and Palmieri told the employees there to treat McKinney like an owner, by failing to provide financial statements on the projects when McKinney asked for them, preventing McKinney's discovery of the breaches until September 2018 at the earliest, and continuing to conceal their misconduct in this litigation.

151.    As a result of his justified reliance on the defendants' false statements and omissions, McKinney provided money to be invested in the projects and was damaged.

152.    Defendants' acts or omissions were willful and wanton and were committed or omitted with conscious indifference to existing circumstances and conditions.

WHEREFORE, Plaintiff prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

a. For compensatory damages in an amount to be proven at trial;

b. For prejudgment interest;

c. For a constructive trust over the assets owned by the corporate Defendants connected to the projects and the Panico Family Trust.

d. For punitive damages; and

e. For such other relief as this Court deems just and proper.

**COUNT TWO**
**Breach of Fiduciary Duty**
**(Panico and Palmieri)**

153.    Plaintiff incorporates and re-alleges the foregoing allegations.

154.    Panico and Palmieri owed a fiduciary duty to McKinney as a matter of law because McKinney was an investment partner with Panico and Palmieri in the venture they called FDS Partners.

155.    Panico and Palmieri also owed a fiduciary duty to McKinney because McKinney was a partner in the broader partnership among the three of them, including investments and third-party loans.

156.    Panico and Palmieri also owed a fiduciary duty to McKinney due to the special circumstances of Panico's, Palmieri's, and McKinney's relationship. Panico and Palmieri had a significant degree of dominance and superiority over McKinney in that Panico and Palmieri: (a) were the persons in charge of holding all funds contributed by McKinney; (b) controlled the various projects; (c) made all financial decisions, including determining the amount of money McKinney was required to pay into the projects, and (d) controlled all access to information regarding these projects and payments made by third parties to whom Panico had loaned funds provided by McKinney. As a result, McKinney reposed trust and confidence in Panico and Palmieri to conduct themselves with the utmost honesty and fidelity for the benefit of McKinney's

investment in the projects and loans. This disparity in power was even greater because Panico and Palmieri did not allow McKinney access to the books and records of the entities controlling the projects.

157.    These fiduciary duties include the duty of care, the duty to act in good faith, the duty of loyalty, the duty of honesty, the duty of fairness in all dealings and transactions related to the partnership, and the duty to disclose all information relating to the fiduciary relationship.

158.    Panico and Palmieri knowingly and intentionally breached these duties to McKinney by conduct described in detail, including but not limited to the following:

a.      lying to McKinney and concealing relevant facts from him;

b.      misappropriating the investments McKinney made in the projects;

c.      obtaining money as loans from McKinney without an intent to repay those loans;

d.      concealing financial records from McKinney bearing on McKinney's interest in the projects;

e.      withholding amounts due and owing to McKinney for his investment in the projects and loans; and

f.      failing to recognize, or keep corporate records of the entities controlling the projects showing, that McKinney was an investor, partner, and/or member of the entities.

159.    Panico and Palmieri's acts or omissions were willful and wanton and were committed or omitted with conscious indifference to existing circumstances and conditions.

160.    McKinney suffered damages proximately caused by these breaches in misappropriated investments and in his interest in the projects, including the real estate, facilities, and income.

161.    Panico and Palmieri fraudulently concealed the breaches of fiduciary duty as described above, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, Plaintiff prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

a.  For compensatory damages in an amount to be proven at trial;

b.  For prejudgment interest;

c.  For a constructive trust over the assets owned by the corporate Defendants connected to the projects and the Panico children's trusts;

d.  For punitive damages;

e.  For an award to McKinney of his attorneys' fees;

f.  For such other relief as the Court deems just and appropriate.


**COUNT THREE**
**Breach of Contract**
**(Panico and Palmieri)**

162.    Plaintiff incorporates and re-alleges the foregoing allegations.

163.    Beginning on a date near to but preceding August 10, 2007, and continuing through at least 2019, McKinney was party to an oral contract with Panico and Palmieri under which he would provide funds to Panico or his nominees for either specified investment purposes or as loans, including loans to third parties.

