**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LARRY A. MCKINNEY, JR., as Personal Representative of the Estate of Larry A. McKinney, Sr. and as Trustee of the Larry A. McKinney, Sr. Living Trust Dated October 5, 2017, | ) | |
| Plaintiff, | ) | No. 21-cv-04602 |
| v. | ) | Judge Andrea R. Wood |
| ANTHONY PANICO, et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Larry McKinney, Jr. ("Plaintiff"), as personal representative of the Estate of Larry A. McKinney, Sr. and trustee of the Larry A. McKinney Sr. Living Trust, alleges that Defendants Anthony Panico and Vincent Palmieri engaged in a multi-year conspiracy during which they defrauded Larry A. McKinney, Sr. ("McKinney") out of over $25 million. Plaintiff's operative Second Amended Complaint ("SAC") asserts state-law claims for fraud, breach of fiduciary duty, breach of oral contract, promissory estoppel, fraudulent transfer, unjust enrichment, and civil conspiracy. Along with Panico and Palmieri, the SAC names as Defendants several corporate entities affiliated with Panico, including Defendants Panico Properties, LLC, ACV Properties, LLC, AP Capital Management, LLC ("AP Capital"), Adesso Investments, LLC, FPH Management, Inc., and FPH LLC (collectively with Panico, "Panico Defendants"), as well as Defendant Post Time Sports Bar and Grille, LLC ("Post Time"). Now before the Court are motions for summary judgment filed by Panico Defendants, Palmieri, and Post Time. (Dkt. Nos. 198, 202, 205.) For the reasons that follow, all three motions are denied.

## BACKGROUND

While there are numerous disputes as to the material facts, the Court sets forth the following summary drawn from the parties' submissions under Local Rule 56.1 in the light most favorable to Plaintiff as the non-moving party. *E.g.*, *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021).

Before his passing, McKinney was a successful businessman who lived in South Carolina. (Pl.'s Resp. to Post Time's Statement of Facts ("PRPTSF") ¶ 1, Dkt. No. 222.) In 2007, McKinney met Panico at a fundraising event in South Carolina and the two quickly became close friends. (Pl.'s Resp. to Panico Defs.' Statement of Facts ("PRPDSF ¶ 2, Dkt. No. 220; PRPTSF ¶ 2.) Shortly after the two became acquainted, McKinney began providing money to Panico or entities under his control, including Panico Defendants, with Panico representing that the money would go to various real estate projects and ultimately result in a profit for both of them. (Panico Defs.' Resp. to Pl.'s Statement of Additional Facts ("PDRSAF") ¶¶ 1–4, Dkt. No. 233; Def. Post Time's Resp. to Pl.'s Statement of Additional Facts ("PTRSAF") ¶¶ 1–4, Dkt. No. 232.) Beginning around 2010, Panico involved his personal lawyer, Palmieri, in his ventures with McKinney. (Pl.'s Resp. to Palmieri's Statement of Facts ¶ 1, Dkt. No. 221; PDRSAF ¶¶ 60, 64.)

Because McKinney had an aversion to written agreements, he did not formally document his deals with Panico and Palmieri. (PRPDSF ¶ 9.) Instead, McKinney often included the name of the particular real estate project in the memo line of the checks that he made out to Panico Defendants. (PDRSAF ¶ 10.) Other times, he listed in the check's memo line the general purpose for which he was providing the funds, with notations including "Real Estate Development," "Real Estate," "Escrow," "Capital Investment," and "Stock." (*Id.*) However, by November 2014, McKinney asked Palmieri to compile in a single document a record of the numerous agreements

into which McKinney had entered with Panico and Palmieri. (*Id.* ¶ 11.) Thus, Palmieri drafted a document that purported to recognize a partnership called "FDS Partners" comprised of three entities affiliated with each of McKinney, Panico, and Palmieri ("FDS Document"). (PDRSAF ¶¶ 11, 15; Pl.'s Statement of Additional Facts, Ex. E, FDS Document, Dkt. No. 218-5.) Dated November 21, 2014, the FDS Document states that McKinney, Panico, and Palmieri had five specific projects either "under way or under consideration": the Naples Garage Project, the Viking-Polo Project, the Polo Build to Suit Project, the Post Time Sports Bar and Grille, and the Libertyville Shopping Center Project. (PDRSAF ¶ 16; FDS Document.) In addition, the FDS Document notes the existence of unspecified other projects involving only McKinney and Panico. (PDRSAF ¶ 17; FDS Document.)