164.    That agreement covered each instance in which McKinney provided funds to Panico, his entities, or nominees.

165.    The terms of the agreement were that McKinney would provide funds for the agreed-upon purpose, that Panico and Palmieri would use those funds only for the agreed-upon purpose, and that Panico would fully re-pay McKinney. In the case of investments, Panico agreed

to invest his own funds in the projects, provide McKinney with profits from successful projects, or return or roll-over his capital into new projects. In the case of loans, Panico agreed to repay McKinney the full amount of the principal borrowed plus interest.

166. Panico and Palmieri breached their agreement each and every time they: (a) used McKinney's funds other than for the agreed-upon purpose; (b) diverted McKinney's funds for their own purposes; (c) did not invest their own funds in the projects as promised; (d) refused to acknowledge McKinney as an owner of the projects; (e) failed to repay McKinney what they owed; or (f) failed to acknowledge their obligation to repay McKinney what they owed.

167. As a direct and proximate result of Panico and Palmieri's breaches, McKinney has suffered damages in an amount to be proved at trial.

168. Panico and Palmieri fraudulently concealed the breaches of contract as described above, preventing McKinney's discovery of the breaches until September 2018 at the earliest.

WHEREFORE, Plaintiff prays for the entry of judgment in his favor and against Defendants Panico and Palmieri as follows:

a. For damages in an amount to be proven at trial;

b. For prejudgment interest;

c. For other relief this Court deems just and appropriate.

**COUNT FOUR**
**Promissory Estoppel**
**(Panico and Palmieri)**

169. Plaintiff incorporates and re-alleges the allegations in paragraphs 1–161.

170. Alternatively to the breach of contract count, Plaintiff asserts that between August 2007 and August 2018, McKinney made at least 102 payments to Panico and Palmieri or their entities totaling nearly $30 million.

171.     Each payment was induced by an unambiguous promise by Panico and Palmieri to McKinney that his funds would be used for the agreed-upon purposes. Each payment was further induced by an unambiguous promise by Panico and Palmieri to: (a) in the case of investments, invest his own funds in the projects, provide McKinney with profits from successful projects, or return or roll-over his capital into new projects; and (b) in the case of loans, to repay McKinney the full amount of the principal borrowed plus interest.

172.     McKinney reasonably relied on those promises by continuing to provide funds to Defendants and by not demanding full repayment on an earlier date.

173.     McKinney's reliance was expected and foreseeable by Panico and Palmieri.

174.     McKinney relied on those promises to his detriment by making the payments, as Panico and Palmieri repaid only approximately $7 million.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, and in favor of McKinney, by:

    a.  ordering Panico and Palmieri to pay to Plaintiff the full amount they owe; and

    b.  granting such other relief to Plaintiff as the Court deems just and appropriate.

**COUNT FIVE**
**Civil Conspiracy**
**(All Defendants)**

175.     Plaintiff incorporates and re-alleges the foregoing allegations.

176.     The Defendants engaged in a conspiracy to defraud McKinney out of his investments in the projects by diverting his investment and his ownership interest into the corporate Defendant entities owned and controlled by the individual Defendants and the trusts.

177. The Defendants acted in concert for the purpose of diverting McKinney's investment and ownership interest into the corporate Defendant entities owned and controlled by the individual Defendants.

178. In furtherance of the conspiracy, Panico and Palmieri fraudulently induced McKinney into investing in the projects and transferred his investments and ownership interests into the corporate Defendants owned and controlled by the individual Defendants.

179. Defendants' conduct was willful and wanton.

WHEREFORE, Plaintiff prays for the entry of judgment in his favor and against Defendants as follows:

    a. For compensatory damages in an amount to be proven at trial;

    b. For prejudgment interest;

    c. For punitive damages;

    d. For such other relief as the Court deems just and appropriate.