The FDS Document goes on to provide details regarding the agreements made with respect to McKinney's monetary contributions as of the date of the document's creation. First, it notes that McKinney initially paid $3 million in connection with the Naples Garage Project but later consented to Panico using that sum to purchase the Viking-Polo Project. (PDRSAF ¶ 18.) The FDS Document also states that McKinney had loaned Panico $2.1 million so that he could pay taxes and represents that sum would either be repaid to McKinney or credited as an investment in the Naples Garage Project. (*Id.* ¶ 20.) Finally, the FDS Document acknowledges that the Polo Build to Suit Project's capital account reflected a $2 million contribution from McKinney. (*Id.* ¶ 21.)

Ultimately, at least two of the three monetary contributions by McKinney described in the FDS Document were not used for the purposes stated in that document. Most of the $3 million that McKinney provided for the Naples Garage Project and was supposedly rolled over to the Viking-Polo Project went to neither project. (*Id.* ¶ 25.) Rather, by 2016, only $1.25 million

had gone to the Naples Garage Project, and $250,000 of that money had been supplied by another investor. (*Id.*) Meanwhile, the Viking-Polo Project property was ultimately shown to have been purchased with a downpayment supplied by one of Panico's affiliated entities and a mortgage. (*Id.*) And, unbeknownst to McKinney, Panico used McKinney's $2.1 million not to pay his taxes but instead to purchase a property for himself and his family and to pay other personal expenses. (*Id.* ¶¶ 26–28.) Nor did Panico ever pay the $2.1 million back to McKinney or credit that sum toward his investment in the Naples Garage Project. (*Id.* ¶ 29.)

The FDS Document also discusses another project, the Post Time Sports Bar and Grille ("Bar and Grille"), which is described as awaiting preliminary approval from the county board. (*Id.* ¶ 22.) If the project proceeded, the FDS Document represents that McKinney would have the chance to buy a 50% share for $500,000. (*Id.*) On June 27, 2016, the deed for the building that was to become the Bar and Grille was conveyed to Sports Bar Properties LLC ("Sports Bar Properties"), an entity organized by Palmieri. (PRPTSF ¶¶ 17, 19.) Shortly thereafter, Sports Bar Properties agreed to lease the Bar and Grille to Post Time. (*Id.* ¶ 20.) Under the lease agreement, Sports Bar Properties was to be responsible for renovating the building and, accordingly, it was the entity that paid for subsequent renovations to the property. (*Id.* ¶¶ 21–22.) On the other hand, Post Time was responsible for the Bar and Grille's operations and operating expenses. (*Id.* ¶¶ 8, 39–40.) Between August 2016 and May 2018, McKinney made at least 21 payments of around $2.8 million toward the Bar and Grille project through checks written out to AP Capital, a Panico Defendant, with the memo line usually listing either "Post Time" or a purpose related to the development of the Bar and Grille's physical property. (*Id.* ¶¶ 50–53, 56–57, 60–61.)

In April 2017, McKinney asked Panico to create a Limited Liability Company that would accurately reflect McKinney's, Panico's, and Palmieri's ownership interests in each of the

projects. (PRPTSF ¶¶ 71–72; PDRSAF ¶ 73; PTRSAF ¶ 74.) Palmieri then proceeded to prepare a draft of the necessary paperwork. (PDRSAF ¶ 73; PTRSAF ¶ 74.) However, after Panico reviewed Palmieri's draft, he ripped it up and offered to create a "better" version. (PRPTSF ¶ 73; PDRSAF ¶ 73; PTRSAF ¶ 74.) Despite Panico failing to provide the promised paperwork until April 2019, McKinney continued to write checks to Panico via AP Capital through May 2018. (PRPTSF ¶¶ 74–75.) But in September 2018, McKinney came to suspect that Defendants were not using his money to fund real estate projects as represented. (PDRSAF ¶ 67; PTRSAF ¶ 67.) And when Panico finally presented McKinney with his "better" Limited Liability Company in April 2019, the paperwork simply stated that McKinney had lent his money over the past 15 years with the understanding that it would be invested as Panico saw fit. (PRPTSF ¶ 77.) McKinney refused to sign the paperwork and never saw Panico or Palmieri again. (*Id.* ¶ 78.)