**COUNT SIX**
**Fraudulent Transfer Under 740 ILCS § 160/5**
**(Post Time Sports Bar and Grille LLC)**

180. Plaintiff incorporates and re-alleges the allegations.

181. The Defendants defrauded McKinney out of his investments in the projects by diverting his investment and his ownership into the corporate Defendant entities owned and controlled by the individual Defendants and the Panico Family Trust.

182. McKinney has a claim to his investments and ownership interests in the projects.

183. Panico and Palmieri transferred McKinney's investments and ownership in the projects to the Corporate Defendants and the Panico Family Trust with actual intent to hinder, delay, or defraud McKinney and/or without receiving a reasonably equivalent value in exchange for the transfer or obligation, and Panico and Palmieri intended to incur, or believed or reasonably

39

should have believed that they would incur, debts beyond their ability to pay as they became due. Specifically, Panico and Palmieri transferred:

    a.  McKinney's investment and ownership interest in the Post Time project to Post Time Sports Bar and Grille LLC in or around September 2017;

    b.  McKinney's further investment in the Post Time project  to Post Time Sports Bar and Grille LLC in or around October 2017;

    c.  McKinney's further investment in the Post Time project to Post Time Sports Bar and Grille LLC in or around December 2017;

    d.  McKinney's further investment in the Post Time project to Post Time Sports Bar and Grille LLC in or around April 2018;

    e.  McKinney's further investment in the Post Time project to Post Time Sports Bar and Grille LLC in or around May 2018;

184. The transfer or obligation was to an insider; Panico and Palmieri retained possession or control of the property transferred after the transfer; the transfer was concealed and Panico and Palmieri concealed assets; and Panico and Palmieri, on information and belief, received no consideration for the transfers.

WHEREFORE, Plaintiff prays for the entry of judgment in his favor and against Defendant Post Time Sports Bar and Grille LLC as follows:

    a.  For avoidance of the transfers to Defendant;

    b.  For an attachment against the amount of McKinney's investment interests transferred to Defendant;

    c.  For such other relief as the Court deems just and appropriate.

## COUNT SEVEN
## Unjust Enrichment
## (All Defendants)

185.    Plaintiff incorporates and re-alleges the allegations in paragraphs 1–161.

186.    Alternatively to the breach of contract count, Plaintiff asserts that Defendants were unjustly enriched by McKinney's payment of investments to Defendants without McKinney being given an ownership share in the projects or receiving income from the projects. Plaintiff further asserts that Defendants were unjustly enriched by McKinney's providing funds for loans to Defendants, induced by Defendants' misrepresentations that they intended to repay those loans and acknowledged their obligation to repay those loans, and Defendants' ultimate failure to repay the principal or interest on those loans. It would be inequitable for Defendants to retain the benefits they received from McKinney through their wrongful conduct.

187.    Defendants unjustly retained a benefit to McKinney's detriment.

188.    Defendants' retention of these benefits violates fundamental principles of justice, equity, and good conscience.

189.    Plaintiff lacks a remedy at law.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, and in favor of McKinney, by:

    a.  ordering Defendants to return the benefits to Plaintiff that have been wrongfully withheld by them;

    b.  granting such other relief to Plaintiff as the Court deems just and appropriate.

September 13, 2023

Respectfully submitted,

LARRY MCKINNEY, Jr., as Personal Representative of the Estate of Larry A. McKinney, Sr. and as Trustee of the Larry A. McKinney, Sr. Living Trust Dated October 5, 2017

By: /s/ Chris Gair
One of His Attorneys

Chris Gair (ARDC No. 6190781)
Jeff Eberhard (ARDC No. 6276471)
Blake Edwards (ARDC No. 6326850)
Gair Eberhard Nelson Dedinas Ltd.
1 E. Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 600-4900
cgair@gairlawgroup.com
jeberhard@gairlawgroup.com
bedwards@gairlawgroup.com