Altogether, McKinney paid approximately $30.4 million to Panico, either directly or through affiliated entities like Panico Defendants, between August 2007 and August 2018. (PDRSAF ¶ 1, PTRSAF ¶ 1.) Yet McKinney was not recognized as an owner of any of the projects to which he provided money. (PDRSAF ¶ 35; PTRSAF ¶ 35.) And between August 2007 and August 2019, Defendants, combined, repaid McKinney about $4.7 million. (PDRSAF ¶ 7; PTRSAF ¶ 7.) Thus, approximately $25.7 million that McKinney provided to Defendants remains unpaid and not otherwise connected to an ownership interest in any of the projects in which McKinney believed he was investing. And Plaintiff has obtained a report from an expert who traced McKinney's funds and concluded that Panico used a significant portion for the benefit of himself and his family. (PDRSAF ¶ 55.) The expert also found that Panico transferred

some of McKinney's money to Palmieri, and Palmieri then used the money to pay his own expenses and to fund his gambling activities. (*Id.* ¶ 66.)[1]

McKinney brought the present lawsuit alleging that Defendants defrauded him by taking his money and failing to use it for the real estate projects as promised. Early on in the action, McKinney passed away and his son was substituted as Plaintiff. (*See* Dkt. No. 56.) The seven-count SAC asserts claims for fraud, civil conspiracy, and unjust enrichment against all Defendants. As to Panico and Palmieri, the SAC sets forth claims for breach of fiduciary duty, breach of contract, and promissory estoppel. And as to Post Time only, the SAC asserts a claim of fraudulent transfer pursuant to 740 ILCS 160/5.

## DISCUSSION

Panico Defendants, Palmieri, and Post Time each seek summary judgment as to the claims against them. Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011).

All three motions are predicated in significant part on Defendants' contention that Plaintiff has failed to come forward with enough evidence to create a genuine issue of fact for trial as to any of their claims. The Supreme Court recognized in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), that summary judgment may properly be entered "against a party who fails

[1] Panico Defendants object to Plaintiff's factual assertions supported by citations to his expert's report. But it is permissible for a plaintiff to rely on expert opinions to oppose summary judgment, provided that the expert testimony would be admissible or usable at trial. *E.g.*, *Walker v. Macy's Merch. Grp., Inc.*, 288 F. Supp. 3d 840, 851 (N.D. Ill. 2017).

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." In that situation, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. Thus, where a party moves for summary judgment based on the non-movant's failure of proof, "the requirements that Rule 56 imposes on the moving party are not onerous. . . . [T]he movant's initial burden 'may be discharged by showing—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 325). Once the moving party makes that showing, the nonmovant must "'go beyond the pleadings' (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence 'upon which a jury could properly proceed to find a verdict' in [his] favor." *Id.* at 1169 (first quoting *Celotex*, 477 U.S. at 324; then quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

The Court will first address Defendants' common arguments as to each cause of action and then conclude by addressing Post Time's contention that Plaintiff lacks evidence to support any of the claims brought against it in particular.[2]

## I. Fraud

To establish a fraud claim in Illinois, a plaintiff must prove: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that

---

[2] In their motion, Panico Defendants assert that several claims are time-barred. But as Plaintiff notes in his response brief, each statute-of-limitations argument consists of a single sentence asserting that the particular claim is time barred followed by a citation to the applicable statute of limitations. And Panico Defendants' reply brief does not return to the statute-of-limitations issue. Consequently, those perfunctory statute-of-limitations arguments are waived. *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996). Panico Defendants and Palmieri argue that they are entitled to summary judgment on Plaintiff's fraud claims because Plaintiff lacks evidence that either Panico or Palmieri made a materially false statement to McKinney. For its part, Post Time contends that Plaintiff's fraud claims fail because McKinney did not reasonably rely on any of the allegedly fraudulent misrepresentations.

### A. False Statement

Panico Defendants and Palmieri's contention that Plaintiff lacks evidence of false statements is based almost entirely on the fact that McKinney passed away before he could be deposed in this action. Specifically, they assert that, because the supposed false statements were made verbally to McKinney, the absence of testimony from McKinney about the alleged misrepresentations is fatal to Plaintiff's fraud claims. But while McKinney's direct account of Panico's and Palmieri's purportedly false statements would certainly have been helpful evidence in support of Plaintiff's fraud claims, the lack of such evidence does not necessarily doom Plaintiff's claims. The Court agrees with Plaintiff that the FDS Document, viewed together with other evidence in the record, sufficiently evidences multiple allegedly false statements Panico and Palmieri made to McKinney about how they would use his money.

First, the FDS Document acknowledges that McKinney had provided $3 million to fund the Naples Garage Project and later agreed for it to be rolled over to the Viking-Polo Project. (PDRSAF ¶ 18.) And it goes on to give McKinney the option to purchase a 50% interest in the Viking-Polo Project in the event that the Naples Garage Project proceeded and, if it did not, McKinney would become a 50% owner of the Viking-Polo Project. (PDRSAF ¶ 19; FDS Document.) Yet, at most, one-third of McKinney's money went to the Naperville Garage Project

and McKinney never had a recognized ownership interest in either the Naperville Garage Project or the Viking-Polo Project. (PDRSAF ¶¶ 25, 35.) In addition, the FDS Document notes that McKinney provided a $2 million capital contribution toward the Polo Build to Suit Project. (*Id.* ¶ 21.) But again, McKinney was not recognized as an owner of that project, nor is there evidence that his contribution was ever repaid. (*Id.* ¶¶ 35–36.) The FDS Document also mentions that McKinney loaned Panico $2.1 million to pay his taxes, which would either be repaid or credited as an investment in the Naples Garage Project. (*Id.* ¶ 20.) However, Plaintiff has adduced evidence tending to show that Panico used the money to buy property for himself and for other personal expenses. (*Id.* ¶¶ 26–28.)

Finally, the FDS Document claims that McKinney would have the opportunity to become a 50% owner of the Bar and Grille for $500,000. (*Id.* ¶ 22.) McKinney did make several capital contributions toward the Bar and Grille. (PRPTSF ¶ 50–53, 56–57, 60–61.) Yet, as with the other projects, McKinney was never credited with an ownership interest in the Bar and Grille. (PRPTSF ¶ 68; PDRSAF ¶ 35.) At the same time, Panico and Palmieri led McKinney to believe that he was either a lender or owner of the projects, as they sent him financial information and architectural renderings for the Viking-Polo Project and the Bar and Grille, took him to investor meetings regarding the Naples Garage Project, and accompanied him to visit the site of the Bar and Grille. (PDRSAF ¶ 34.) In addition, Defendants regularly sent McKinney payments—combined, anywhere between $100,000 and $1 million per year—to foster his belief that he had a legitimate interest in the projects. (*Id.* ¶ 67.)

While the representations in the FDS Document are largely statements of future intention, which are not typically actionable as fraud, this Court previously explained that there is an exception for statements that were "part of a scheme to defraud." *McKinney v. Panico*, No. 21-

cv-04602, 2022 WL 4551695, at *13 (N.D. Ill. Sept. 29, 2022) (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012)). To establish the applicability of the scheme exception, a plaintiff must "prove that, at the time the promise was made, the defendant did not intend to fulfill it," *Wigod*, 673 F.3d at 570, and that the unfulfilled promises were "embedded in a larger pattern of deceptions or enticements that reasonably induces reliance," *Desnick v. American Broadcasting Companies, Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995).

Here, a jury could reasonably view the FDS Document's statements as evidence of Panico and Palmieri's scheme to induce McKinney to provide them with money that they claimed would be a loan for or investment in a specific real estate project. The jury could then reasonably conclude that Panico and Palmieri never intended to use McKinney's money as represented in the FDS Document, based on the evidence tracing that money to Panico's and Palmieri's own personal uses and the fact that McKinney never received an ownership interest in any of the projects or anywhere close to full repayment of his contributions. There is therefore a genuine issue of fact as to whether the statements in the FDS Document were part of a scheme to defraud McKinney.

Panico Defendants nonetheless argue that nothing in the record suggests that Panico, Palmieri, and McKinney ever agreed to the FDS Document's terms. However, that the FDS Document was not a formal contract binding the three of them is immaterial to the fraud claims, as the document may still evidence false statements made by Panico and Palmieri. And while Panico Defendants deny that the FDS Document accurately reflects any representation made by Panico regarding McKinney's money, that only underscores the existence of a dispute of fact that must be resolved by the jury.[3]

---

[3] Although Panico denied having read the FDS Document prior the initiation of this action, Palmieri testified that he provided Panico with the document shortly after drafting it. (PDRSAF ¶ 14.) Palmieri

For his part, Palmieri contends that there is not sufficient evidence to support his liability for fraud, since the FDS Document does not specifically attribute any misrepresentation to him and McKinney's transfers were all made to Panico or entities affiliated with Panico. But Palmieri admits that he prepared the FDS Document. Moreover, Plaintiff points to evidence tending to show that Panico had authorized Palmieri to transact business on his behalf by, among other things, engaging in banking transactions on behalf of Panico Defendants, organizing many of the entities affiliated with Panico, and corresponding with McKinney regarding the real estate projects. (PDRSAF ¶¶ 53, 64.) Plaintiff also has evidence that Palmieri himself received and benefitted from McKinney's funds. (*Id.* ¶ 66.) At a minimum, a jury could reasonably infer from this record that, upon becoming involved with Panico's dealings with McKinney, Palmieri was acting as Panico's agent and therefore he can be held jointly liable for Panico's fraud. *E.g.*, *Fortech, LLC v. R.W. Dunteman Co.*, 852 N.E.2d 451, 457 (Ill. App. Ct. 2006) ("Whether he is acting on his own behalf or for another, an agent who violates a duty which he owes to a third person is answerable to the injured party for the consequences." (internal quotation marks omitted)).

In sum, the Court finds that even without McKinney's own testimony, there is sufficient evidence in the record that Panico and Palmieri made false statements to McKinney about how they would use his money and that those statements were part of a scheme to defraud McKinney. For that reason, the Court rejects Panico Defendants' and Palmieri's arguments that they are entitled to summary judgment due to the supposed absence of evidence of a false statement of material fact.

---

stated that the FDS Document was an accurate summary of the agreements with McKinney from his point of view, but Panico rejected it as inaccurate and not "complete enough." (PDRSAF ¶¶ 11–14; Pl.'s Statement of Additional Facts, Ex. F, Palmieri Dep. Tr. 201:20–203:11.)

**B. Reliance**

Separately, Post Time asserts that it was unreasonable for an experienced and successful businessman like McKinney to eschew written agreements and instead take Panico and Palmieri at their word that they would use his money as they represented. Because "[t]he law will not allow a person to enter into a transaction with eyes closed to material facts and then claim fraud by deceit," Illinois law requires a plaintiff alleging fraud to "demonstrate that they justifiably relied on defendant's words or silence." *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 9 (Ill. App. Ct. 2001) (internal quotation marks omitted). For reliance to be justifiable, it need only be "'not reckless,' in other words not willfully embracing a substantial risk." *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 138–39 (7th Cir. 2011). "The right to rely depends on consideration of all the surrounding circumstances." *Miller*, 762 N.E.2d at 9. Consequently, whether a plaintiff's reliance was reasonable ordinarily presents "a question of fact, but it can be determined as a matter of law when only one conclusion can be drawn." *Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 918 (N.D. Ill. 2019).

Here, viewing the facts in the light most favorable to Plaintiff, the Court is unable to conclude as a matter of law that McKinney was not justified in relying on Panico and Palmieri's misrepresentations. First, a reasonable jury could conclude that McKinney believed he could trust Panico based on what he thought was their close friendship. (PDRSAF ¶ 76.) And Panico and Palmieri made efforts to cultivate that trust, as can be seen in their choice to use the abbreviation "FDS" in the name of the proposed partnership. In particular, "FDS" is an abbreviation for "Fratelli di Sangue," which means "Blood Brothers" in Italian. (*Id.* ¶ 15.) Thus, a jury could reasonably understand the reference as Panico and Palmieri's way of giving McKinney a false sense of security that they would do right by him given that they were not merely business partners but like brothers. *Miller*, 762 N.E.2d at 652 ("[W]here the person

making the statement has inhibited plaintiff's inquires by creating a false sense of security the failure to inquire into facts that could be made available to plaintiff is not fatal." (internal quotation marks omitted)). They also made regular payments to McKinney to give the appearance that he was being repaid or earning money from the projects. (PDRSAF ¶ 67.)

In any case, there is evidence from which a reasonable jury could conclude that Panico and Palmieri undertook numerous measures to prevent McKinney from uncovering their fraud. Among other things, they routed McKinney's money through multiple entities owned or controlled by Panico while also closely guarding the financial records for the real estate projects. (*Id.* ¶¶ 67, 75.) Further, Plaintiff has adduced evidence from which a jury could conclude that Panico and Palmieri made up excuses for why certain projects in which McKinney invested fell through and told him his contributions would be rolled over to new projects. (*Id.* ¶¶ 67–68.) That Panico and Palmieri had superior access to the facts regarding McKinney's supposed investments and loans in the real estate projects supports the reasonableness of McKinney's reliance on their representations. *E.g.*, *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1058 (7th Cir. 1988) ("Only where the parties do not have equal knowledge, or access thereto . . . will a person be found to have justifiably relied upon others' representations."). And the evidence of their efforts to conceal their wrongdoing from McKinney suggests that he would have been unable to uncover the fraud through a reasonable investigation. *E.g.*, *Mullen v. GLV, Inc.*, 488 F. Supp. 3d 695, 709 (N.D. Ill. 2020) ("Reliance is justifiable if the plaintiff 'could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection.'" (quoting *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 40 N.E.3d 264, 274 (Ill. App. Ct. 2015))).

Overall, the record precludes this Court from ruling as a matter of law that McKinney unreasonably relied on Panico and Palmieri's representations regarding how they would use his money. And because Defendants have failed to show that there is insufficient evidence supporting either the false statement or reliance elements, Plaintiff's fraud claims may proceed.

**II. Breach of Fiduciary Duty**

Next, Panico and Palmieri seek summary judgment as to the breach of fiduciary duty claims brought against only them. "To establish a breach of fiduciary duty in Illinois, a plaintiff must show: (1) that a fiduciary duty exists; (2) that the duty was breached; and (3) injury proximately caused by the breach." *Breedlove v. Museum of Sci. & Indus.*, No. 16 C 5861, 2017 WL 56641, at *1 (N.D. Ill. Jan. 5, 2017) (internal quotation marks omitted).

According to Panico and Palmieri, nothing in the record demonstrates that they owed a fiduciary duty to McKinney. The Court disagrees. A jury could find that the three had formed a partnership with respect to the real estate projects. *See nClosures Inc. v. Block & Co.*, 770 F.3d 598, 603 (7th Cir. 2014) ("The Illinois Uniform Partnership Act defines a partnership as 'the association of 2 or more persons to carry on as co-owners of a business for profit.'" (quoting 805 ILCS 206/202(a))). Alternatively, a jury could conclude that each project constituted a joint venture. *See Powell v. Dean Foods Co.*, 7 N.E.3d 675, 698 (Ill. App. Ct. 2013) ("A joint venture is defined as an association of two or more persons to carry out a single enterprise for profit." (internal quotation marks omitted)). And a fiduciary relationship exists between partners in either a partnership or a joint venture. *nClosures*, 770 F.3d at 603. Because there is evidence of a fiduciary relationship between McKinney and both Panico and Palmieri, the Court denies Panico and Palmieri summary judgment on the breach of fiduciary duty claims.

### III. Breach of Contract

As discussed above, there is no evidence that McKinney entered into a written agreement with respect to the use of his money. And Panico and Palmieri both argue that the record is devoid of evidence of an enforceable agreement as to how McKinney's funds would be used. For that reason, they request that summary judgment should be entered in their favor on the breach of contract claims.

Despite the lack of any written instruments, Plaintiff contends that there is more than enough evidence to find that an enforceable oral contract governed McKinney's relationship with Panico and Palmieri. "Under Illinois law, oral agreements are enforceable 'so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement.'" *Toll Processing Servs., LLC v. Kastalon, Inc.*, 880 F.3d 820, 829 (7th Cir. 2018) (quoting *Bruzas v. Richardson*, 945 N.E.2d 1208, 1215 (Ill. App. Ct. 2011)). To be enforceable, the terms of the oral agreement must be "definite and certain." *Bruzas*, 945 N.E.2d at 1215.

Normally, "[t]he existence of an oral contract, its terms, and the intent of the parties are questions fact." *Kessebohmer Retail Merch. USA, Inc. v. Pete's Fresh Market 4700 Corp.*, 803 F. Supp. 3d 692, 699 (N.D. Ill. 2025). Thus, it suffices at the summary judgment stage that Plaintiff can point to evidence from which it can be reasonably inferred that there existed an agreement under which McKinney would provide funds for a particular real estate project and, in exchange, Panico and Palmieri agreed to give him either an ownership interest in the project or to repay his contributions. (PDRSAF ¶¶ 8–9.) That such an agreement existed can be inferred from the statements in the FDS Document treating McKinney's money as either a capital contribution or a loan. Similarly, the memo lines of many of McKinney's checks suggest that he intended his money to be used for specific project-related purposes. (*Id.* ¶ 10.) Such evidence tends to rebut Panico's claim that McKinney provided the money with no terms whatsoever. (PRPDSF ¶ 9.)

Accordingly, the Court must leave it "to the jury to decide what the terms of the contract were." *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 848 (7th Cir. 1998).[4]

**IV. Promissory Estoppel**

Pleaded in the alternative to the breach of contract claims, the SAC asserts claims for promissory estoppel against Panico and Palmieri. "To establish a claim for promissory estoppel a plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to [his] detriment." *Centro Medico Panamericano, Ltd. v. Laborers' Welfare Fund*, 33 N.E.3d 691, 694 (Ill. App. Ct. 2015).

Panico and Palmieri argue that they are entitled to summary judgment on Plaintiff's promissory estoppel claims because there is no evidence that they made an unambiguous promise to McKinney regarding the uses to which they would put his money. "For purposes of a promissory estoppel claim, a promise need not be express, but it must be unambiguous." *Karas v. Penn Mut. Life Ins. Co.*, No. 25 C 12678, 2026 WL 949010, at *3 (N.D. Ill. Apr. 8, 2026). Accordingly, an unambiguous promise "may be inferred from conduct and words." *First Nat'l Bank of Cicero v. Sylvester*, 554 N.E.2d 1063, 1070 (Ill. App. Ct. 1990). Here, a jury could reasonably infer from Panico and Palmieri's actions that they made an unambiguous promise to McKinney that his contributions would either give him an ownership interest in a particular

[4] The Court rejects Palmieri's contention that the lack of a written instrument means that Plaintiff's oral contract claims are barred under the statute of frauds. His argument relies on 740 ILCS 80/1, which provides that a defendant cannot be held liable for "any special promise to answer for the debt, default, or miscarriage of another person" if the promise is not in writing. However, that statute concerns suretyship agreements, *Rosewood Care Center, Inc. v. Caterpillar, Inc.*, 877 N.E.2d 1091, 1096 (Ill. 2007), and the alleged oral contract here does not constitute a surety contract.

project or be repaid. Accordingly, the Court denies summary judgment as to the promissory estoppel claims as well.

### V. Unjust Enrichment

The SAC also asserts claims for unjust enrichment against all Defendants in the alternative to the breach of contract claims. Under Illinois law, a plaintiff claiming unjust enrichment must establish that "the defendant has 'unjustly retained a benefit to the plaintiff's detriment' and . . . the defendant's 'retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Siegel v. Shell Oil Co.*, 656 F. Supp. 2d 825, 834 (N.D. Ill. 2009) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)). Defendants contend that there is no evidence that any of them retained McKinney's money to his detriment. But as discussed above, there is sufficient evidence tending to show that McKinney provided Defendants money either as an investment or loan for the real estate projects, but Panico and Palmieri instead diverted much of that money to their own benefit and, collectively, Defendants have retained over $25 million to this day. Accordingly, summary judgment must be denied as to the unjust enrichment claims.

### VI. Civil Conspiracy

Finally, Defendants contend that there is no evidence that they entered into a conspiratorial agreement and therefore the Court should grant summary judgment in their favor on the civil conspiracy claims. "Civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). To prevail on a civil conspiracy claim, a plaintiff must prove:

> (1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was

> performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act.

*Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053–54 (Ill. 2020).

As alleged in the SAC, the civil conspiracy claims are predicated on Plaintiff's claims of fraud. *See Siegel*, 656 F. Supp. 2d at 836 ("[T]here must be an independent cause of action underlying a plaintiff's conspiracy claims."). To prove an agreement among Defendants to defraud McKinney, there must be evidence showing that each Defendant understood "the general objectives of the conspiratorial scheme, accept[ed] them, and agree[d], either explicitly or implicitly to do its part to further those objectives." *Linkepic*, 370 F. Supp. 3d at 925. The Court has already noted above the evidence reflecting how Panico and Palmieri worked in tandem. Moreover, each of the Defendant entities was controlled by one or both of Panico and Palmieri. (PDRSAF ¶¶ 2, 60, 64, 69, 72.) Plaintiff has adduced evidence tending to show ways in which Panico and Palmieri involved the Defendant entities in the scheme. For example, Panico used his affiliated entities to purchase property for the underlying real estate projects. (PDRSAF ¶¶ 25, 35, 51–52; PRPTSF ¶¶ 30–31.) In addition, Panico usually had McKinney make out his checks to Defendants AP Capital and FPH LLC. (PDRSAF ¶¶ 5–6, 10; PRPTSF ¶¶ 53–54, 56, 74.) And Plaintiff can point to his expert's opinions about how McKinney's funds were often routed through one or more of the Defendant entities as part of Panico and Palmieri's effort to conceal their wrongdoing. (PDRSAF ¶¶ 1, 67.)

Together, there is enough evidence to "raise the inference of mutual understanding (*i.e.*, the acts performed by members of a conspiracy are unlikely to have been undertaken without an agreement)." *Linkepic*, 370 F. Supp. 3d at 926 (quoting *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000)). Because there is a jury question as to the existence of an agreement

among Defendants to defraud McKinney, summary judgment is not warranted with respect to the civil conspiracy claims.

**VII. Post Time's Liability**

Even if Plaintiff's claims may proceed as to the other Defendants, Post Time contends that it is nonetheless entitled to summary judgment because Plaintiff has no evidence supporting Post Time's liability as to any of the claims asserted against it (including the fraudulent transfer claim brought against only Post Time). According to Post Time, the record shows only that McKinney provided money for the purpose of acquiring and renovating the building that was to become the Bar and Grille. However, a different entity, Sports Bar Properties, was responsible for buying and developing the property for the Bar and Grille. By contrast, Post Time was responsible only for the operations of the establishment. According to Post Time, because none of McKinney's money can be traced to operations-related uses, Plaintiff has no fraud claim against it.

At bottom, Post Time's argument for summary judgment hinges on its contention that it did not receive any of McKinney's money. But Plaintiff's expert says he was able to trace $77,834 of McKinney's funds from Panico, via AP Capital, to bank accounts in Post Time's name. (PTRSAF ¶ 71.) Without offering any basis to exclude the testimony of Plaintiff's expert, Post Time argues that the Court should doubt the accuracy of his conclusion that a portion of McKinney's money ended up in Post Time's bank account. But in challenging the credibility of Plaintiff's expert, Post Time simply confirms that the matter is one that must be resolved by the jury. *E.g.*, *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) ("The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." (internal quotation marks omitted)). For purposes of summary judgment,

Plaintiff's evidence that Post Time received some of McKinney's money suffices to create an issue of fact as to Post Time's liability with respect to each of the claims asserted against it.

**CONCLUSION**

For the foregoing reasons, Panico Defendants, Palmieri, and Post Time's motions for summary judgment (Dkt. Nos. 198, 202, 205) are denied.

ENTERED:

Dated: September 15, 2026

______________________________
Andrea R. Wood
United States District Judge